No. 23-3332

IN THE

# United States Court of Appeals
### FOR THE SIXTH CIRCUIT

APOGEE COAL COMPANY, *et al.*,

*Petitioners,*

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR, *et al.*,
*Respondents.*

ON PETITION FOR REVIEW OF A DECISION
AND ORDER OF THE BENEFITS REVIEW BOARD,
UNITED STATES DEPARTMENT OF LABOR

## PETITIONERS' CORRECTED OPENING BRIEF

Mark E. Solomons, Esq.
Dominic E. Draye, Esq.
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
(202) 533-2361
(202) 331-3168
solomonsm@gtlaw.com
drayed@gtlaw.com
Counsel for Arch Resource

## TABLE OF CONTENTS

Page

REQUEST FOR ORAL ARGUMENT ................................................................. 1

JURISDICTIONAL STATEMENT ..................................................................... 1

ISSUES PRESENTED........................................................................................ 2

STATEMENT OF THE CASE ............................................................................ 2

SUMMARY OF ARGUMENT .......................................................................... 11

Argument........................................................................................................... 14

Conclusion......................................................................................................... 38

CERTIFICATE OF COMPLIANCE.................................................................. 39

CERTIFICATE OF SERVICE........................................................................... 1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. Hobet,*
    No. B7MHB-2015029.................................................................31

*Anderson v. Kissam,*
    28 F. 900 (C.C.S.D.N.Y. 1886)....................................................37

*Arch Coal, Inc. v. Acosta,*
    888 F.3d 493 (D.C. Cir. 2018) ..............................................14, 41

*Arch Coal, Inc. v. Acosta,*
    888 F.3d 498 (D.C. Cir. 2018) ...............................20, 35, 36, 42

*Arch Coal, Inc. v. Perez,*
    No. 16-cv-00669-JDB (D.D.C. 2016) ........................................12

*Arch Coal v. Acosta,*
    No. 17-5074..................................................................13, 41

*Arch Coal v. Hugler,*
    242 F. Supp. 3d 13 (D.D.C. 2017) .....................................passim

*Arlington v. FCC,*
    569 U.S. 290 (2013).....................................................................39

*Bowen v. G'Town Univ. Hosp.,*
    488 U.S. 204 (1998)..............................................................28, 32

*Browning v. Arch of Ky,*
    No. 2017-BLA-05005 ..................................................................44

*Caperton v. A.T. Massey Coal,*
    556 U.S. 868 (2009).....................................................................43

*Carllson v. United States Citizenship and Immigration Servs.*
    No. 12-cv-7983, 2015 WL 1467174 (C.D. Cal. March 23, 2015)
    (unpub.) ......................................................................................38

*Chadmoore Commc'ns v. FCC,*
    113 F.3d 235 (D.C. Cir. 1997) ....................................................32

*Chapman v. Apogee Coal,*
    Case ID: 2BS5B-2018187.............................................................41

*Chevron v. NRDC*,
467 U.S. 837 (1984)......................................................................34

*Chitwood v. Arch of Ky*,
2017-BLA-05097..........................................................................44

*Clark v. Barnwell Coal Co.*,
22 BLR 1-275 (2000)....................................................................44

*Cochran v. SEC*,
20 F. 4th 194 (5th Cir. 2021), *affirmed sub nom Axon v. FCC* .......................42

*Combs v. Commr. of Soc. Sec.*,
459 F.3d 640 (6th Cir. 2006)...............................................................28

*Crabtree v. Bethlehem Steel Corp.*,
7 BLR 1-354 (1984)......................................................................44

*Crowell v. Benson*,
285 U.S. 22 (1932)..........................................................33, 34, 40

*Deskins v. Hobet*,
Case ID: BJJTW-2018096 ...........................................................41

*Dingess v. Director, OWCP*,
12 BLR 1-141 (1989).....................................................................40

*Director, OWCP v. Greenwich Collieries*,
512 U.S. 267 (1994).......................................................................34

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016)....................................................18, 28, 32

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)......................................................................28

*Fox v. United States*,
88 M.S.P.R. 381 (2001) ...............................................................38

*Harvard College v. Zurich American Insur. Co.*,
No. 22-1938,__ F.4th __, slip op. 7-8, 10-11 (1st Cir. Aug. 9,
2023) .............................................................................................passim

*United States ex rel. Hobbs v. Medquest Assocs., Inc.*,
711 F.3d 707 (6th Cir. 2013)...........................................................23

*Inter-Tel Technologies, Inc. v. Linn Station Properties, LLC*,
360 S.W.3d 152 (Ky. 2012) ...........................................................22

*Investment Company Inst. v. Camp*,
　401 U.S. 617 (1971)..................................................................32

*Ison v. Arch of KY*,
　Case ID: BGXMS-2017062 ......................................................41

*Kisor v. Willkie*,
　139 S. Ct. 2400, 2417 (2019) ..........................................33, 34

*Merritt v. Catholic Health Initiatives*,
　612 S.W.3d 822 (Ky. 2020) ....................................................23

*Montgomery Cnty. v. FCC*,
　863 F.3d 485 (6th Cir. 2017)..................................................32

*National Mining Association v. DOL*,
　292 F.3d 849 (D.C. Cir. 2002) .........................................28, 32

*NLRB v. S.W. General Inc.*,
　580 U.S. 288 (2017)................................................................35

*Olivares v. Transport. Sec. Admin.*,
　819 F.3d 454 (D.C. Cir. 2016) ...............................................38

*In re: Patriot Coal*,
　No. 15-32450 (Bankr. E.D. Va. 2015).....................................10

*PHH Corp. v. Consumer Financial Protection Bureau*,
　839 F.3d 1 (D.C. Cir. 2016) ....................................................32

*Saginaw Chippewa Indian Tribe v. Blue Cross*,
　32 F.4th 548 (6th Cir. 2022)...................................................27

*SEC v. Chenery Corp.*,
　318 U.S. 80 (1943).................................................................22

*Sierra Club v. EPA*,
　___F.4th ___, No. 21-3057 (6th Cir. Feb. 10, 2023) ...................30

*Smalley v. Comm'r of Soc. Sec.*,
　No. 20-1865 (6th Cir. Sep. 3, 2021) .......................................26

*Sturgill v. Apogee Coal Co.*,
　Case ID: 2B85Z-2018086 .......................................................41

*Thunder Basin Coal Company v. Reich*,
　510 U.S. 200 (1994)..........................................................12, 20

*United States v. Al-Maliki*,
    787 F.3d 784 (6th Cir. 2015)............................................................23

*United States v. Ins. Co. of N. America*,
    131 F.3d 1037 (D.C. Cir. 1997) ..................................................24

*United States v. Insurance Co. of N. Am.*,
    131 F.2d. 1037 (D.C. Cir. 1997) ..................................................29

*United States v. Insurance Co. of N. Am.*,
    83 F.2d 1507 (D.C. Cir. 1996) ......................................................29

*Util. Air Reg. Grp. v. EPA*,
    573 U.S. 302 (2014)........................................................................45

*Warner Coal Co. v. Director, OWCP*,
    804 F.2d 346 (6th Cir. 1986)..............................................43, 45

*Wilson v. Comm'r of Soc. Sec.*,
    378 F.3d 541 (6th Cir. 2004)........................................................26

**Statutes**

5 U.S.C. §§ 554-56 .............................................................................34

5 U.S.C. § 706 ....................................................................................27

5 U.S.C. § 706(2) ...............................................................................23

26 U.S.C.§ 9501..................................................................................10

30 U.S.C. § 901-945 .............................................................................6

30 U.S.C. § 932(i)(1) ..........................................................................22

30 U.S.C. § 932(i)(3) .............................................................................9

30 U.S.C. § 932(a) ...........................................................6, 33, 34, 40

30 U.S.C. § 933 ...................................................................................11

33 U.S.C. §§ 901 through 945.............................................................33

33 U.S.C § 919(d)..................................................................33, 34, 40

33 U.S.C. § 921(b) .................................................................................6

33 U.S.C. § 921(c) .................................................................................6

33 U.S.C. § 923 ...................................................................................33

33 U.S.C. § 927(a) .......................................................................34, 40

Black Lung Benefits Act ............................................................................passim

Longshore Act, 33 U.S.C. §§ 918 through 921, and 939 ................................passim

**Other Authorities**

20 C.F.R. Part 726, Subpart B ................................................................................24

20 C.F.R. § 710 ..........................................................................................................19

20 C.F.R. §§ 725.351 ..............................................................................................14

20 C.F.R. § 725.407 ..................................................................................................44

20 C.F.R. § 725.408 ..................................................................................................20

20 C.F.R. §§ 725.410 ................................................................................................41

20 C.F.R. § 725.418 ....................................................................................11, 43, 44

20 C.F.R. § 725.450 ..................................................................................................40

20 C.F.R. § 726.101 ..........................................................................................25, 27

20 C.F.R. § 726.102 ..........................................................................9, 24, 25, 27

20 C.F.R. § 726.203 ....................................................................19, 24, 27, 29

Black's Law Dictionary 602 (7th ed. 1999) ........................................................27

## REQUEST FOR ORAL ARGUMENT

Given the complex and important issues of administrative law and insurance law raised in this appeal, Arch believes that the Court would benefit from the give-and-take of oral argument.

## JURISDICTIONAL STATEMENT

Apogee Coal Co. ("Apogee") and Arch Resources ("Arch") appeal from an award of benefits under the Black Lung Benefits Act ("BLBA"), 30 U.S.C. §§ 901-945.

A Department of Labor ("DOL" or the "Department") Administrative Law Judge ("ALJ") issued the decision and order on February 25, 2020, which is the subject of this appeal. Joint Appendix ("J.A.") at 109. Arch filed an appeal from that decision to DOL's Benefits Review Board ("Board") within thirty days. A.R. at 186-188. The appeal was timely, giving the Board jurisdiction under 33 U.S.C. § 921(b), *incorporated by reference into* the Black Lung Benefits Act, 30 U.S.C. § 932(a). On October 18, 2022, the Board affirmed the ALJ's decision and on February 17, 2023, denied Arch's motion for reconsideration. A. R. at 1, 25. Arch filed a timely petition for review which this Court received on April 18, 2023. J.A. at 282. The appeal was filed within the sixty-day period permitted for appeal under 33 U.S.C. § 921(c). The miner in this case, David Howard, last worked in the Commonwealth of Kentucky.

These facts establish this Court's appellate and subject matter jurisdiction.

# ISSUES PRESENTED

1. May the Department of Labor violate its own regulations by failing to dismiss a potentially liable mine operator that the Department failed to name in a necessary filing where doing so necessitated a retroactive change in policy that conflicts with corporate law, insurance principles, and past practice?

2. Are the regulations relied on to deny Arch basic discovery rights invalid under the Black Lung Benefits Act, the Longshore Act, and incorporated provisions of the Administrative Procedure Act ("APA")?

3. Is DOL's re-interpretation of its evidentiary and discovery rules to deprive Arch of fundamental rights to conduct normal discovery arbitrary and capricious in violation of the APA?

# STATEMENT OF THE CASE

## A. Medical Eligibility

David Howard worked as an underground coal miner for seventeen years from 1978 to February 27, 1997. Dx. 3, Dx. 44. He filed this claim for benefits in November 2014 and, ultimately, in February 2020, ALJ Lauren Boucher awarded benefits. J.A. at 121, 134. The Board affirmed the award. A.R. at 25.

This appeal does not dispute Howard's eligibility. It instead challenges DOL's determination to hold Arch liable for Howard's claim as somehow "self-insuring" a different company that declared bankruptcy. Whether or not Arch prevails, Howard will continue to receive Black Lung benefits. The only question is who pays: Arch or the federal Black Lung Disability Trust Fund ("Trust Fund") created by Congress and funded by mining operations for this very purpose.

## B. Liability Proceedings Below

David Howard was employed by Apogee until 1997. Though the agency never produced an instrument establishing as much, it avers that Apogee was self-insured by Arch during Howard's employment.

On January 1, 2006, Arch sold the assets and federal black lung liabilities of three subsidiaries (Hobet Mining, Catenary Coal, and Apogee Coal) to Magnum Coal Company ("Magnum"). Add. at 104. On January 5, 2006, Arch wrote to DOL

informing it of the sale of its subsidiaries to Magnum and identified the companies sold, including Apogee. *Id.* at 395.[1]  In the letter, Arch informed DOL that Magnum had assumed all of the black lung liability of the sold subsidiaries "whenever created," and as result of that transaction, "your records should be changed to reflect that Arch Coal Inc. is no longer responsible for black lung claims arising out of employment with these three former subsidiaries, and that Magnum Coal is now the parent company responsible for all liability, past, present and future." *Id.*  That notice is consistent with Arch's obligation as a DOL-approved self-insurer. *See, e.g,* 20 C.F.R. § 726.102(b)(3) (requiring self-insurers to list covered mines).

The Department never at the time denied that Arch had no further liability for any new claims filed against Apogee. Arch had no reason to believe it had any obligation to insure these claims. *See* 30 U.S.C. § 932 (i)(3).  Magnum purchased a commercial insurance policy for the period during which it was liable for the claims of Apogee, Hobet, and Catenary miners and for claims filed during the period of Magnum's ownership. The Department never reversed course by attempting to hold Arch liable.  Magnum's commercial insurer paid all of the federal black lung claims of Arch's former subsidiaries from 2006 to 2008.

In 2008 Patriot Coal Company ("Patriot") purchased Magnum including all of its assets and liabilities.  Add. at 105.  In March 2011, DOL authorized Patriot to self-insure all black lung liabilities, past, present and future, including this claim.  Add. at 106.  From 2008 until its bankruptcy, Patriot paid all of Apogee's federal black lung claims.

---

[1]Many of the secondary sources relied upon are in the public record. The documents are collected in an Addendum filed with this brief and referred to as "Add." For documents not in public sources, Arch proffers them because in most instances, the evidence was submitted to the ALJ but excluded. Arch has asked the Court to allow this filing of the Addendum by Motion filed with this Brief.

In November 2014, when David Howard filed for benefits, the district director named Apogee as the responsible operator and Patriot as its self-insurer. Dx. 2, Dx. 21. Patriot responded to the notice of claim and agreed that it was a proper party. Dx. 23. After considering the evidence presented by Patriot, the claimant, and other parties including Arch, the district director named Patriot as the responsible party in its Proposed Decision and Order ("PDO"). Arch was not listed. *Id.*

In October 2015, Patriot went bankrupt. *See In re: Patriot Coal*, No. 15-32450 (Bankr. E.D. Va. 2015). Patriot's self-insurance assets were ceded to DOL and Patriot was dissolved. *Id.* There is no question that the assets were insufficient to cover Patriot's federal black lung liabilities. That shortfall brought scrutiny of DOL's diligence, *vel non*, in requiring adequate financial assurance from Patriot. *See* Government Accountability Office, Black Lung Benefits Program: Improved Oversight of Coal Mine Operator Insurance Is Needed (GAO-2021, Feb. 2020)(Add. at 190).[2] When these assets had dried up, responsibility should have shifted to the Black Lung Disability Trust Fund by law. 26 U.S.C.§ 9501.

In November 2015, DOL published Bulletin 16-01.[3] *Id.* at 385. The Bulletin retroactively imposed liability on Arch as the self-insurer of former subsidiaries that later became part of Patriot. *Id.* The mechanism for this change was using the claimant's last date of work to assign liability—the standard "trigger" for commercial insurance—rather than the date on which the claim was filed—the "trigger" approach for self-insurance. *Id.* It changed the procedures for identifying a liable party previously entered into DOL's computer instructions to the District Director's claims staff. *Id. at* 5, 312. It is beyond dispute that after Arch notified DOL in 2006 that it would no longer cover Apogee's black lung claims, a DOL

[2] *Available at* [Black Lung Benefits Program: Improved Oversight of Coal Mine Operator Insurance Is Needed | U.S. GAO](#)
[3] *Available at* [BL16.01OCR.pdf (dol.gov)](#)

senior insurance manager created a computer-generated instruction to all claims examiners that Arch was not liable for Apogee. Add. at 7, 395.

Consistent with the Bulletin, however, on December 8, 2015, the district director issued a second Notice of Claim that, for the first time, named Arch as the responsible insurer for this claim.  Dx. 22.

DOL relied exclusively on Bulletin 16-01 to impose Arch's liability. Although this would have been an insured liability under the BLBA 30 U.S.C. § 933,  DOL presented nothing at all to document Arch's liability for this or any Apogee claims. No self-insurance agreement or other document establishing Arch's liability was submitted to support the Bulletin's say-so.  DOL never presented any contract or regulatory filing supporting the notion that Arch continued to self-insure Apogee after selling it to Magnum.   J.A. at 319, 329, 350.

Then, on September 26, 2016, the district director issued a final PDO and named Apogee—not Arch—as the responsible operator and Patriot—not Arch—as the responsible self-insurer.  Dx. 44 at 11 (J.A. at 350). The ALJ, however, concluded that Arch was liable under Bulletin 16-01 and disregarded the PDO's contrary conclusion that Patriot was liable as a "typographical error."  J.A. at 366. The ALJ thereby further excused a failure to dismiss Arch as required by regulation. 20 C.F.R. § 725.418(d). The ALJ declined to permit Arch to conduct discovery and simply agreed with the Department's lawyers that Arch was liable for a claim that it never insured and never agreed to pay.  J.A. at 49-51, 136-138.

## C.  The *Acosta* Litigation

After the Bulletin issued, Arch grew concerned about the Department's change of course with retroactive effect and filed a four-count complaint in federal court to challenge Bulletin 16-01 and its changed policy.  *Arch Coal, Inc. v. Perez*, No. 16-cv-00669-JDB (D.D.C. 2016).   In the Complaint, Arch charged that the Bulletin was a *de facto* legislative rule that required notice-and-comment

rulemaking, that the Bulletin imposed "a new regime of joint and several liability" on companies "that transferred all such liability to successor corporations," that the Bulletin's policy was impermissibly retroactive, imposing "new liability on long closed transactions," that the Bulletin was arbitrary and capricious, irrational, and inconsistent with the BLBA's treatment of successor owners and the agency's past practice, and that the Bulletin impermissibly absolved the Department from the consequences of its failure to monitor and apply Patriot's self-insurance assets. *Id.*

The government moved to dismiss arguing that Arch's challenge to the Bulletin was the type of challenge committed to the administrative process rather than the federal district court and that that the Bulletin was not final agency action.

In March 2017, the district court dismissed Arch's challenges to the Bulletin for want of subject matter jurisdiction, relying principally on *Thunder Basin Coal Company v. Reich*, 510 U.S. 200 (1994). *Arch Coal v. Hugler*, 242 F. Supp. 3d 13, 15 (D.D.C. 2017). The Court stated that "Arch Coal's challenge here to the Bulletin is neither 'wholly collateral to the statute's review' provisions' nor 'outside the agency's expertise…Arch Coal's challenge, then, goes to the core of the issue that the administrative review process is designed to determine." *Id.* at 20–21 (Add. at 327-328). The court thus concluded that Arch's challenge to the Bulletin's allegedly "impermissibly retroactive effect" and "imposition of new and unanticipated liabilities on Arch Coal" must be "first heard by the Department." *Id.* at 23 (Add. at 327-328). And "[a]lthough the hearing procedures do not envision discovery of the type that occurs in the district court, parties may take depositions or interrogatories." *Id.* The district court thus concluded that "there is no reason why Arch Coal could not receive meaningful relief…through the Department's administrative process." *Id.* at 24 (Add. at 330). The district court additionally noted that Arch's administrative and constitutional claims could be presented to the courts after exhausting the agency process: "once Arch Coal reaches the Court of Appeals

it will have the benefit of a full Administrative Record which will provide the evidence of the issues raised." *Hugler,* 292 F. Supp. 3d at 23.

Arch appealed. The government defended the district court's ruling, assuring the appellate court that "Arch may raise all of its challenges to the bulletin in any adjudication" and "there is no reason why Arch cannot obtain meaningful review of its challenge through the statutory review process." Add. at 438 (Answering Brief for Federal Defendants, *Arch Coal v. Acosta*, No. 17-5074, at *25). Arch argued that experience had taught it that DOL would not, in fact, afford it discovery to develop its claims during the administrative proceedings. Second, Arch believed it would be very difficult to achieve a fair opportunity to litigate a complex statutory issue in hundreds of Patriot cases, many of which also involved non-germane issues of a claimant's entitlement. The D.C. Circuit was concerned and ordered additional briefing. In its Letter Brief of Jan. 16, 2018, DOL represented the following:

> There are no statutes or regulations that generally prohibit Arch from receiving discovery or specifically prohibit Arch from receiving discovery on particular arguments that it may raise. If a district director wrongfully denies Arch discovery, an administrative law judge (ALJ) can order that such discovery be provided, and the ALJ's decision can be reviewed by the Benefits Review Board and by the court of appeals.

Add. at 316. Regarding "[d]iscovery in Ongoing Administrative Proceedings Concerning the Department's Bulletin," the government guaranteed that "Arch can seek discovery from the Department on issues related to its liability, including on its claims that Patriot Coal ought to be held liable instead of Arch (or if Patriot is incapable of assuming liability, that the Black Lung Disability Trust Fund should pay benefits."). *Id.* at 320.

On April 27, 2018, the D.C. Circuit affirmed the district court's dismissal for lack of jurisdiction, concluding that Arch must first present its four-count Bulletin challenge to the Department. *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 499-500 (D.C. Cir. 2018). The Court, however, emphasized that "Arch is entitled to reasonable

discovery before the Department" to advance its challenge.  *Id*. at 502.  The court characterized Arch's concern that "the Department will not afford it adequate discovery to develop its claims during the administrative proceedings" as "premature," taking comfort in ALJs' ability to "compel the production of documents and appearance of witnesses by the issuance of subpoenas" subject to Board oversight and the government's assurance of the same. *Id*. (citing 20 C.F.R. §§ 725.351 and 802.301(a)).  It concluded: "[t]he simple point here is that Arch's challenges to the Bulletin are the exact sort of claims" falling within the agency's authority and expertise and that Arch "will be able to raise its objections to the Bulletin and any enforcement actions taken against it during the course of the administrative process."  *Id*. at 501.

In April 2018, the claim then returned to the Office of Administrative Law Judges.

### D. Discovery in this Case and the Evidence-Limiting Regulations

While the federal court litigation was underway in 2016 and 2017, this claim proceeded to a hearing before ALJ Scott Morris. In August 2017, prior to the scheduled October 2017 hearing, Arch filed a Motion for Abeyance, and/or Bifurcation requesting that the ALJ hold the proceedings in abeyance because the D.C. Circuit was considering the question whether the ALJ or the federal district court has jurisdiction to decide Arch's liability for black lung claims initially brought against Patriot, as well as its four-count challenge to the Bulletin. J.A. at 1.  In the alternative, Arch requested that the ALJ bifurcate the proceedings and only address the merits of Mr. Howard's entitlement.  *Id.*  Simultaneously, Arch also filed a motion to extend the evidentiary deadlines to permit Arch to submit evidence addressing whether Arch was a proper party.  DOL opposed all these requests, and the ALJ denied them all.  *Id.* at 8.

When the case returned to ALJ Boucher post-*Acosta* (ALJ Morris had not been constitutionally appointed), Arch requested subpoenas for two DOL employees and served discovery requests for paper and electronic documents aimed at proving the Bulletin's retroactive and arbitrary departure from established self-insurance principles. J.A. at 28, 39. Relying on a new interpretation of its evidence-limiting regulations, DOL argued that the request was untimely. *Id.* at 61. The regulations that the Director cited require a responsible operator—not a self-insurer—to identify witnesses and produce evidence addressing "the liability of a potentially liable operator or the designated responsible operator" in proceedings before the district director. 20 C.F.R. §§ 725.414(c), 725.414(d) ("no documentary evidence pertaining to liability shall be admitted in any further proceeding conducted with respect to a claim unless it is submitted to the district director in accordance with this section."); *id.* at § 725.457(c) (stating that no person shall be permitted to testify regarding *the liability of the responsible operator* absent extraordinary circumstances unless the witness was identified when the claim was pending before the district director)(emphasis added); *id.* at § 725.456(b)(1) ("Documentary evidence pertaining to *the liability of a potentially liable operator and/or the identification of a responsible operator* which was not submitted to the district director shall not be admitted into the hearing record in the absence of extraordinary circumstances.") (emphasis added). This exclusionary rule was not revealed to the D.C. Circuit by DOL even though according to the Department's interpretation of it the deadline for the submission of evidence had already passed in over 100 cases.

The ALJ, however, agreed with the Department, denying all requests for discovery as untimely and finding that the extraordinary circumstances did not exist. J.A. at 49-51.[4]

### E. Rulings Presented for Review

Arch challenges DOL's interpretation of its evidence-limiting regulations resulting in denial of its request for subpoenas, the failure of DOL to respond to written discovery and the ALJ's exclusion of proffered liability evidence (Ex. 12-17, Ex. 19-21), J.A. at 49. Arch also challenges the order denying Arch's request for subpoenas and written discovery dated May 28, 2019 and June 17, 2019. It also challenges the ALJ's exclusion of its proffered liability evidence at the hearing, as well as the ALJ's and Board's refusal to entertain Arch's challenges to the agency's interpretation of the evidence-limiting regulations, which require that discovery be conducted before district director employees incapable of overseeing that process.

Arch also challenges the ALJ's findings in the February 25, 2020 Decision and Order awarding benefits and finding Arch liable. J.A. at 135-141. The ALJ ignored Arch's challenge to the Bulletin and new interpretations of the regulations entirely, stating only that "to defeat liability, Employer must establish either that Apogee was not the last potentially liable operator to employ Claimant, or that Apogee is not financially capable of paying benefits." *Id.* at 139. She noted that "[t]he fact that Apogee is no longer in operation does not affect this analysis" because "[a]n operator may still be liable for payment of benefits as long as the operator meets the conditions set forth in 725.494" and "whether Arch meets the regulatory definition of operator at 725.491 is irrelevant." *Id.* at 139-140. She cited regulations governing the admission of evidence by operators, but not self-insurers

---

[4] In objecting to these proposed regulations, among others, the Chief ALJ at the Department of Labor submitted comments stating that the extraordinary circumstances standard was extreme and never met. Add. at 327.

or carriers, for support. *Id*. at 138 n. 19; *but see id*. at 141 ("Arch bears liability for this claim as Apogee's self-insurer, not as the responsible operator."). She concluded that "the self-insurance regulations simply do not govern the imposition of liability" and "[e]ven if Employer's assertions about general principles of corporate and insurance law are correct, black lung liabilities are very specifically regulated, and I am bound to apply those regulations." *Id*. at 141.

## SUMMARY OF ARGUMENT

Over many years, the Department of Labor failed to require adequate financial security for Patriot Coal Corporation's self-insurance program under the BLBA. When Patriot declared bankruptcy in 2015, the Department quickly exhausted the company's bonds and began referring claims to the Trust Fund as statutorily required. As claims against Patriot continue to roll in, the Department began trying to shift liability from the Trust Fund to other companies. This case extends that strategy too far.

The central question presented here is whether Arch Resources' black lung self-insurance program, approved by DOL, covered Patriot's claims based on the regulations and the agency's prior practice, which embraced corporate law and insurance principles and recognized that claims triggers for commercial insurers cannot rationally apply to self-insurers like Arch.

**1.** For all the Department's discussion about how Arch ***could have been*** liable as an operator, that is not the basis for liability endorsed by the ALJ and affirmed by the Board: "Arch bears responsibility for this claim *as Apogee's self-insurer*, not as the responsible operator." J.A. at 139-140 (emphasis original); *see also* A.R. at 25-47. In other words, this is an insurance coverage case. And Arch ceased self-insuring claims against Apogee when it sold Apogee—*i.e.,* when Apogee was no longer part of Arch's "self." At that time, Patriot, the acquiring company, took over

self-insuring Apogee—all with the Department's knowledge, as demonstrated in numerous public filings.

The Department violates the APA by disregarding the sale of Apogee. For starters, the Department has long respected the sale of subsidiary businesses and the fact that a former owner is no longer a self-insurer for a business unit that is now part of another company. Changing that approach requires reasoned decision-making. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Additionally, the Department's new approach is contrary to existing regulations that distinguish between commercial insurance and self-insurance. The former is triggered by the date a claim arises (*i.e.,* the miner's last day of work), while the latter depends on the date when a claimant files for compensation. *See* 20 C.F.R. § 726.203 (Federal Endorsement for all insurance policies rely on last day of work trigger); 20 C.F.R. § 710(a)(1)(self-insurer agrees to pay benefits "when due, as required by the Act"). A sister circuit recently appreciated these differences, observing that litigants may not "impermissibly collapse the critical distinction…between occurrence based" policies like self-insurance and "claims-made policies" that apply "regardless of when the event or act that instigated the claim occurred." *See Harvard College v. Zurich American Insur. Co.,* No. 22-1938,__ F.4th __, slip op. 7-8, 10-11 (1st Cir. Aug. 9, 2023).

The Department attempts to elide this distinction by importing concepts from operator liability—a "potentially responsible operator" includes the claimant's employer on his last day of work. Compare Part 726, Subpart B (§§ 726.101–726.115) (self-insurance) *with* Subpart C (§§ 726.201–726.113) (commercial insurance). But the ALJ and Board expressly eschewed operator liability for Arch in favor of liability as an insurer: "Arch bears responsibility for this claim *as Apogee's self-insurer*, not as the responsible operator." J.A. at 139-140.

Viewed as an insurance issue, the Department's approach is an unexplained departure from previous practice and contrary to its own existing insurance regulations and established self-insurance principles.

**2.** The Department's attempt to cut off any argument around whether Arch is Apogee's insurer offends both the APA and the Due Process Clause. The Department attempts to shift liability to Arch based on Arch being a permanent "self-insurer" of Apogee, while also preventing Arch from litigating the many improprieties in that maneuver. It does so by asserting that Arch was obliged to introduce additional evidence of a changed regulatory approach. Though additional evidence is unnecessary, Arch is happy to oblige, but the Department then moves the goal posts and argues that it is too late because Arch was obliged to produce evidence of insurance coverage before the district director, even though the Department's own regulations specify that the district director can receive evidence only on five factors related to identifying the responsible operator. 20 C.F.R. § 725.408(a)(2)(i)-(v).

This strategy is especially disingenuous in light of litigation between Arch and the Department in the District of Columbia federal courts, in which the Department assured the district court and the D.C. Circuit that Arch would have a full opportunity to litigate before the agency. *Arch Coal, Inc. v. Acosta*, 888 F.3d 498 (D.C. Cir. 2018); *Arch Coal, Inc. v. Hugler*, 242 F.Supp.3d 13 (D.D.C. 2017). With those assurances, the Department convinced the D.C. courts that Arch's insurance argument must be brought before the agency in the first instance under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). This Court is certainly free to disagree with the D.C. Circuit, in which case Arch will promptly file suit to enjoin the Department's insurance gambit in federal district court. Alternatively, if the D.C. Circuit is correct in its application of *Thunder Basin*, then the evidence-limiting regulations cannot prevent Arch from bringing evidence of a regulatory change

before the ALJ. The current posture, in which Arch can neither sue in district court nor present evidence related to insurance coverage before the agency, is arbitrary and capricious, foreclosed by judicial estoppel, and unconstitutional.

**3.** The Department's hyper-technical but wrong-on-its-face application of its evidence-limiting regulations is also concerning because in the Proposed Decision and Order its own regulations require, the Department named a different company—not Arch—as liable. A strict reading of the regulations demands that the Department "must dismiss" Arch.

All told, this Court should vacate the decision of the Benefits Review Board and remand for assignment of this claim to the Trust Fund.

## ARGUMENT

I.  **The Department Improperly Required Arch to Insure Claims Made Against Patriot's Subsidiary, Apogee, by Changing a Fifty-Year-Old Policy Retroactively and in violation of Corporate and Insurance Law Principles and the Regulations.**

The ALJ concluded that Arch should be responsible for *self*-insuring a *different* business. That reasoning ignores corporate form, rewrites the record of DOL approving Patriot's self-insurance of Apogee, and departs from prior practice without reasoned decision-making. This Court should reject the Department's attempt to hold Arch responsible—as an insurer rather than an operator—for the liabilities of Patriot's subsidiary.

### *A. The ALJ and Board Unlawfully Ignored Corporate Separateness.*

Arch sold Apogee on January 1, 2006. Four days later, it wrote to the Department informing it that Apogee's assets and black lung liabilities now belonged to Magnum. Add. at 404. Had Magnum not assumed Apogee's liabilities, the purchase price would have been millions of dollars higher. In the absence of any reason to disregard the transaction or "pierce the corporate veil" under state law, the Department cannot require Arch to self-insure a different company.

Arch's sale of Apogee was not a secret. Arch's letter to the Department on January 5, 2006 summarized the deal: Magnum assumed Apogee's BLBA liabilities "whenever created." Add. at 395. As a result, Arch advised that DOL's "records should be changed to reflect that Arch Coal Inc. is no longer responsible for black lung claims arising out of employment with these three former subsidiaries, and that Magnum Coal is now the parent company responsible for all liability, past, present and future . . . ." *Id.* As expected, Magnum paid all of the federal black lung claims of Arch's former subsidiaries from 2006 to 2008. Patriot then purchased Magnum and later self -insured all past present and future obligations of Magnum until its bankruptcy, including this claim.

Federal and state law confirm the importance of corporate sales. Corporate law is typically the domain of the States, but a specific federal provision addresses successor liability. When a new operator acquires a coal mine, "such operator shall be liable for and shall . . . secure the payment of all benefits which would have been payable by the prior operator . . . ." 30 U.S.C. § 932(i)(1). While this provision does not absolve a prior operator of liability, *id.* § 932(i)(2), the ALJ did not find Arch liable as an operator—only as an insurer. J.A. at 139-140. Magnum, and later Patriot, assumed responsibility for Apogee's BLBA liabilities when Apogee became part of their companies. The only other possibility for ignoring corporate form would be to pierce the corporate veil under state law, but DOL has never attempted to make that argument. An agency must defend its action based on its contemporaneous rationale. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). Even if the Department could argue for piercing the corporate veil, there are no facts to suggest that Arch and Apogee were one entity after January 1, 2006. Under Kentucky law, the party seeking to pierce the corporate veil must establish "(1) domination of the corporation resulting in a loss of corporate separateness *and* (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice."

*Inter-Tel Technologies, Inc. v. Linn Station Properties, LLC*, 360 S.W.3d 152, 165 (Ky. 2012). The first element depends on an 11-factor test including comingling of funds, equity ownership, and common officers and directors. *Id.* at 163–64. The Department developed no factual record before the ALJ to permit a ruling that Apogee remained part of Arch following its sale to Magnum.

Simply, in an absence of a veil-piercing attempt and given Arch's party status as a named "insurer" but not an operator or employer, as a matter of insurance law, the ALJ and Board erred in requiring Arch to self-insure a different company's subsidiary when it never agreed to do so. *See Merritt v. Catholic Health Initiatives*, 612 S.W.3d 822, 831 (Ky. 2020) ("A self-insurer and an insurer are not the same").

### B. Absent Notice-and-Comment Rulemaking, the Department Cannot Depart from Its Existing Regulations that Recognize the Meaning of Self-Insurance.

Consistent with case law, existing regulations recognize the difference between self-insurance that applies to a company's own exposure and commercial insurance that covers a different entity's liability. *See Merritt*, 612 S.W.3d at 821 ("Self-insurance does not have the necessary of risk shifting and risk distribution" that characterize commercial insurance); *see also Harvard College*, No. 22-1938, _ F.4th__, slip op. at 7 (1st Cir. Aug. 9, 2023) (the difference between self-insurance and commercial insurance triggers is "essen[tial]"). DOL's decision to treat Arch as "self-insuring" a wholly owned subsidiary of Patriot is incompatible with this regulatory scheme. *See id.* ("Self-insurers are not in the business of entering into contracts of insurance" to cover others' liabilities "but rather have a self-insurance agreement with covered entities" affiliated with them). As such, it violates the APA's prohibition on agency action that is arbitrary and capricious, an abuse of discretion, or not in accord with law. 5 U.S.C. § 706(2). If the Department desires to change its insurance regulations, it must do so through notice-and-comment rulemaking, which did not occur here.

This Court regularly considers "the structure of the regulatory scheme" to apply what can sometimes be byzantine regulations. *United States ex rel. Hobbs v. Medquest Assocs., Inc.*, 711 F.3d 707, 715 (6th Cir. 2013) (rejecting practice of blending rules across regulatory sections); *see also, e.g., United States v. Al-Maliki*, 787 F.3d 784, 792 (6th Cir. 2015) (noting differences between subparts of a criminal statute). In the arena of black lung benefits, the Department's regulations contain separate subparts for self-insurance and commercial insurance. *Compare* 20 C.F.R. Part 726, Subpart B (§§ 726.101–726.115) (self-insurance) *with* Subpart C (§§ 726.201–726.113) (commercial insurance).

Regarding commercial insurance, the federally required endorsement for all commercial workers' compensation policies that cover black lung liability explains that the commercial policy covers "disease caused or aggravated by exposure of which the last day of the last exposure, in the employment of the insured, . . . occurs during the policy period." 20 C.F.R. § 726.203(a). Thus, a commercial insurer is responsible for claims that arise long after the policy ends, provided that the claimant's last exposure occurred during the policy period. If Arch held commercial insurance on the last day that claimant worked for Apogee, that insurer would bear the cost of providing benefits. *Harvard College*, No. 22-1938, __ F.4th__, slip op. at 7 (a commercial "occurrence-based policy provides coverage…during the policy period…regardless of when a claim is brought").

But Arch did not hold commercial insurance. Instead, it obtained permission from the Department to self-insure pursuant to 20 C.F.R. § 726.102. Authorization to self-insure follows an extensive application process and provision of financial instruments, typically bonds, to secure the self-insurer's potential liability. *See id.* §§ 726.102 (application), 726.105 (calculating security). These bonds may be invoked only while they remain in force, and their use is limited to covering the self-insured only when and if liability has "incurred." GAO 20-21 at 9, Add. at 190;

*United States v. Ins. Co. of N. America*, 131 F.3d 1037, 1041-42 (D.C. Cir. 1997) (a self-insurance agreement is a contract between DOL, the self-insured entity, and the surety). Following an initial approval, the Department may renew the self-insurance authorization at annual intervals, possibly with adjustments to the amount of financial security required. *Id.* § 726.114(a). Among the items an applicant must provide the Department is a current "list of the mine or mines to be covered." *Id.* § 726.102(b)(3). An operator must have sufficient assets to cover the "annual" cost of obtaining security plus the estimated black lung benefits the applicant "may be expected to be required to pay during the ensuing year." *Id.* § 726.101(b)(3). Notably, these financial assurance requirements—like the authorization—are defined in terms of the single year for which a self-insurance application is granted. There is no regulation analogous to the requirement for commercial insurers that self-insuring operators provide perpetual coverage based on the date of a claimant's exposure. Such a scheme would affect rate-setting so as to render self-insurance impossible. *See Harvard College*, No. 22-1938, __ F.4th__, slip op. at 8 (applying commercial insurance triggers to self-insurance would compromise "fairness in rate setting").

The Department's insistence that a self-insurer remains perpetually liable for claims as if it was governed by the rules for commercial insurers is arbitrary, capricious, and contrary to law. Bulletin 16-01 instructs Department personnel to determine whether a claim against Patriot "is covered by Arch Coal's self-insurance or an Arch Coal commercial insurance policy." Add. at 386, Bulletin ¶ 3(c). It then instructs (correctly) that claims covered by a commercial policy should be directed to the insurer. But it wrongly mandates the same course of action for claims that were self-insured. Rather than directing those claims to the Trust Fund after exhausting Patriot's financial assurances, DOL decided that other businesses should supply Patriot's self-insurance if they ever self-insured a mine that Patriot later

acquired.  Relevant here, the Department ordered Arch to pay Patriot's claims based on the dates of Arch's self-insurance before selling the mines and their operating unit.  *Id.* ("the miner's employment falls within a period of Arch Coal's self-insurance.").  Though this misapplies commercial insurance triggers to self-insurers irrationally, *see* discussion, *infra*, the agency endorsed it: "Arch is liable here because it provided Apogee's self-insurance while Claimant was employed by Apogee."  J.A. at 141.  That is precisely the application of Subpart C, governing *commercial* insurance—*i.e.,* coverage based on exposure during the policy period—to self-insurance that follows the mine under Subpart B.

The closest the ALJ ever came to explaining why the Department can overrule regulatory distinctions between types of insurance is inapt: "Section 726 of the regulations governs only *how* an operator must secure its existing liability; it does not *create* liability" for the operator.  *Id.* (emphasis original).  But operator liability is not the issue.  Just one page earlier, the ALJ held that Arch (rather than the Trust Fund) was obliged to pay claimant as Apogee's insurer, "not as the responsible operator."  J.A. at 140.  The provisions that "*create*" operator liability are therefore irrelevant; only Section 726 and its two-part insurance framework for "*how*" an operator insures its potential liability is in question.  Specifically: can the Department require an entity approved for self-insurance to assume the greater liability that would accompany a commercial policy?  On that score, the ALJ acknowledged that Arch's argument has "some appeal" before veering back into the framework of operator liability.  J.A. at 141.

Neither the Department nor the ALJ or Board has ever offered an explanation for how the Department can erase a distinction in the regulations and insurance law generally between commercial and self-insurance.  "It is an elemental principle of administrative law that agencies are bound to follow their own regulations."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004).  When agencies

conveniently depart from their own regulatory framework, the resulting action is improper under the APA. *Smalley v. Comm'r of Soc. Sec.*, No. 20-1865 (6th Cir. Sep. 3, 2021).

Here, there is no doubt that the Department's creation of perpetual liability for self-insurers is contrary to its regulations. As explained above, the regulations separately treat commercial and self-insurance, and only the subpart governing commercial insurance creates continuing responsibility for claims accruing during the coverage period. 20 C.F.R. § 726.203(a). As a basic matter of construction, courts interpret the inclusion of a provision in one section and its omission elsewhere as purposeful. *Saginaw Chippewa Indian Tribe v. Blue Cross*, 32 F.4th 548, 557 (6th Cir. 2022) (explaining that "the standard tools of interpretation" apply equally to statutes and regulations); Black's Law Dictionary 602 (7th ed. 1999) (the canon "*expressio unius est exclusio alterius*" holds that "to express or include one thing implies the exclusion of another, or of the alternative."). This rule also matches ordinary insurance law, which is the background against which the regulator is presumed to act. *See* discussion, *supra*. Additionally, the regulatory text governing self-insurance expressly ties each of the applicant's financial qualifications to the year ahead. 20 C.F.R. § 726.101(b)(3). It also requires specific enumeration of the mines then in the applicant's possession. *Id.* § 726.102(b)(3). The amount of financial security then changes from year to year depending on the list of mines. *Id.* § 726.114(a). All of these features confirm that self-insurance begins with the acquisition of a mine (or entity that owns it) and ends with its sale—at which point the buyer takes over. That is the definition of self-insurance, and the regulations correctly reflect it. *See also* Add. at 158-164, 166-167, 169.

Ultimately, the Department's approach in this case, embraced by the ALJ and Board, is contrary to the substance and structure of its own regulations. It therefore

violates the APA.  5 U.S.C. § 706. If the Department desired to change regulatory course, it needed to comply with notice-and-comment rulemaking.

### C. The Department's Unexplained Departure from Prior Practice Violates the APA and Due Process.

Arch's sale of Apogee is not the first time a coal company has changed hands. For decades, those transaction had precisely the effect on self-insurance that Arch advocates in this case.  The Department's new approach is just that—a change in regulatory direction undertaken without advance notice or reasoned explanation. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). That is not allowed.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Id.*  At minimum, this requirement demands that the agency "display awareness that it is changing position" and forbids agencies from "depart[ing] from a prior policy *sub silentio*." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  It must also "take[] into account" the "serious reliance interests" that accrue as a result of longstanding rules.  *Id.*

Even when an agency permissibly changes direction, the new rule may not be retroactive.  "[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. G'Town Univ. Hosp.*, 488 U.S. 204, 208 (1998).  The statutes at issue in this case contain no such express authorization.  As far as identifying retroactive rules, courts ask whether the agency action "creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past." *National Mining Association v. DOL*, 292 F.3d 849, 859 (D.C. Cir. 2002); *see also Combs v. Commr. of Soc. Sec.*, 459 F.3d 640, 650 n.3 (6th Cir. 2006) (applying *National Mining*'s retroactivity standard).

The Department's official documents show that it changed its rule to add an obligation to agreements executed decades ago, pivoting from a claims-made trigger for self-insurance to a different trigger—one relying on the last day of employment—that works for commercial insurance, but not self-insurance. *See* 20 C.F.R. § 726.203(a)("a commercial carrier is responsible for benefits only if the insurance agreement was in effect on the date of last exposure."). The claims-made trigger makes no sense for self-insurance, which is guaranteed by DOL-approved bonds. DOL annually approves the amount—the "penal sum"—of the bond, which is a contract between the company and its surety. *United States v. Insurance Co. of N. Am.*, 131 F.2d 1037, 1041-42 (D.C. Cir. 1997). When a company's underlying liability changes as mines are purchased and sold, the company purchases new bonds, which extinguish their predecessors. *United States v. Insurance Co. of N. Am.*, 83 F.2d 1507, 1511-13 (D.C. Cir. 1996). This means that the bonds that previously secured a self-insurer's liability for a former mine are no longer in place after that mine is sold and the self-insurer enters a new bonding agreement.

As Arch alleged in its four-count *Acosta* Complaint, the Department's new approach offends self-insurance principles by applying claims-made triggers appropriate for commercial insurers to self-insurers. Writing for the First Circuit, Judge Selya explained the difference:

> an occurrence-based policy provides coverage for events that occur during the policy period, regardless of when a claim is brought against an insured. By contrast, a claims-made policy…covers claims made against the insured during the policy period, regardless of when the event or act that instigated the claim occurred.

*See Harvard College v. Zurich American Insur. Co.,* No. 22-1938, __F.4th__, slip op. at 7. That court added that the distinction between claims-made and occurrence-made triggers represents "the essence of" insurance law, and that keeping the two schemes separate ensures "fairness in rate setting." *Id*., slip op. at 8. The court

warned that litigants may not "impermissibly collapse the[se] critical distinction[s]." *Id*. at 10-11.[5]

Honoring these distinctions, before Patriot's bankruptcy the Department paid claims against bankrupt companies out of the Trust Fund—*i.e.,* the reason for the Fund's existence. That was equally true of claims arising from mines that the bankrupt entity operated at the time the claim accrued and, like here, claims arising from a subsidiary's operations before acquisition by the bankrupt entity. For example, when James River Coal Company filed for bankruptcy in 2014, the Department issued Bulletin 16-03, which expressed its longstanding approach to bankruptcies by self-insured operators. *See* Bulletin 16-03 (Apr. 14, 2016)(Add. at 402).[6] It directed DOL staff to "[c]onvert all James River Coal Company claims to the [Trust Fund]" and, concerning prior black lung benefits to its eligible employees by paying claims ***as they are incurred***." *See* GAO Report at 9 (emphasis added)(Add. at 202).[7] This "claims-made" trigger applied even when a self-insurer became insolvent or bankrupt. For example, in the 2004 Horizon Natural Resource bankruptcy, DOL did not attempt to shift liability to the prior parent, which was self-insured at the time it owned a subsidiary later sold to Horizon. Indeed, prior to Patriot's bankruptcy, DOL never once imposed liability on a prior self-insurer. *See e.g.* Add. at 166-169.

---

[5] Arch Resources' excluded evidence reiterates these distinctions. For instance, Robert Briscoe, a self-insurance expert with first-hand experience with DOL's self-insurance regulations covering federal black lung claims, explained that imposing commercial insurance triggers upon self-insurers would be irrational and would "take away any degree of finality," and would stifle corporate transfers like Arch's sale of Apogee to Magnum. Add. at 143, 146-47, 166.

[6] *Available at* https://www.dol.gov/sites/dolgov/files/owcp/dcmwc/blba/indexes/BL16.03OCR.pdf.

[7] These official documents are all judicially noticeable. *Sierra Club v. EPA*, ___ F.4th ___, No. 21-3057, at *6 n.2 (6th Cir. Feb. 10, 2023) ("We may take judicial notice of public and government documents.").

This prior practice is well-documented, including for the transactions at issue here. In *Allen v. Hobet Mining*, while processing the claim, after Apogee's sale to Magnum, DOL instructed its claims' examiners as follows:

> Effective 12/31/05 Arch sold the following subsidiaries [including Apogee] to Magnum Coal Company . . . . Magnum Coal Company assumes all black lung claims liability . . . effective 1/1/06 and continuing Brickstreet Mutual Ins. Co. [ ] provides coverage for the individual companies which were created following the sale of Arch Coal and subsidiaries to Magnum Coal Company.

Add. at 7. Another claim, *Adkins v. Hobet*, No. B7MHB-2015029, is even more telling. There, a miner filed a claim against Patriot in January 2015 after retiring in 2002. A February 16, 2016 PDO accepted the Trust Fund's liability, stating:

> Hobet Mining Inc., a self-insured coal operator through Patriot Coal Company has been identified as the Responsible Operator in this claim; however, Patriot Coal Company is in bankruptcy and no longer possesses sufficient assets to secure the payment of benefits in this claim. ***Since the company was self-insured, a previous employer cannot be named liable in this matter.*** Therefore, this company is deemed not viable now and is considered to be the responsibility of the Black Lung Disability Trust Fund.

*Adkins v. Hobet*, No. B7MHB-2015029, Proposed Decision & Order of Feb. 16, 2016 at 6 (emphasis added) (Add. at 406).[8]

That approach changed with Patriot's bankruptcy and increasing scrutiny of DOL's failure to require adequate financial assurances of self-insurers. *See generally* GAO Report (Add. at 190). Instead of recognizing that prior operators cannot be treated as self-insurers of a different, bankrupt business, the Department decreed just the opposite. Bulletin 16-01 at 3 (Add. at 313). At no point did the Department announce a formal rulemaking to change direction or even explain its reasons for concluding that a new approach was necessary and consistent with the regulations.

---

[8] Mr. Briscoe testified to this prior policy. See Add. at 143, 146-147 ("if the buyer of the company took on all of the claims liabilities from past periods, then that subsidiary would drop out of the ongoing self-insurance of the seller"); id. at 156-57 (DOL never imposed a perpetual parental guaranty and never advised self-insureds that a parent company could be still liable for claims brought by employees of entities that were sold to other companies).

That is precisely the kind of unexplained change of course that this Court and the Supreme Court have condemned. *Encino Motorcars*, 136 S. Ct. at 2126 (agency "offered barely any explanation," and industry had relied on prior policy); *Montgomery Cnty. v. FCC*, 863 F.3d 485 (6th Cir. 2017) (rejecting unexplained revisions to agency order regarding cable television franchises). And it is now too late to articulate a rationale. *Investment Company Inst. v. Camp*, 401 U.S. 617, 628 (1971) ("Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.").

The result of this unlawful policy change is a new obligation on Arch that did not exist at the time it sold Apogee in 2005. Like the hospital in *Bowen* that faced reduced Medicare reimbursement for patients it had already treated, Arch closed its sale of Apogee years ago under the Department's former approach. *Bowen*, 488 U.S. at 209–13. At that time, it was not liable for claims incurred after the sale. GAO Report at 9 (Add. at 199). The new rule requires Arch to pay those claims, which "creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past." *National Mining*, 292 F.3d at 859. This "retroactive application is foreclosed by the express terms of the APA." *Chadmoore Commc'ns v. FCC*, 113 F.3d 235, 240 (D.C. Cir. 1997).

Applying the Department's new approach to transactions completed over a decade ago likewise offends Arch's due process rights. When an agency effects a "reversal of position—an abrupt departure from a consistent, longstanding position. . . . [t]he Due Process Clause does not allow retroactive application of such a change." *PHH Corp. v. Consumer Financial Protection Bureau*, 839 F.3d 1, 48 (D.C. Cir. 2016) (quotation omitted).

The Department's solution to its failure to require adequate reserves for Patriot Coal and the resulting demands on the Trust Fund is an unexplained change in how it treats claims against a bankrupt operator. That change attempts to shift

liability to an unrelated company that once owned a smaller operator that eventually became part of Patriot. Not only is the agency pivot unexplained, but it **cannot** be justified in light of the Department's own regulations. The result is agency action that is arbitrary and capricious, contrary to law, and impermissible as a matter of due process. The Court should vacate the Board decision approving this unlawful action.

## II. DOL's Exclusionary Rules of Evidence Violate the BLBA and the APA

DOL's exclusionary rules prohibiting ALJs from considering evidence concerning Arch's liability are, on their face, inconsistent with the statutory mandate.

All black lung procedures are incorporated into the BLBA by reference to the procedural sections of the Longshore Act, 33 U.S.C. §§ 918 through 921, and 939; 30 U.S.C. § 932(a)( incorporating by reference specific provisions of 33 U.S.C. §§ 901 through 945). The Longshore Act, in turn, incorporates and makes applicable the adjudication sections in the Administrative Procedure Act. 5 U.S.C §§ 554 through 559. The LHWCA has been amended many times since its original enactment in 1927, well before the enactment of the APA in 1946. In the original Longshore Act, adjudicative functions were assigned to "deputy commissioners," a position that no longer exists. *See* 33 U.S.C. § 923. *See Crowell v. Benson,* 285 U.S. 22 (1932). In 1972 the Longshore Act was amended to provide:

> (d) Provisions governing conduct of hearing; administrative law judges
>
> Notwithstanding any other provisions of this chapter, any hearing held under this chapter shall be conducted in accordance with the provisions of section 554 of Title 5. Any such hearing shall be conducted by an administrative law judge qualified under section 3105 of that title. All powers, duties, and responsibilities vested by this chapter, on October 27, 1972, in the deputy commissioners with respect to such hearings shall be vested in such administrative law judges.

33 U.S.C § 919(d).

There is no ambiguity in the statement "all powers duties and responsibilities vested by this chapter on October 27, 1972 in the deputy commissioners with respect to such hearings shall be vested in such ALJ." *Id.* The "powers and duties" vested in the deputy commissioners as of October 27, 1972 are set forth in 33 U.S.C. § 927(a), and they include all of the powers required to conduct and manage discovery of concern here, and while this provision remains in the statute it was necessary to keep it in to cover the transition from deputy commissioners to ALJs. The powers of the deputy commissioner under the 1927 LHWCA were far broader. *Crowell,* 285 U.S. at 22. Because "congress has directly spoken to the precise question at issue," *i.e.* whether ALJs retain all discovery functions, "that is the end of the matter." *Chevron v. NRDC*, 467 U.S. 837, 843 (1984).

Practical considerations prove the same. The old provisions have no obvious function today, especially since the persons now called district directors are neither trained nor qualified to perform the judicial functions listed in LHWCA and the APA. *See* 5 U.S.C. §§ 554-56, and specifically *id.* at § 556(c)(listing functions similar to those in 33 U.S.C. § 927(a)). All of the procedural sections of the LHWCA apply in the adjudication of claims under the BLBA. 30 U.S.C. § 932(a); *Director, OWCP v. Greenwich Collieries,* 512 U.S. 267, 271 (1994). Specifically, District directors cannot issue subpoenas or compel any action necessary to conduct discovery. Arguably they cannot compel DOL to do anything where, as here, DOL is the custodian of information desired through discovery.

DOL sometimes argues that it is authorized by 30 U.S.C. § 932(a) to regulate around the LHWCA to meet special concerns in the black lung area. That argument at least with respect to the incorporation of the APA, has been rejected by the Supreme Court and has no force. *Greenwich Collieries,* 512 U.S. at 270-71 ("we do not likely presume exceptions to the APA… and we do not think that section 932 by its terms exempts the LHWCA from section 7(c) of the APA").

A more recent decision of the Supreme Court refines the point. The lead into the incorporating provisions of the LHWCA provides in part, "notwithstanding any other provisions of this chapter …." In *NLRB v. S.W. General Inc.*, 580 U.S. 288, 301 (2017), the High Court held that "the ordinary meaning of notwithstanding 'is 'in spite of' 'or without' prevention or obfuscation from or by." *Id.* (citations omitted). In this context, the term clearly means that DOL must follow the adjudicative provisions of the APA regardless of any possible conflicting provision from other places in the law and must transfer the claims examiners pre-1972 functions as specified. No authority supports DOL's attempts to eviscerate the core principals of an APA adjudication nor can any reasonably be inferred from the BLBA. No regulation providing to the contrary is valid, and none is authorized. The rules challenged here, excluding the normal process of discovering liability evidence from ALJ oversight are not valid. The *Acosta* Court seems to have assumed the same conclusion. *Acosta,* 888 F. 3d at 502.

A final point is worth mentioning although it does not detract from the force of the authorities cited. In the late 1990s, DOL decided to reinvent the entire black lung program. There was no congressional impetus, no scientific breakthrough and no apparent reason for doing so. But DOL forged ahead. A centerpiece of the proposed regulations would have restructured not only the medical eligibility provisions but all of the procedural sections of the rules as well. It was published for comment on January 22, 1997. Add. at 228. The proposed rules would have effectively divested all ALJs of any ability to develop medical or liability evidence assigning those functions exclusively to claims examiners. The ALJs were divested of their statutory powers and duties to facilitate any discovery. Claims examiners were given significant authority to conduct normal investigative and discovery functions that none of them were qualified or authorized by law to perform. Litigants, on the other hand, were expected to submit all of their evidence to these

claims examiners and develop it while the claim was pending before these claims examiners. ALJs effectively were excluded from the process of developing evidence. *Id.* (investing district directors with judicial powers) (Add. at 292-95); *Id.* at 3401-04 (excluding evidence not developed before the district director). ALJs could make decisions in claims, but could not assist the parties in developing a record or conducting discovery, with very few exceptions. *Id.* at 3405-07)(Add. at 296-98).

The public response was remarkable having many commentators noting that the proposed rules including those limiting the development of evidence and reassigning ALJs' functions to claims examiners, "are contrary to the requirements of the Federal Administrative Procedure Act or the Black Lung Benefits Act." Letter from Jerome J. Shestack, President, American Bar Association transmitting Resolution Adopted by the House of Delegates, American Bar Association, to Alexis Herman, Secretary of Labor (August 15,1970)(Add. at 367). The Chief Judge of DOL's Office of the Administrative Law Judges objected to the proposed rules with equal force and in greater detail. Add. at 327. The ALJ's materials note that virtually all stakeholders objected to the DOL proposals. *Id.* The rules challenged here are remnants of DOL's procedural restricting of the program and are addressed in the comments cited here.

Finally, it is noted that here despite the fact that Arch raised its challenges to the evidence limiting regulations (J.A. at 136), the ALJ did not address them. J.A. at 136-141.

### III.     DOL's Interpretation of its Exclusionary Rules is Arbitrary, Capricious, and not in accordance with the APA.

To support the *Acosta* complaint's allegations, Arch requested subpoenas for testimony from two agency employees and also sought to discover from DOL and introduce its own affirmative evidence proving that Bulletin 16-01 reflects a changed policy and violates self-insurance principles. J.A. at 28.

Back in the administrative process, the ALJ applied a set of regulations limiting evidence before the district director to documents "pertaining to the liability of a potentially liable operator and/or the identification of a responsible operator." J.A. at 50 (citing 20 C.F.R. §§ 725.414, 456, and 457). Because Arch's challenge to the Department's changed approach to self-insurance did not fall within that subject matter, the ALJ refused to consider it. And yet, the ALJ ignored Arch's challenge to the Bulletin, in part, by asserting that Arch needed to present additional evidence substantiating its four-count challenge. *See, e.g.,* J.A. at 50, 136, 138, 241, 245-256.

The Director defended that course on appeal to the Board. To him, "the ALJ properly denied Employer's discovery attempts" because "the Bulletin does not mark a departure from the regulations or a change in policy," because the discovery "is not relevant" and because "Employer failed to timely request" and submit the discovery. J.A. at 209. Each argument is unavailing.

First, the Director's *ipse dixit* assertion that "the Bulletin did not mark a departure from the black lung regulations or a change in Department policy," J.A. at 212, assumes its conclusion. The impropriety of that argument in the American judicial system hardly needs discussion: "a defendant cannot defeat full discovery by denying that the evidence will be of assistance to the complainant." *Anderson v. Kissam*, 28 F. 900 (C.C.S.D.N.Y. 1886).

The Director's assertion is also factually incorrect, as shown through limited discovery Arch has obtained in other cases. That evidence includes prior Bulletins that did not interpret the regulations to impose perpetual liability, testimony from an expert with decades of experience with self-insurance in the mining industry, documents from a case indistinguishable from the one at bar where the agency respected Arch's sale of Apogee as relieving it of liability, and a failed attempt by the Department to codify the regulatory interpretation it now advocates. The Department's insistence that "the Bulletin does not mark a departure" thus puts the

cart before the horse. The parties dispute that point, and to prevail, the Department of Labor must do what every other agency treats as routine—it must provide transparency into its decision-making and allow Arch to prove its well-pled allegation that Bulletin 16-01 marks a change of regulatory direction, one that is arbitrary and capricious, retroactive, and inconsistent with past practice. *See Olivares v. Transport. Sec. Admin.,* 819 F.3d 454, 464 (D.C. Cir. 2016) (allowing discovery showing that agency "changed the way that it conducts background investigations"); *Carllson v. United States Citizenship and Immigration Servs*. No. 12-cv-7983, 2015 WL 1467174 at *14 (C.D. Cal. March 23, 2015) (unpub.) (ordering discovery "directed at the alleged policy changes that form the basis of plaintiff's retroactivity claims"); *Fox v. United States*, 88 M.S.P.R. 381, 387 (2001) (ordering remand for agency to respond to party's request for agency records including "discussions" and "documents relevant to the agency's change of its policy" regarding merit adjustments). If factual development is necessary, the Department cannot truncate it by declaring its conclusion and pronouncing discovery unnecessary.

Finally, the Director's belief that "Employer's discovery effort came too late and was properly rejected," which relies on 20 C.F.R. §§ 725.414 and 456, contradicts those regulations' unambiguous text.

The district director's notice of claim permitted Arch to "contest your status as a potentially liable operator" by "accepting or denying each of the five assertions listed in Section B," which "are limited to information about your employment of the miner and your status as an operator." Dx. 21 at 2. Those "five assertions," are:

    i.    That the named operator was an operator for any period after June 30, 1973;
    ii.    That the operator employed the miner as a miner for a cumulative period of not less than one year;
    iii.    That the miner was exposed to coal mine dust while working or the operator;
    iv.    That the miner's employment with the operator included at least one working day after December 31, 1969; and

> v. That the operator is capable of assuming liability for the payment of benefits.

Arch's proffered exhibits, confirming the Department's change of policy following Patriot's bankruptcy and demonstrating why the Bulletin's newly minted policy violated corporate and insurance law principles and was thus arbitrary and capricious, had nothing to do with the five issues, or even with "liability" generally. And yet, Arch was not permitted to present its evidence to the district director.

But when Arch sought discovery before the ALJ, the Department offered an implausible reading of its own rules and the relevant statute. It faulted Arch for not introducing the evidence before the district director, notwithstanding the limited five points on which evidence was permitted at that stage: "Employer's [ ] Bulletin-related discovery was properly denied because [ ] Employer failed to timely request it." J.A. 209. Construing the district director proceeding in this way is irreconcilable with the text of the Notice of Claim. Challenging the Bulletin and proving the agency's release of Arch from responsibility for Apogee in 2006 have ***nothing*** to do with the five assertions described in the Notice of Claim and the regulations the ALJ and Director cite. The Department's reading not only strays beyond "the bounds of reasonable interpretation," *Arlington v. FCC*, 569 U.S. 290, 296 (2013), but it amounts to a convenient excuse to stonewall Arch Resources' *Acosta* claims. The Supreme Court in *Kisor v. Willkie,* warned against precisely this type of agency "interpretation" of its own rules: "a court should decline to defer to a merely 'convenient litigating position' or '*post hoc* rationalization advanced' to 'defend agency action against attack.'" 139 S. Ct. 2400, 2417 (2019) (quotations omitted).

The statutes are even more damning for the ALJ's refusal to accept Arch's evidence confirming a regulatory change of course. The BLBA incorporates various provisions of the Longshore Harbor Workers Compensation Act. One of those provisions defines the ALJs' purview: "***all*** powers duties and responsibilities vested . . . in the deputy commissioners with respect to such hearings shall be vested in such

ALJ." 33 U.S.C § 919(d) (emphasis added). The "powers, duties, and responsibilities" vested in the deputy commissioners include all of the powers required to conduct and manage discovery. 33 U.S.C. § 927(a). In fact, the deputy commissioners had sweeping power to conduct mini-trials for benefits under the Longshore Act. *See Corwell v. Benson*, 285 U.S. 22 (1932).

The agency has no authority to divest an ALJ of these "powers, duties, and responsibilities," which include accepting and overseeing disputes concerning evidence. *See* 33 U.S.C. § 919(d), *incorp. by ref. into* 30 U.S.C. § 932(a); 33 U.S.C. § 927(a) (affording ALJs discovery functions including the development of the record and the administration of oaths); *see also* 20 C.F.R. § 725.450 (party to claim "shall have a right to a hearing concerning any contested issue of fact or law" and have any contested issues decided *de novo*), § 725.455(a)(purpose of hearing is to resolve contested issues of fact or law); *see also Dingess v. Director, OWCP*, 12 BLR 1-141, 1-143 (1989) ("any party aggrieved by the deputy commissioner's findings may appeal this case to the Office of Administrative Law Judges for a de novo review of any contested issues."). In light of the statutory authorization for ALJs to oversee expansive discovery and the regulations' limited, five-topic discovery for district directors, the ALJ's refusal to consider Arch's evidence in this case is inexplicable.

Additionally, the District Director's office is ill-suited to assume the work of ALJs. The District Director's office is staffed with civil servants who are neither lawyers nor officers empowered to resolve discovery disputes or even administer oaths. It would be impossible for these employees to accomplish what the solicitor promised the D.C. Circuit they would. *See* Add. at 391. DOL's Supplemental Letter Brief, *Arch Coal v. Acosta*, No. 17-5074, at *3 (D.C. Cir. Jan. 16, 2018) ("Arch can seek discovery from the Department on issues related to its liability, including on its claims that Patriot Coal ought to be held liable instead of Arch Coal"); *Arch Coal v.*

*Acosta*, 888 F.3d 493, 502 (D.C. Cir. 2018) (citing 20 C.F.R. §§ 725.410; 725.411-17; 725.450-458) (assuring that Arch Coal would be able to "raise its claims through the Black Lung Act's statutory review scheme" and "introduce evidence relevant to its liability in the BLBA proceedings").[9]

Additionally, the Department's interpretation breaks promises it made to the D.C. Circuit, which affirmed dismissal of Arch's challenge to the Bulletin—not on the merits—but because Arch's challenge could proceed before the agency. In moving to dismiss *Acosta* (then styled as *Hugler*) "the Department of Labor argue[d] that this court lacks subject matter jurisdiction because the Black Lung Benefits Act assigns exclusive jurisdiction to the Department's administrative process and then the relevant federal court of appeals." *Arch Coal v. Hugler*, 242 F. Supp. 3d 13, 18 (D.D.C. 2017). Citing *Thunder Basin* and related authority, the District Court agreed, dismissing for want of subject matter jurisdiction because Arch's challenge is "the type Congress intended to be reviewed within [the] statutory structure." *Id*. Specifically, it observed that "Congress has undoubtedly created a special statutory review scheme for miners' claims under the Black Lung Benefits Act, and the intent that the review scheme be exclusive is 'fairly discernible.'" *Id*. Crucially, "the fact that Arch Coal raises statutory claims—that the Bulletin violates the BLBA and the APA—does not indicate that these claims are outside of the scope of the administrative review scheme." *Id*. at 20; *accord Arch Coal v. Acosta*, 888 F.3d at

---

[9] Historical challenges lay bare the District Director's inability to manage discovery. In several cases, Arch sought discovery from the agency before the District Director. The agency either ignored or else affirmatively rejected the requests. In no event did Arch have any recourse, either before the District Director or later during ALJ proceedings. *See, e.g., Sturgill v. Apogee Coal Co.*, Case ID: 2B85Z-2018086 (failing to provide discovery concerning Arch's party status within 30 days of Arch's request); *Deskins v. Hobet*, Case ID: BJJTW-2018096 (same); *Ison v. Arch of KY*, Case ID: BGXMS-2017062 (same); *Chapman v. Apogee Coal*, Case ID: 2BS5B-2018187 (affirmatively refusing to provide discovery).

501 ("Arch's challenges to the Bulletin are the exact sort of claims" committed to administrative review").

After succeeding in the D.C. courts, the Department has reneged. Seven years after Arch brought its complaint in *Acosta*, it is no closer to proving up its claims than it was in 2016. Only now, it has been forced to litigate those claims in over 400 cases implicating the same question of whether a self-insurer can be held perpetually liable for a mine that it sold. *Hugler*, 242 F. Supp. 3d at 15. Tragically, Arch's concern that "the Department will not afford it adequate discovery to develop its claims during the administrative proceedings" is no longer "premature." *Arch Coal v. Acosta*, 888 F.3d at 501.

Either the *Acosta* Court was mistaken in concluding that "the administrative review scheme" could address Arch's administrative challenge, or the Department was wrong in denying Arch a fair adversarial testing of its four-count complaint. The result has been an intolerable Catch-22: the government told the D.C. Circuit that Arch could develop its record in the agency proceeding, but it then refused because Arch's administrative claims do not implicate the five points on which it permits evidence before the district director. The perverse result is that Arch Resources "might never receive judicial review" of its claims before any tribunal. *Cf. Cochran v. SEC*, 20 F. 4th 194, 212 (5th Cir. 2021), *affirmed sub nom Axon v. FCC*; No. 21-86 (April 14, 2023); *see also Caperton v. A.T. Massey Coal*, 556 U.S. 868, 887 (2009) (parties enjoy "a basic right to a fair trial in a fair tribunal.").

Ultimately, then, if this Court disagrees with the *Acosta* Court's application of *Thunder Basin*, then it should instruct that the district courts in this Circuit may review Arch Resources' four-count complaint. *See Axon*, slip op. at 18 ("Our conclusion follows: The claims are not 'of the type' the statutory review schemes reach. A district court can therefore review them."). Alternatively, if *Acosta* survives the Supreme Court's decision in *Axon*, then the Department is judicially

estopped from telling the D.C. Circuit that discovery is possible only to argue now, through a hyper-technical but misguided reading of its own regulations, that Arch could not present its evidence to the district director.

## IV. A Plain-Text Application of the Regulations Requires Arch's Dismissal

The Department's hyper-technical citations to its evidence-excluding regulations (misguided though they are) should trouble this Court for another reason. The Department, itself, failed to follow its own regulations by naming Arch in the Proposed Decision and Order that first declared Howard entitled to benefits.

In the Black Lung context, DOL regulations prescribe the notice that parties must receive, and precedent confirms that inadequate notice requires dismissal for want of due process. *See Warner Coal Co. v. Director, OWCP*, 804 F.2d 346, 347 (6th Cir. 1986) (named parties, including insurers, must receive notice in the PDO as a matter of due process). Specifically, the regulations require that the district director identify the responsible operator in the PDO, which the district director enters after reviewing evidence of potential liability against all parties who receive a notice of claim. 20 C.F.R. § 725.418(a). The PDO is the final document to emerge from the district director's investigation. Because the PDO identifies the party facing financial responsibility, the regulations make it a mandatory precondition for liability. "The proposed decision and order ***must*** reflect the district director's final designation of the responsible operator liable for the payment of benefits." 20 C.F.R. § 725.418(d) (emphasis added). The district director "must dismiss" any other operator not named in the PDO. *Id.* That is exactly what ALJs have done in other cases in which the PDO failed to name a party whom the Department later sought to saddle with liability. *Clark v. Barnwell Coal Co.*, 22 BLR 1-275, 1-284 (2000); *Crabtree v. Bethlehem Steel Corp.*, 7 BLR 1-354 (1984).[10]

---

[10] Before panicking at its gross underestimation of Trust Fund liability emanating from Patriot's bankruptcy, DOL agreed to dismiss Arch in cases indistinguishable

No one disputes that the PDO named only Patriot. Dx. 44. Moreover, the Department appropriately identified Patriot as its own self-insurer and never notified Arch that it would be liable for self-insuring a different business. The only notice that ever properly identified Arch was a notice of claim sent pursuant to 20 C.F.R. § 725.407. Dx. 22. But the regulations require more; they recognize a notice of claim is different than a PDO. As this case illustrates, in accordance with the regulations, a district director can send multiple notices of claim before receiving any evidence. 20 C.F.R. § 725.407(b)("The district director may identify one or more operators potentially liable."). Here, Arch responded to the notice of claim explaining that it was not liable. The PDO then named Patriot, indicating the district director's agreement with Arch—that is, until the Department decided to change course before the ALJ.

The Department's justification—hard as it is to believe—was that naming a different business was excusable as a "typographical error." J.A. at 367. [7/10/19 Order at 3]. In case it needs saying, this is not a typographical error. The latter would be something like naming "Ach Coal" in the PDO, *not* naming a totally different coal company—and specifically the company that ultimately agreed to cover this claim. If naming and serving a separate entity is excusable as a typo, due process lacks all meaning. *But see Warner Coal Co.*, 804 F.2d at 347 (6th Cir. 1986). For that matter, other constitutional protections would be similarly vacuous. Under the Department's view, law enforcement could obtain a warrant to search one person's home but search a different house, characterizing the difference as a mere typo. This theory would be comical if the federal government had not actually argued it in the administrative process *and succeeded*. If there was ever a poster case to

---

from this one, where the PDO did not name it as a party. *See Chitwood v. Arch of Ky*, 2017-BLA-05097; *Browning v. Arch of Ky*, No. 2017-BLA-05005; *Grimmett v. Arch of West Virginia*, 2017 BLA-06184).

justify courts' growing "skepticism" of agency action, this is it.  *See, e.g., Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

## CONCLUSION

This Court should vacate the Board's order holding Arch responsible as the self-insurer for liabilities belonging to another company.  As a result, claimant should be paid from the Trust Fund.

Respectfully submitted,

/s/ Mark E. Solomons
Mark E. Solomons
Dominic Draye
Solomonsm@gtlaw.com
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
(202) 533-2361

# CERTIFICATE OF COMPLIANCE

**Word count**

  As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains 11,991 words (exclusive of the cover, table of contents and table of authorities).  I relied on my word processor to obtain the count, using Microsoft Word 2016.

**TypeFace**

  In addition, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times Roman, 14 pt.

/s/Mark E. Solomons   
Mark E. Solomons

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Appellant's Brief, along with a Joint Appendix and Addendum were electronically served upon counsel of record via the Court's CM/ECF system on September 28, 2023.

/s/Mark E. Solomons
Mark E. Solomons