No. 23-3332

IN THE

# United States Court of Appeals
## FOR THE SIXTH CIRCUIT

APOGEE COAL COMPANY, *et al.*,

*Petitioners,*

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR, *et al.*,
*Respondents.*

ON PETITION FOR REVIEW OF A DECISION
AND ORDER OF THE BENEFITS REVIEW BOARD,
UNITED STATES DEPARTMENT OF LABOR

## PETITIONERS' COMBINED REPLY BRIEF

Mark E. Solomons, Esq.
Dominic E. Draye, Esq.
Michael A. Pusateri, Esq.
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
(202) 533-2361
(202) 331-3168
(202) 533-2354
solomonsm@gtlaw.com
drayed@gtlaw.com
Counsel for Arch Resources

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

I.   The ALJ Held Arch Responsible Only as an Insurer, and
     Insurer Liability Follows Different Rules than Operator
     Liability. ............................................................................................................ 2

     A.   Unlike Operator Liability, Insurance Is a Creature of
          Contract, and the Director Identifies No Agreement
          that Would Oblige Arch to Insure a Different
          Company's Liabilities. ............................................................................ 5
     B.   The Regulations and Precedent Applying Them
          Establish an Impermissible Retroactive Rule Change. ........ 10

II.  The Liability Evidence Rules Have Nothing to Say About the
     Record Arch Assembled. ........................................................................... 20

III. Even if They Were Applied Correctly, the "Liability" Evidence
     Rules are Illegal. ......................................................................................... 26

IV.  The Director's "Typo" Defense Fails. .................................................... 30

CONCLUSION ..................................................................................................... 32

CERTIFICATE OF COMPLIANCE ................................................................ 34

CERTIFICATE OF SERVICE ........................................................................... 35

Page(s)

**Cases**

*Abbott v. McCoy Elkhorn Coal Corp.,*
     2019-BLA-05029 ...................................................................... 17

*Adkins v. Hobet Mining,*
     2021-BLA-05409 ...................................................................... 16

*Allen v. Hobet Min. Inc.,*
     Case ID: BRLD5-2017268................................................... 28

*Allen v. Hobet Mining,*
     2019-BLA-06231 ...................................................................... 18

*Amax Coal v. Dir., OWCP,*
     312 F.3d 992 (7th Cir. 2002)............................................... 28

*Arch Coal v. Acosta,*
     888 F.3d 493 (D.C. Cir. 2018) ...................................... 1, 25

*Arch Coal v. Hugler,*
     242 F. Supp. 3d 13 (D.D.C. 2017) ......................... 21, 25, 28

*Arlington v. FCC,*
     569 U.S. 290 (2013)............................................................... 22

*Ass'n of Am. RRs v. Costle,*
     562 F.2d 1310 (D.C. Cir. 1977) ......................................... 15

*Axon Enterprise, Inc. v. FTC,*
     598 U.S. 175 (2023)............................................................... 25

*Burton v. Arch of Alabama, Inc.,*
     Case ID: BV2J7-2017044................................................... 28

*Calcutt v. FDIC,*
     37 F.4th 293 (6th Cir. 2022) ......................................... 31, 32

*Carllson v. United States Citizenship and Immigration
     Servs.,*
     No. 12-cv-7983, 2015 WL 1467174 (C.D. Cal. March 25,
     2015)............................................................................................. 24

*Citizens to Preserve Overton Park v. Volpe,*
   401 U.S. 402 (1971) ............................................................................... 31

*Clark v. Saul,*
   No. 20-cv-15, 2021 WL 164794 (N.D. Ind. Jan. 19, 2021) ..................... 1

*Connolly v. Pension Ben. Guar. Corp.,*
   475 U.S. 211 (1986) .................................................................................. 9

*Dep't of Homeland Sec. v. Regents of the Univ of Cal.,*
   140 S. Ct. 1891 (2020) ........................................................................... 31

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016) ........................................................................... 19

*Florida Power & Light Co. v. FERC,*
   88 F.3d 684 (D.C. Cir. 1996) ................................................................. 32

*Gonzales v. Thomas,*
   547 U.S. 193 (2006) ................................................................................ 31

*Greenwich Collieries,*
   512 U.S. 267 (1994) ................................................................................ 26

*In re Hokulani Square, Inc.,*
   776 F.3d 1083 (9th Cir. 2015) ............................................................... 13

*Keffer v. H.K. Porter Co., Inc.,*
   872 F.2d 60 (4th Cir. 1989) ................................................................... 10

*Kisor v. Wilkie,*
   139 S. Ct. 2400 (2019) ...................................................................... 19, 23

*Kutty v. Dep't of Labor,*
   764 F.3d 540 (6th Cir. 2014) ................................................................. 10

*Massey v. Catenary Coal Co.,*
   Case ID: 2BLMJ-2017193 ..................................................................... 28

*McClure v. Catenary Coal Co.,*
   Case ID: 2BRZ3-2017236 ...................................................................... 28

*Meredith v. Hobet Mining.,*
   2021-BLA-05075 ..................................................................................... 28

*N. Fork Coal Corp. v. Fed. Mine Safety & Health Review Comm'n,*
  691 F.3d 735 (6th Cir. 2012) .............................................................. 12

*NMA v. Chao,*
  160 F. Supp. 2d 47 (D.D.C. 2001) ..................................................... 28

*Olivares v. Transport. Sec. Admin,*
  819 F.3d 454 (D.C. Cir. 2016) ........................................................... 24

*Pfalsgraf v. Long Island R.R. Co.,*
  248 N.Y. 339 (N.Y. 1928) ...................................................................... 6

*President & Fellows of Harvard Coll. v. Zurich Am. Ins. Co.,*
  77 F.4th 33 (1st Cir. 2023) ................................................... 12, 15, 16

*Saginaw Chippewa Indian Tribe v. Blue Cross,*
  32 F.4th 548 (6th Cir. 2022) ............................................................. 12

*SEC v. Chenery Corp.,*
  318 U.S. 80 (1943) ......................................................................... 3, 18

*U.S. Dep't of Labor v. Triplett,*
  494 U.S. 715 (1990) ............................................................................... 9

*United States v. Ins. Co. of N. America,*
  131 F.3d 1037 (D.C. Cir. 1997) ........................................................... 4

*Ward v. Catenary Coal Co. LLC,*
  Case ID: 2B2LD-2016090 ..................................................................... 28

*Williamson v. Hobet Mining, Inc.,*
  Case ID: 2BJ7M-2019066 ..................................................................... 28

## Statutes

5 U.S.C. § 556(c) .......................................................................................... 27

5 U.S.C. § 559 ...................................................................................... 26, 29

26 U.S.C. § 9501(d) ................................................................................... 14

30 U.S.C. § 932(c) ....................................................................................... 20

30 U.S.C. § 933(a) ....................................................................................... 11

33 U.S.C. § 927(a) ....................................................................................... 27

## Other Authorities

20 C.F.R. § 725.365 ................................................................. 9

20 C.F.R. § 725.407 ............................................................... 27

20 C.F.R. § 725.408(a)(2)(v) ........................................... 23, 30

20 C.F.R. § 725.409(b)(2) ................................................. 23, 27

20 C.F.R. § 725.414(a)(3)(i) ................................................. 27

20 C.F.R. § 725.414(b)(1) ..................................................... 23

20 C.F.R. § 725.416 ............................................................... 27

20 C.F.R. § 725.418 ............................................................... 30

20 C.F.R. § 725.418(d) ................................................... 30, 31

20 C.F.R. § 725.494 ................................................................. 5

20 C.F.R. § 725.601 ................................................................. 8

20 C.F.R. § 725.606 ................................................................. 8

20 C.F.R. § 726 ..................................................................... 11

20 C.F.R. § 726.101-726.115 ............................................... 11

20 C.F.R. § 726.102 ................................................................. 3

20 C.F.R. § 726.102(b)(3) ................................................. 6, 19

20 C.F.R. § 726.105 ........................................................ 6, 7, 8

20 C.F.R. § 726.109 ............................................................ 4, 7

20 C.F.R. § 726.201-726.213 ............................................... 11

20 C.F.R. § 726.203 ................................................................. 5

20 C.F.R. § 726.203(a) .......................................................... 12

20 C.F.R. § 802.203(f) ............................................................. 9

Ralph F. Fuchs, *The Hearing Examiner Fiasco under the Administrative Procedure Act*, 63 HARV. L. REV. 737 (1950) .............. 26

## INTRODUCTION

This case turns on the Department's efforts to retroactively and without public notice try to fix its failure to require adequate insurance for Patriot Coal Company's liabilities and its refusal to be transparent about that strategy.

To make up for Patriot's inadequate insurance, the Department argues that Arch is liable ***as an insurer*** because Apogee was an Arch subsidiary covered by its former parent's self-insurance policy on the last day of Howard's tenure as a coal miner. But that applies operator liability rules to an insurer, and commercial insurance triggers to a self-insurer. That tactic must fail; the Department cannot lean on the rules for operator liability when an ALJ eschewed precisely that liability.

The Department's other central argument is that this is the way things have always been. But it is not, and Arch has proof of the retroactive change to the way the program had operated for 50 years. The Department, though, hopes to avoid that evidence by pressing into service a reading of its own regulations so strained that it defies not only those regulations' plain text, but the D.C. Circuit's mandate in *Arch Coal v. Acosta*, 888 F.3d 493 (D.C. Cir. 2018).

This Court should hold the Department to the rationale it gave at the time it acted, the rules and procedures it adopted, and its decades of past practice to reject DOL's effort to transform self-insurance into an obligation to cover other companies' liabilities. The same goes for the Department's efforts to to preclude any normal discovery denying the rights required by Black Lung Act ("BLBA") and the Administrative Procedure Act that is expressly incorporated by reference ("APA").

## I. The ALJ Held Arch Responsible Only as an Insurer, and Insurer Liability Follows Different Rules than Operator Liability.

The Director's[1] Answering Brief was written for a different case. It speaks almost exclusively in terms of operator liability and recites nearly *fifteen* times the "default rule" that "operator[s]" can be held liable for later-occurring pneumoconiosis if the operator employed the claimant on his "last day of coal-mining work." AB 3, 14, 15, 21, 25, 26, 28, 31, 32, 35, 36. That rule applies only to companies held liable *as operators*. This case is different. The ALJ and Board held Arch responsible as an insurer

---

[1] For the most part, Claimant's Answering Brief ("CAB") offers "little more than recitations of the [ ] findings of the ALJ" that requires no reply. *See Clark v. Saul*, No. 20-cv-15, 2021 WL 164794, at *1 n.1 (N.D. Ind. Jan. 19, 2021). Petitioner will address Claimant's points where appropriate.

and expressly eschewed operator liability: "Arch bears liability for this claim **as Apogee's self-insurer**, **not** as the responsible operator." J.A. at 140 (emphasis added). No statute or rule makes insurers liable on the same terms as operators. And no amount of appellate briefing by the Director can alter the ALJ's decision to treat Arch as an insurer, not an operator. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). Here that made-for-litigation change of rationale would also disrupt the financial mechanisms that Congress created so that workers compensation insurance principles function rationally and fairly as they are intended.

The second crucial fact that the Answering Brief avoids is the Department's awareness and approval of Arch transferring Apogee's liabilities to Magnum along with its assets. Though it distances itself from its codified role in overseeing mining companies' purchase and sale agreements, *e.g.,* AB 27, the Department never responds to Arch's argument about its approval of self-insurance documents transferring Arch's liabilities to Magnum. OB at 17-20 (citing 20 C.F.R. § 726.102). In fact, it never even mentions its active oversight role at all, pretending it does not exist. RB at 26-27. But that oversight role does exist, and it proves what case law confirms: DOL **was** a party to the various self-

insurance arrangements that it approved, at least implicitly. *United States v. Ins. Co. of N. America*, 131 F.3d 1037, 1041-42 (D.C. Cir. 1997) (a self-insurance agreement is a contract between DOL, the self-insured entity, and the surety). Ignoring the Department's role in approving Arch's (and Patriot's) self-insurance—complete with a "list of the mine or mines to be covered," 20 C.F.R. § 726.102(b)(3)—will not make it go away. *See also* 20 C.F.R. § 726.105 ("the Office shall require the amount of security which it deems necessary" and "the amount of security which shall be required may be increased or decreased when experience or changed conditions so warrant"); *id*. at § 726.109 ("the Office may reduce the amount of security at any time…when it believes the facts warrant a reduction" including when the scope of the operator's "payroll of employees" or "current affairs" change). And documents confirm that the Department was not only aware that Arch had transferred BLBA liability to Magnum (which in turn transferred it to Patriot), but it also approved Arch's post-sale self-insurance based on a reduced list of mines and associated reduction in headcount. These procedures, codified in the regulations and followed for decades, are not meaningless. They prove

that Arch has not been liable for claims like Howard's for over nineteen years. Arch must be dismissed.

**A. Unlike Operator Liability, Insurance Is a Creature of Contract, and the Director Identifies No Agreement that Would Oblige Arch to Insure a Different Company's Liabilities.**

The ALJ and Benefits Review Board declared that Arch was not liable as an operator of the mine at which Howard worked. J.A. 139–40 (ALJ), 248 (Board). As such, the fact that Howard worked for Apogee on his last day of employment is immaterial. Indeed, the only regulations that refer to the last day of employment are those defining operator liability, 20 C.F.R. § 725.494, and commercial insurance, 20 C.F.R. § 726.203. But the ALJ did not hold Arch liable either as an operator or as a commercial insurer. He did so through the non sequitur of assigning liability to "Apogee as self-insured through Arch"—*i.e., **self**-*insured through a ***different*** company.

While operator liability is fixed on the last day of a miner's employment, corporations' self-insurance is not. This case illustrates the reason why: businesses buy and sell subsidiaries all the time, and construing self-insurance—especially when approved for only current liabilities—to encompass former business units would make Arch liable

for huge amounts of other companies' liabilities, essentially transforming it into a junior-varsity version of the Trust Fund. That is not how self-insurance or the regulations operate; that paradigm is "so far from the norm" that it cannot "possibly work." Add. at 171.

By failing to address the basis for the decisions below, the Director's brief renders itself largely unhelpful. For example, it points to Arch's "statutory liabilities," AB 27, but the only statute that could reach back to Howard's employment imposes liability for operators, not former self-insured parent companies. This argument is apparently repurposed from cases involving operator liability. It certainly does not answer the challenge in Arch's Opening Brief of how the Director can conclude that Arch, as a self-insured business, has an obligation to insure a different business's liabilities. To paraphrase the canonical tort rule, there is no such thing as an insurance obligation "in the air." *See Pfalsgraf v. Long Island R.R. Co.*, 248 N.Y. 339 (N.Y. 1928). Rather, insuring another party is a matter of contract, and the Director has never identified an insurance policy between Arch and Patriot, which the District Director designated as the responsible operator for Howard's claims.

Consistent with a corporate parent-subsidiary relationship, Arch's self-insurance program before January 1, 2006 encompassed Apogee. Arch had provided security for Apogee's liabilities and listed its mines in its self-insurance filings with DOL. *See* 20 C.F.R. § 726.105. The Department had approved self-insurance based on those filings. When Arch later sold Apogee to Magnum, Arch updated its security instruments and list of mines with DOL, as required by the regulation contemplating a reduction in self-insurance assets where the "payroll of employees engaged in coal mine employment" or "current affairs" warrant that reduction. OB at 2-3; *id*. at 14-16; 20 C.F.R. § 726.109. The Department approved Arch's changed statement of liabilities and revised financial security, which no longer purported to cover mines that then belonged to Magnum. When Patriot later bought Magnum, it likewise updated its self-insurance documentation and security. And once again, the Department approved Patriot's self-insurance program. Thus, Magnum— and later Patriot—were not merely "free to agree to pay Arch's BLBA liabilities" as though they were running charities. AB at 27. Instead, having purchased Arch and insured all "past present and future liabilities," these purchasers were *required* to assume these liabilities.

Add. at 106, 331, 404; *but see* AB at 27; CAB at 13 (casting the sales aside as "convoluted transactions" that "do not serve to release Employer from liability"). And, until the cash ran out, DOL oversaw these companies and ensured they did, just as the regulations expect of it. *See* 20 C.F.R. § 725.601 (empowering the agency to monitor and enforce liability generally); *id*. at § § 725.606 (requiring the agency to set, adjust, and monitor security for prospective operator liabilities); *id*. at § 726.105 ("the Office shall require the amount of security which it deems necessary" and "the amount of security which shall be required may be increased or decreased when experience or changed conditions so warrant"); AB at 6 (acknowledging that "the Office" sets and approves "security" from self-insurers). Ignoring these transactions and their legal significance requires the Department to clear a high bar under state corporation law, *see* OB 15, which the Director does not even attempt to do.

Instead, he casts these agreements (and the agency's approval of them) aside, characterizing them as mere toothless "private contracts." AB at 27. That ignores the agency's knowledge—and approval—of the sales, and relies on authority that does not support his characterization. In *Triplett*, the Supreme Court addressed the constitutionality of an

agreement between a claimant for benefits under the BLBA and an attorney he hired to represent him. *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715 (1990). The BLBA authorizes fee-shifting when claimants prevail, but prohibits an attorney from receiving a fee—whether from the employer, insurer, Trust Fund, or claimant—unless approved by the appropriate agency or court. DOL's regulations invalidate all contractual agreements for fees. *See* 20 C.F.R. §§ 725.365, 802.203(f) (1989). Mr. Triplett, however, entered into such a contractual arrangement. The West Virginia Supreme Court refused to enforce a sanctions order against Triplett and the Supreme Court reversed. The parties are left to guess how that case supports the Director's argument concerning the 2005 Arch-Magnum purchase agreement here, especially where that agreement fully complied with the BLBA's insurance requirements.

Similarly, in *Connolly*, the Supreme Court held that the retroactive application of withdrawal of liability provisions of the Multiemployer Pension Plan Amendments Act of 1980 did not constitute an unlawful taking under the Fifth Amendment. *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211 (1986). It rejected a party's effort to contract out of its statutory obligations. Here too, the case is inapposite because Apogee's

sale fully complied with the obligations imposed by the BLBA; if it had not, the agency would have been constrained to challenge it.

Corporate separateness is no small matter; "decisions to pierce the corporate veil…must be taken reluctantly and cautiously." *Keffer v. H.K. Porter Co., Inc.*, 872 F.2d 60, 64 (4th Cir. 1989); *accord* OB at 15-17; *cf. Kutty v. Dep't of Labor*, 764 F.3d 540, 552-53 (6th Cir. 2014) (affirming veil-piercing where agency offered evidence of "wrongs" to justify this remedy). That is especially true when self-insurance documents filed with and approved by the Department confirm that a subsidiary and its liabilities have changed hands. While that might not matter for operator liability, it is the beginning and end of the case for self-insurance.

## B. The Regulations and Precedent Applying Them Establish an Impermissible Retroactive Rule Change.

Because of its failure to address the basis of liability—*i.e.*, as another company's "self-insurer"—the Answering Brief does not respond to many of Arch's arguments establishing the rule change in Bulletin 16-01. The Department declares in conclusory fashion that "[n]othing in the statute, regulations, or caselaw" supports a distinction between self-insurance and commercial insurance. AB 3. That is incorrect. Among the unrebutted features supporting that distinction are the regulations' text and

structure, the *expressio unius* and absurdity canons of construction, and the recognition by courts around the country that self-insurance does not survive a corporate sale. OB at 20-21. The Director does not respond to any of these points, and his alternative arguments fail to bear the weight he places on them.

First, the structure of DOL's regulations and the nature of self-insurance confirm the linguistic point the Director, himself concedes: "[a]s the name suggests, self-insurance allows an employer to guarantee its own liabilities." AB at. 29. The Answering Brief recognizes that the BLBA gives mining companies the choice of "either purchasing commercial insurance or obtaining DOL's permission to self-insure." AB 6 (citing 30 U.S.C. § 933(a)). That dichotomy is enshrined in the regulations, which treat self-insurance and commercial insurance in separate subparts. *Compare* 20 C.F.R. Part 726, Subpart B (§§ 726.101–726.115) (self-insurance) *with* Subpart C (§§ 726.201–726.213) (commercial insurance). As explained in the Opening Brief and uncontested in the Answering Brief, structural features like separate subparts indicate that the rules in the two areas are not interchangeable. Instead, "the structure of the regulatory scheme" illustrates that the agency's theory "applies Subpart

C, governing commercial insurance…to self-insurance that follows the mine under Subpart B." OB at 17-20. Thus, the Answering Brief errs when it says that there is no reason to apply the trigger for commercial insurance coverage to self-insurance. *See* 20 C.F.R. § 726.203(a). Because there is no self-insurance regulation in Subpart B analogous to the occurrence-based trigger in Subpart C, this Court "presume[s]" that the "choice of language was purposeful." *N. Fork Coal Corp. v. Fed. Mine Safety & Health Review Comm'n*, 691 F.3d 735, 743 (6th Cir. 2012); *see generally Saginaw Chippewa Indian Tribe v. Blue Cross*, 32 F.4th 548, 557 (6th Cir. 2022) (explaining that "the standard tools of interpretation" apply equally to statutes and regulations). That choice was not merely purposeful, it was also full of wisdom: distinguishing claims-made and occurrence-made triggers represents "the essence of" insurance law; the agency may not "impermissibly collapse these critical distinctions." *President & Fellows of Harvard Coll. v. Zurich Am. Ins. Co.*, 77 F.4th 33, 39 (1st Cir. 2023) (cleaned up).

The Answering Brief argues that honoring these critical distinctions would lead to "absurd results." AB 33–35. As a preliminary matter, relying on the absurdity canon sets a high bar; it must be "quite

impossible that Congress could have intended the result." *In re Hokulani Square, Inc.*, 776 F.3d 1083, 1088 (9th Cir. 2015). Here, the Department's alleged "absurdity" involves a very specific circumstance—a self-insured insured operator switches to commercial insurance then declares bankruptcy before a retired miner, whose last day of work occurred during the commercial-insurance phase, files a BLBA claim. AB 35. The Answering Brief does not identify a single case matching this hypothetical fact pattern.

Notably, though, the case at bar comes close, and the agency's own insurance guru resolved the hypothetical in Arch's favor. Like the Director's theoretical self-insured operator, Apogee was self-insured until December 31, 2005. And, hewing to the agency's hypothetical, commercial insurance in the form of Magnum's policy through Brickstreet Mutual took over from 2006 through 2008 before Patriot purchased Magnum's assets and liabilities. After Arch attempted to assemble the record below, David Benedict, the Department of Labor's own section chief of insurance and financial compliance, reflected upon the Director's posited scenario in a July 22, 2021 deposition in *Meredith v. Hobet Mining*, 2021-BLA-05075. He testified that "[t]here ***was*** a gap in coverage" when Magnum was

commercially insured, but that the Department expected Patriot to cover those liabilities once it bought Magnum and took over as self-insurer rather than reaching back in time to Arch.  Indeed, the Department, itself, would need to approve the switch to self-insurance and could insist on adequate security to cover all of its *operator* liability while commercially insured.  That last fact is the most important: even in the Department's hypothetical doomsday scenario, the worst that happens is that the Trust Fund covers the claim.  That outcome is not absurd.  In fact, the Trust Fund exists to cover claims where no one else is liable, whether through bankruptcy or an unanticipated fall through the Department's own regulatory cracks.  *See* 26 U.S.C. § 9501(d). The agency's retroactive solution—to cover for its publicized and embarrassing failure to "estimate future benefit liability" by fingering Arch for that liability through the Bulletin—is an unconstitutional non-starter.  *See* Government Accountability Office, Black Lung Benefits Program: Improved Oversight of Coal Mine Operator Insurance Is Needed, at 18 (GAO-2021, Feb. 2020), Available at [GAO-20-1, Black Lung Benefits Program: Improved Oversight of Coal Mine Operator Insurance Is Needed](#) (last visited January 31, 2024).

Second, the concept of self-insurance is not unique to the Department of Labor, and courts presume that Congress adopted the self-insurance provision in the BLBA against the background of ordinary usage: "[W]e believe that Congress intended for this definition to be developed by the agency in a manner that is consistent with the customary usage of the phrase in the . . . industry.. *See, e.g., Ass'n of Am. RRs v. Costle*, 562 F.2d 1310, 1321 (D.C. Cir. 1977). The Answering Brief makes no attempt to show that anyone in any industry understands self-insurance to have an occurrence-based trigger. Nor could it. Courts around the country honor "the critical distinction . . . between occurrence-based and claims-made policies." *Harvard College*, 77 F.4th at 39; Add. at 166 (imposing commercial insurance triggers upon self-insurers would be irrational and would "take away any degree of finality" and thus stifle corporate transactions). When the Department approves self-insurance and sets security levels on an annual basis to reflect a then-current list of covered mines, it approves a claims-made policy. If it were otherwise, the list of mines would include all mines the company ever owned, and the amount of security required would be vastly higher. This would make Black Lung liabilities "almost impossible to insure." Add at 154; *accord*

*Harvard College*, 77 F.4th at 38  (applying commercial insurance triggers to self-insurance would compromise "fairness in rate setting").

Third, DOL's own practice confirms that the regulations have, prior to Bulletin 16-01, enforced a claims-made rather than occurrence-based trigger on self-insured mining companies.  OB 24.  The Director has no answer for the facial difference between the Bulletins governing the James River and Patriot bankruptcies: claims against James River were directed to the Trust Fund, while claims against Patriot were directed to different companies that had sold business units to Patriot. *Compare* Add. 202, 411 *with* Add. 313. Those documents confirm an improper change in policy that required rulemaking formalities and notice to potentially liable entities.

Vestiges of DOL's old policy can be found elsewhere in the public record. In response to an especially instructive example—the agency's own articulation of its pre-Bulletin policy in *Adkins v. Hobet Mining,* 2021-BLA-05409—the Director simply declares in one of his dozens of footnotes that this recitation  of the former rule was a "mistake."  AB 33 n.26.  It was not.  Rather, the agency's conclusion—"since the company was self-insured, a previous employer cannot be named liable in this

manner"—was detailed, clear-eyed, and confident. Add. at 421. Far from a "mistake" worthy of no more than a mere passing mention in a footnote, this admission reflects the longstanding practice of the Department, consistent with its earlier Bulletins: a miner who retires prior to the Magnum sale but files for benefits years later "is considered to be the responsibility of the Black Lung Disability Trust Fund." Add. at 421; *see also* Add. at 156-57 (DOL never advised self-insureds that a parent company could still be liable for claims brought by employees of entities that were sold to other companies).

The Answering Brief's discussion of *Abbott v. McCoy Elkhorn Coal Corp.,* 2019-BLA-05029 is even less constructive. The Director cites that case for the proposition that DOL "named self-insured subsidiaries to James River liable for claims based on employment before the sale." AB 31–32. True, but it did so on the basis of ***operator*** liability. Once again, the Director refuses to engage with the ALJ's rationale in this case, which expressly rejected operator liability in favor of treating Arch like a commercial insurer. J.A. 139–40; *see also* CAB at 12 (misapprehending the ALJ's liability theory as holding Arch responsible because it "was correctly designated as the Responsible Operator"). Nothing in *Abbott*

addresses that justification, and the Department cannot change liability theories on appeal. *Chenery*, 318 U.S. at 87.

The Department similarly misses the mark on *Allen v. Hobet Mining*, 2019-BLA-06231. AB 33 n.26. Like *Adkins*, that case arose from the same transaction at issue here—the sale of various Arch subsidiaries to Magnum. But in that case, DOL instructed its claims examiners to respect the corporate transaction and the transfer of liability it included. The Department explained that "Magnum Coal Company assumes all black lung claims liability . . . effective 1/1/06 and continuing Brickstreet Mutual Ins. Co. [commercial policy] provides coverage for the individual companies . . . ." Add. 7; *accord id.* at 146-47 ("if the buyer of the company took on all of the claims liabilities from past periods, then that subsidiary would drop out of the ongoing self-insurance of the seller"). It is immaterial that Patriot had not yet declared bankruptcy—it just completed a major purchase. AB 33 n.26. The important thing is that the Department respected the transfer of liability in 2005 and rejected it in Bulletin 16-01 in 2015.

At no point during the era of respecting corporate separateness did the Department require companies to obtain some sort of "release." AB

21, 36–39. The Department simply invents its release concept on appeal—it appears nowhere in the regulations or in the pleadings below. Even worse, it stakes its entire case on this nonsense: "the one thing [Arch] needs to escape liability [is] a release from DOL." AB at 51. This is the portrait of "a 'convenient litigating position' or a *post hoc* rationalization'" that the Supreme Court condemned in *Kisor v. Wilkie*, 139 S. Ct. 2400, 2430 (2019). While the Answering Brief attempts to wrap itself in deference, AB 24–25, "a court may not defer to a new interpretation, whether or not introduced in litigation, that creates unfair surprise to regulated parties." *Kisor,* 139 S. Ct. at 2417–18 (quotation omitted). Here, the notion of a release is both surprising—it appears nowhere in either statute or regulation—and superfluous in light of the requirement that the Department approve the sufficiency of a self-insurer's security to cover the mines listed on its annual application. 20 C.F.R. § 726.102(b)(3). If, in addition to listing covered mines, a self-insured operator must now obtain a release for mines no longer on the list, that change could be the clearest example of a new rule yet.

Ultimately, the Department is free to change its position through reasoned decision-making. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct.

2117, 2125 (2016). But that did not occur here. Instead, the Department quietly changed its rule through Bulletin 16-01. That gambit lacked the required formality of notice-and-comment rulemaking and applied retroactively in violation of the APA and due process. OB 22. As a result, the Court should hold the Department to the understanding of self-insurance that existed before the Patriot bankruptcy and the Department's decision to shift Patriot's liability away from the Trust Fund to unaffiliated companies.

This case adds an extra layer of lawlessness in the Department's pervasive failure to face the justification that the ALJ and BLBA used for assigning liability—that is, as an insurer and ***not*** as an operator.[2] This pure insurance case presents the Department's changed approach to self-insurance in an uncomplicated vehicle that cries out for reversal.

## II. The Liability Evidence Rules Have Nothing to Say About the Record Arch Assembled.

Just as alarming as the agency's changes is the way it has sought to avoid meaningful debate about them.

---

[2] The statute also precludes liability if an operator transfers ownership to a successor, whether or not the claimant worked for the successor. 30 U.S.C. § 932(c). DOL's changed occurrence principle plainly contravenes the Act's express terms.

Throughout this and countless other cases, Arch has sought to prove up its well-pled allegation that the Bulletin marked a "retroactive and arbitrary departure from established self-insurance principles." OB at 9 (citing J.A. at 28, 39). At every turn, the agency has stonewalled that effort by repurposing regulations that have nothing to say about the agency's exclusionary objectives.

As Arch has already made clear, its discovery effort aimed to "confirm the Department's change of policy" and to "demonstrate why the Bulletin's newly minted policy violated corporate and insurance law principles" and thus "had nothing to do with…liability generally." OB at 32; *accord id.* at 9 (repeating Arch's well-pled allegation that the Bulletin marked a "retroactive and arbitrary departure from established self-insurance principles." (citing J.A. at 28, 39).

The Answering Brief does not even endeavor to respond to that plain-as-day point. Instead, it recasts *Acosta*—and indeed the gravamen of Arch's APA-related arguments before this Court—as amounting to a mere "liability" dispute. But *Acosta* concerned "statutory claims that the Bulletin violates the BLBA and the APA." *See Arch Coal v. Hugler*, 242 F. Supp. 3d 13, 20 (D.D.C. 2017). And though the Director references

"liability evidence" more than two dozen times, never once does she mention—much less address meaningfully—Arch's statutory claims or the evidence proving them up.

So far, that strategy has worked: without exception, ALJs and the Board have left DOL's repurposed (but palpably wrong) interpretation of "liability" evidence unchecked. *See* J.A. at 33, 50 (denying document discovery addressing, *inter alia*, changes to DOL's policy toward "self-insured mine operator[s]…that later became insolvent" because "the SSAE (an early step in the administrative process) instructed Employer to submit its liability evidence by May 16, 2016"); *id.* at 71 (wherein DOL refused to provide documents "addressing how DOL allocated black lung liability in cases filed before the BLBA Bulletin No. 16-01 was issued" because this "documentary evidence pertaining to liability" was untimely).

But this reflexively accepted concept—that statutory claims challenging a retroactive policy change that departs from industry norms and renders Black Lung liabilities "almost impossible to insure" somehow amount to a "liability" challenge—strays beyond "the bounds of reasonable interpretation." *Arlington v. FCC*, 569 U.S. 290, 296 (2013).

Sections 408(a)(2)(v) and 414(b)(1), addressing whether an "operator is capable of assuming liability for the payment of benefits" or "qualified as a self-insurer," have nothing to do with Arch's statutory claims. *See* OB at 32-34; *but se*e AB at 41-42. Far from merely concerning "insurance or self-insurance coverage," the *Acosta* complaint and Arch's related discovery concern the agency's historical treatment of bankrupt self-insurers before and after BLBA Bulletin 16-01. Contrasting that changed policy with traditional notions of insurance law—and establishing the change in the first place—transcends mere "insurance coverage questions"; Arch's policy and procedure challenges come nowhere close to "the subjects specified in 20 C.F.R. § 725.408(a)(2)" or any other limiting regulation the agency hints at but conveniently fails to identify. *See* OB at 31-32 *but see* AB at 38; *id*. at 42 ("section 725.408 is not the only liability-evidence rule that applies to documents"). The *Kisor* Court warned against precisely this type of agency "interpretation" of its own rules: "a court should decline to defer to a merely 'convenient litigating position' or '*post hoc* rationalization advanced' to 'defend agency action against attack.'" 139 S. Ct. at 2417 (quotations omitted).

The Director adds that Arch "can and has developed its record" in other claims. AB at 41 n.41. That is no response at all. This Court must decide the case at bar, not other, later-in-time cases in which Arch has made the tactical decision not to fight the Director's arbitrary view of "liability" evidence. And just because Arch has "successfully developed and submitted" evidence advancing its statutory claims in later-filed cases does not make the Director's view any less wrong. *But see* AB at 43.

In a moment of clarity, the Director acknowledges that the evidence at issue concerns not only "liability," but also "a departure from past practice." AB at 39. He adds, *ipse dixit*, that the excluded evidence "does not, in fact, prove" a changed policy just as she did below. OB at 30 (citing J.A. at 212). Those assurances are worth testing; the impropriety of the Director's approach "hardly needs discussion." OB at 30. Before it can announce proclamations like "the Bulletin does not mark a departure from the regulations or a change in policy," JA 209, *id*. at 211, with impunity, DOL "must do what every other agency treats as routine" by subjecting those outcome-determinative proclamations to a full, fair, and evidence-driven adversarial testing. *See* OB at 38 (citing *Olivares v. Transport. Sec. Admin*, 819 F.3d 454, 464 (D.C. Cir. 2016) and *Carllson v.*

*United States Citizenship and Immigration Servs.*, No. 12-cv-7983, 2015 WL 1467174, at *14 (C.D. Cal. March 25, 2015) (unpub.). So far, it hasn't.

And so, nearly six years after *Acosta*, the parties are back where they began and precisely where Arch predicted they would be when it warned that DOL would refuse to allow Arch to "develop its claims during the administrative proceedings." *Acosta*, 888 F.3d at 502. When the D.C. Circuit responded with consolation—Arch's "statutory claims that the Bulletin violates the BLBA and the APA" are not "outside the scope of the administrative review scheme," *Hugler*, 242 F. Supp. 3d at 20—there is no way it had in mind the Department's weaponized readings of "liability" evidence limitations. And if this really is the best the agency's administrative proceedings offer, then perhaps the *Axon* Court's intervening holding provides an answer: "our conclusion follows: the claims are not 'of the type' the statutory review schemes reach. A district court can therefore review them." *Axon Enterprise, Inc. v. FTC,* 598 U.S. 175, 196 (2023). If this Court shares that conclusion, it should note its departure from *Acosta* and Arch's right to bring suit in an Article III court.

## III. Even if They Were Applied Correctly, the "Liability" Evidence Rules are Illegal.

Arch's opening brief argued that the ALJ's rulings concerning Arch's evidence are, on their face, inconsistent with the Act's mandate that ALJs shall undertake "all powers duties and responsibilities" vested in them without limitation. OB at 26-29. The Director's response, interpreting the regulations to conflict with the BLBA and the APA and minimizing the District Director's outsized role, should not persuade.

The APA ensured that "subsequent statues may not be held to supersede or modify" the APA's edicts "that relate to hearing examiners." 5 U.S.C. § 559. And the Supreme Court in *Greenwich Collieries* made clear that courts "do not lightly presume exemptions to the APA" like the one the Director advocates. 512 U.S. 267, 271 (1994). Thus, while regulations may supplement the APA, they may not "displace" that Act.

The APA envisions that "hearing officers" should preside over adjudicatory proceedings competently to ensure the "effective execution of regulatory policies by administrative agencies." *See* Ralph F. Fuchs, The Hearing Examiner Fiasco Under the Administrative Procedure Act, 63 HARV. L. REV. 737, 751 (1950). Practically speaking, the persons now called District Directors are neither trained nor qualified to perform these

functions; only ALJs are. *See* 5 U.S.C. § 556(c)(listing functions similar to those in 33 U.S.C. § 927(a)).

And yet, despite this lack of training, District Directors *do* have a substantive role. *See* 33 U.S.C. § 927(a); 20 C.F.R. § 725.416 (empowering District Directors to hold informal conferences); *id.* at § 409(b)(2) (empowering District Directors to deny claims by reason of abandonment or to, in their "discretion" otherwise sanction non-participating parties); *id.* at § 725.407 (empowering the District Director to "investigate" prospective parties and to demand from them answers to "specific questions"); *but see* Resp. at 46 (minimizing District Directors' roles as imposing mechanical time limits). For example, if a named operator wishes to obtain medical records from a third party, the operator can send a medical release to the claimant to sign; and if the claimant does not timely sign the release, the District Director is empowered to order the claimant to sign the release or otherwise have his claim deemed abandoned. 20 C.F.R. § 725.414(a)(3)(i). Additionally, the District Directors routinely and almost always address (and usually grant) a party's request to extend time to submit medical evidence. Lastly, the District Directors engage and analyze the medical evidence submitted by

the operator to determine entitlement.  In this respect, the regulations do "displace" the APA by affording District Directors responsibilities properly reserved to "hearing examiners," *i.e.*, ALJs. *Cf. Amax Coal v. Dir., OWCP*, 312 F.3d 992, 893 (7th Cir. 2002) (distinguishing burdens of production from burdens of proof to harmonize the APA and black lung regulations); *NMA v. Chao*, 160 F. Supp. 2d 47, 70 (D.D.C. 2001) (upholding regulations that were "not intended to displace the APA standards"); AB at 50 (relying on this authority).

History reveals the problem with this displacement.  After *Acosta*, the District Director did not engage in the very role that the Solicitor promised the D.C. Circuit he would.  He ignored written discovery requests, ignored requests to have DOL witnesses testify, and ignored evidence calcifying Arch's "statutory claims that the Bulletin violates the BLBA and the APA." *Cf. Hugler*, 242 F. Supp. 3d at 20 (holding that these matters are within "the scope of the administrative review scheme").[3] In multiple cases, when Arch requested that the District Director extend

---

[3] *See Ward v. Catenary Coal Co. LLC*, Case ID: 2B2LD-2016090; OWCP No. CH xxx-xx-2731; *Allen v. Hobet Min. Inc.*, Case ID: BRLD5-2017268; OWCP No. JO xxx-xx-0721; *Massey v. Catenary Coal Co.*, Case ID: 2BLMJ-2017193; OWCP No. CH xxx-xx-5282; *McClure v. Catenary Coal Co.*, Case ID: 2BRZ3-2017236; OWCP No. PA xxx-xx-64; *Williamson v. Hobet Mining, Inc.*, Case ID:  2BJ7M-2019066; *Burton v. Arch of Alabama, Inc.*, Case ID:  BV2J7-2017044.

deadlines to allow it to submit so-called liability evidence into the record, the District Director ignored the requests and merely proceeded to forward the cases with an incomplete record to the ALJ. In each case, Arch protested requesting that the District Director address its requests but District Director never did. Even worse, in each case the ALJ demanded a showing of "extraordinary circumstances" to consider the evidence and found none. If inaction amounting to a dereliction of duties inhibiting the "effective execution of regulatory policies by administrative agencies" does not amount to extraordinary circumstances, then the District Director's failures *are* "held against the company," not just before the District Director but throughout a case's history. Resp. at 47. This disputes, at least in practice, that "discovery management and the admission of evidence remain[s] with the ALJ." *But see* Resp. at 31.

This exemplifies why the evidence-limiting regulations do not merely "set deadlines." Instead, they force the creation of a record to decide a party's liability before a bureaucrat who has no regulatory or legal authority to issue subpoenas to third parties or to DOL. And yet, because those District Directors' decisions "stick," those officers divest ALJs of their APA-granted role in violation of 5 U.S.C. § 559.

## IV. The Director's "Typo" Defense Fails.

The Director believes that the District Director "properly notified Arch of its liability for this claim."

When a plaintiff initiates a lawsuit, courts insist that the plaintiff gets the procedures—filing, service, etc.—right. The importance of procedural accuracy is no less applicable in black lung litigation. *See* 20 C.F.R. § 725.418(d).

Here, the agency failed to comply with section 725.418, plain and simple. Its PDO's (a step later than the SSAE in the administrative process) liability analysis section reasons that "Apogee Coal Company Llc is the responsible operator in this claim" and, further, that notice was proper because

> a Notice of Claim was received by the potentially liable operator/carrier, Self-insured thru Patriot Coal Company, on December 11, 2014, as evidenced by the signed return receipt from the post office. The potentially liable operator/carrier has failed to timely submit evidence to support its position….therefore…no documentary evidence [pertaining to 20 C.F.R. 725.408(a)(2) may be admitted in any further proceeding.

J.A. at 359.

The ALJ excused this language as a "typo," divining that the agency surely meant to name Arch where every other document named Patriot.

*Id*. at 366.  Indeed, the ALJ even blamed ***Arch*** for any confusion.  *Id*. at 367 ("if Arch was confused, it should have raised that issue in its response to the PDO.").  No matter that all the "associated documents" list Patriot.  Or that 20 C.F.R. § 725.418(d) offers no "confusion" or "typo" exception to the requirement that the District Director "must dismiss" unnamed parties.  Or that the regulation imposes no duty upon unnamed parties to clarify the agency's mistakes.

The Director casts this error aside by referencing header language listing Arch Coal as the insurance carrier.  AB at 51 (citing J.A. at 355).  But that excuse appears nowhere in the Decision and Order; such "after-the-fact explanations advanced by agency lawyers during litigation" are prohibited by the "post hoc justification doctrine."  *See Dep't of Homeland Sec. v. Regents of the Univ of Cal.*, 140 S. Ct. 1891, 1934 (2020) (Kavanaugh, J., concurring in part, dissenting in part); *accord Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 419 (1971)).  And where, as here, "the agency's decision rests on a collapsed legal foundation," the courts may not rescue an agency from its own mistakes."  *Calcutt v. FDIC*, 37 F.4th 293, 361 (6th Cir. 2022) (Murphy, J. dissenting); *Gonzales v. Thomas*, 547 U.S. 193, 196 (2006) (the APA does not permit the agency to

utilize a "wrong-reason-right-outcome" approach) (per curiam). Even if this Court was willing to ignore the regulations and look beyond the PDO, why would it think the typo was the PDO's reference to Patriot—consistent with the Notice of Claim and Schedule also naming Patriot—rather than the PDO's lone reference to Arch in a header? This is the very sort of "good-enough-for-government-work" approach to agency decisionmaking observers have condemned. *See Calcutt*, 37 F.4th at 361 (Murphy, J., dissenting).

Especially against the backdrop of its own hyper-technical (but textually indefensible) approach to "liability" evidence, the Director's *post hoc* explanations, which were "neither mentioned nor even implied by the orders on review," must fail. *Florida Power & Light Co. v. FERC*, 88 F.3d 684, 689 (D.C. Cir. 1996) (cleaned up).

## CONCLUSION

For these reasons and those presented in Arch's Opening Brief, this Court should vacate the decisions below, Arch should be dismissed, and Mr. Howard should be paid from the Trust Fund.

Respectfully submitted,

/s/ Mark E. Solomons
Mark E. Solomons
Dominic Draye
Michael A. Pusateri
Solomonsm@gtlaw.com
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
(202) 533-2361

**CERTIFICATE OF COMPLIANCE**

**Word count**

As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains 6496 words (exclusive of the cover, table of contents and table of authorities). I relied on my word processor to obtain the count, using Microsoft Word 2016.

**TypeFace**

In addition, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times Roman, 14 pt.

/s/Mark E. Solomons

Mark E. Solomons

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Combined Reply Brief was electronically served upon counsel of record via the Court's CM/ECF system.

/s/Mark E. Solomons

Mark E. Solomons