IN THE

# United States Court of Appeals

### FOR THE SIXTH CIRCUIT

APOGEE COAL COMPANY, *et al.*,

*Petitioners,*

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR, *et al.*,
*Respondents.*

ON PETITION FOR REVIEW OF A DECISION
AND ORDER OF THE BENEFITS REVIEW BOARD,
UNITED STATES DEPARTMENT OF LABOR

## PETITION FOR REHEARING *EN BANC*

Michael A. Pusateri
Dominic E. Draye
W. William Prochot
Michael A. Pusateri
pusaterim@gtlaw.com
drayed@gtlaw.com
prochotw@gtlaw.com
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
(202) 331-3100

# TABLE OF CONTENTS

RULE 35 STATEMENT.................................................................................1

BACKGROUND ........................................................................................3

    I.    The Black Lung Benefits Act and Designating the Responsible Party................................................................................3

    II.   Patriot's Bankruptcy and its Aftermath.................................4

    III.  Procedural History ................................................................5

REASONS TO GRANT THE PETITION ...................................................8

    I.    The Panel's Result Conflicts with *Grimes* ..................................8

    II.   The Panel's Decision Violates *Chenery*. ....................................12

CONCLUSION ........................................................................................15

Attachment A:  *Apogee Coal Co. v. Dir., OWCP [Howard],*112 4th 343 (6th Cir. 2024)..........................................................................17

Attachment B:  *Apogee Coal Co. v. OWCP [Grimes]*, No. 23-2521 (7th Cir. Aug. 19, 2024)............................................................................31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*American Energy LLC v. Dir., OWCP,*
106 F.4th 319 (4th Cir. 2024) ................................................................. 13

*Apogee Coal Co. v. OWCP [Grimes],*
113 F.4th 751 (7th Cir. 2024) ............................... 1, 2, 5, 7, 9, 10, 11, 12, 15

*Arch of Kent., Inc. v. Dir., OWCP [Hatfield],*
556 F.3d 472 (6th Cir. 2009) ................................................................. 14

*Braniff Airways, Inc. v. CAB,*
379 F.2d 453 (D.C. Cir. 1967) ............................................................... 12

*Crockett Colleries v. Barrett,*
478 F.3d 350 (6th Cir. 2007) ................................................................. 14

*Florida Power & Light Co. v. FERC,*
88 F.3d 684 (D.C. Cir. 1996) ................................................................... 2

*Glen Coal Co. v. Seals,*
147 F.3d 502 (6th Cir. 1998) ................................................................... 9

*Gulf & W. Indus. v. Ling,*
176 F.3d 226 (4th Cir. 1999) ................................................................. 13

*Apogee Coal v. Director, OWCP [Howard],*
112 4th 343 (6th Cir. 2024) ............................................................... 6, 11

*ICC v. Locomotive Eng'rs.,*
482 U.S. 270 (1987) ............................................................................ 13

*INS v. Ventura,*
537 U.S. 12 (2002) .............................................................................. 13

*Int'l Union v. Kelsey-Hayes Co.,*
872 F.3d 388 (6th Cir. 2017) ................................................................... 8

*Island Creek Coal Co. v. Henline,*
456 F.3d 421 (4th Cir. 2006) ............................................................. 13, 14

*Kisor v. Wilkie,*
139 S. Ct. 2400 (2019) ........................................................................ 10

*Lauderdale v. Dir., OWCP,*
940 F.2d 618 (11th Cir. 1991) ............................................................... 14

*President & Fellows of Harvard Coll. v. Zurich Am. Ins. Co.,*
77 F.4th 33 (1st Cir. 2023) .............................................................. 4, 5, 11

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ............................................................ 1, 12, 13, 15

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ...................................................................... 12

*Todd Shipyards v. Dir., OWCP*,
    848 F.2d 125 (9th Cir. 1988) ......................................................... 14

*United Brands v. Melson*,
    594 F.2d 1068 (5th Cir. 1979) ....................................................... 14

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ........................................................................... 2

**Statutes**

26 U.S.C. § 4121 ......................................................................................... 9

26 U.S.C. § 9501(d)(1)(B) .......................................................................... 3

**Other Authorities**

20 C.F.R. § 725.407 ............................................................................ 3, 14

20 C.F.R. § 725.408 ................................................................................ 14

20 C.F.R. § 725.408(a) ............................................................................. 3

20 C.F.R. § 725.408(a)(2)(v) ................................................................. 3, 5

20 C.F.R. § 725.418(d) ............................................................................. 3

20 C.F.R. § 725.494 ......................................................................... 1, 3, 6, 15

20 C.F.R. § 725.495 .......................................................................... 1, 6, 15

20 C.F.R. § 726.4 .............................................................................. 6, 9, 10

20 C.F.R. § 726.4(b) ............................................................................... 2, 7

20 C.F.R. §§ 726.101-726.115 ............................................................. 10, 13

20 C.F.R. § 726.101(b)(3) ......................................................................... 4

20 C.F.R. § 726.104(a) ............................................................................ 11

20 C.F.R. § 726.105 .................................................................................. 4

20 C.F.R. § 726.109 ............................................................................. 4, 11

20 C.F.R. § 726.110(a)(1) .................................................................. 2, 6, 7, 9

20 C.F.R. §§ 726.201-726.213 ................................................................ 10

20 C.F.R. § 726.203(a) ....................................................................... 4, 10

Black's Law Dictionary 602 (7th ed. 1999) ............................................ 11

Cong. Research Serv., The Black Lung Program (Feb. 7, 2023),
    *available at* https://crsreports.congress.gov/product/pdf/R/R45261 ...................... 9

Fed. R. App. P. 35(b)(1)(B) ................................................................................ 8

## RULE 35 STATEMENT

Rehearing *en banc* is warranted because the panel's decision, Exhibit A, conflicts with the Seventh Circuit's decision in *Apogee Coal Co. v. OWCP [Grimes]*, 113 F.4th 751 (7th Cir. 2024), Exhibit B, and at least two Supreme Court decisions.

Fourteen days after the panel's decision in this case, the Seventh Circuit decided *Grimes*. That case presented the same legal issue: can the Department of Labor ("DOL") declare a bankrupt coal mine operator "capable of assuming liability for the payment of benefits" under the Black Lung Benefits Act ("BLBA") because its former parent is still solvent and previously self-insured the bankrupt entity when it still owned the latter? The answer is "no."

Neither the BLBA nor the regulations permit DOL to treat a former parent corporation as an insurer of its sold subsidiary. The regulations that DOL has cited— 20 C.F.R. §§ 725.494 and 725.495—do not authorize DOL to do so. The Seventh Circuit rejected DOL's proposed course because "not one of the regulations it discussed or cited can be fairly read (in isolation or combination) to support the premise at the core of its liability determination." *Grimes,* slip. op. at 16. It also explained its departure from the panel in this case—which had issued two weeks prior without the benefit of oral argument. *Grimes*, slip op. at 16–20. Because of the split, the Seventh Circuit conducted an *en banc* poll, and no judge voted to reconsider the decision. *Id.* at 20.

Part of the reason for the circuit split is the panel's disregard for a pair of Supreme Court cases. First, *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943) precludes courts from backfilling rationales that were not included in the agency's

justifications. Neither the ALJ nor the Board cited any legal authority for holding Arch liable as an insurer where no insurance contract or freestanding legal obligation existed, yet the panel pointed to 20 C.F.R. §§ 726.4(b) and 726.110(a)(1), regulations no one had ever relied on and the ALJ and Board affirmatively disclaimed. J.A. 141. This was impermissible; "*Chenery* [ ] precludes us from affirming the Board on the Sixth Circuit's theory." *Grimes*, slip op. at 19.

Second, as a result of its "*post hoc* salvage operations," *Florida Power & Light Co. v. FERC*, 88 F.3d 684, 689 (D.C. Cir. 1996) (citing *Chenery*), the panel disregarded the principle that "a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). Arch is and has always been a separate company from the now-defunct Apogee Coal. The panel decision ignores corporate separateness in contravention of *Bestfoods*.

Absent a "concrete basis in positive law or principle of equity" to justify treating a former corporate parent as a commercial insurer, *Grimes* at 17, the *en banc* Court should grant this petition, vacate the decision, and hold the Trust Fund liable for benefits, as the Seventh Circuit did in *Grimes*.

# BACKGROUND

## I.     The Black Lung Benefits Act and Designating the Responsible Party

The BLBA establishes a process for compensating miners who contract pneumoconiosis, more commonly known as "black lung disease." The BLBA and its regulations assign responsibility first to the mine operator who last employed the claimant for one year and then, if operators are not available, to the Black Lung Disability Trust Fund. 26 U.S.C. § 9501(d)(1)(B).

The administrative judgment inherent in designating a responsible operator belongs to DOL. 20 C.F.R. § 725.407. The designation process begins with a district director who identifies potentially responsible parties based on five criteria set forth in DOL's regulations. 20 C.F.R. § 725.408(a). Among those is the mine operator's capacity to pay, *id.* § 725.408(a)(2)(v), which can be met if the operator either has commercial insurance or has been approved by DOL to self-insure, *id.* § 725.494. If the responsible operator named by the district director lacks the ability to pay and no earlier operators meet the criteria, the Black Lung Disability Trust Fund pays the claim. DOL's final designation of the responsible operator occurs through a proposed decision and order ("PDO"). Any entity not named in a PDO cannot be named once the case transfers to the Office of Administrative Law Judges for a hearing. *See* 20 C.F.R. § 725.418(d).

Commercial insurance for black lung liability covers any miner who was last exposed to coal dust during the policy period regardless of when he makes his claim— an "occurrence" trigger. DOL requires every commercial policy to include an

3

endorsement with this trigger.  20 C.F.R. § 726.203(a).  To determine insurance coverage, DOL uses a claimant's last date of exposure.  *Id.*

Self-insurance is different.  It follows a "claims-made" trigger, covering all claims made during the period of self-insurance regardless of when the injury accrued. *See President & Fellows of Harvard Coll. v. Zurich Am. Ins. Co.*, 77 F.4th 33, 39 (1st Cir. 2023) (noting the "critical" distinction between insurance and self-insurance triggers).  To qualify as a self-insurer, a company must, among other things, submit to DOL a "list of the mine or mines to be covered," *id.* § 726.102(b)(3), and demonstrate that it can pay the liabilities it "may be expected to be required to pay during the ensuing year." *Id.* § 726.101(b)(3).  DOL can annually alter the financial security it requires when a company changes its list of covered mines.  *Id.* § 726.109.  For self-insurers, nothing akin to the commercial endorsement covering all claims arising "during the policy period" in perpetuity exists.

## II.     Patriot's Bankruptcy and its Aftermath

Until January 1, 2006, Apogee, the subsidiary that employed Mr. Howard, was owned by Arch.  Arch sold Apogee to Magnum, which in turn sold Apogee to Patriot Coal in 2008.  On May 12, 2015, Patriot, along with its subsidiaries, declared bankruptcy and was liquidated five months later.  Patriot's bankruptcy was a disaster for DOL.  It exposed what the Government Accountability Office ("GAO") described as DOL's mismanagement of the BLBA self-insurance program.  *See* GAO, Black Lung Benefits Program: Improved Oversight of Coal Mine Operator Insurance Is Needed (GAO-2021, Feb. 2020); *see also* 20 C.F.R. § 726.105 (requiring the agency to set and reassess self-insurance reserves "when experience or changed conditions so warrant");

*id.* at 726.109 (similar).  In the case of Patriot alone, DOL underestimated its liability by over $200 million dollars.  *See* GAO Report at 2.

In response to this "wave of bankruptcies" and their financial pressure, DOL announced a new "administrative protocol" detailed in BLBA Bulletin 16-01.  *See Grimes*, slip op. at 8.  Under DOL's new approach, claims against a bankrupt operator are chargeable to its former, self-insured parent.  *Id.* at 8.  DOL did not require any contract between the former and current owners or any representation to DOL indicating that the former owner was still self-insuring a business that was no longer part of its "self."  DOL had never done this.  DOL simply invented an insurance obligation where none existed.

## III.    Procedural History

Howard retired from mining in 1997 and filed for black lung benefits in November 2014.[1]  Because he last worked for Apogee, the district director designated Apogee as the responsible operator.  J.A. 284.  When Howard filed his claim, Apogee was a subsidiary of Patriot, which had not yet declared bankruptcy.  *Id.*  Neither Apogee nor any previous corporate parents held a commercial insurance policy that covered Howard's claim.  Once Patriot declared bankruptcy, the correct course was to conclude that Apogee was not "capable of assuming liability for the payments," 20 C.F.R. § 725.408(a)(2)(v), and to hold the Trust Fund liable.  That is the purpose for which the Trust Fund exists.

---

[1]     Howard passed away during this litigation.  His estate will be paid the full amount of benefits owed regardless of how this case plays out.  The only question is who pays.

Rather than following this course, DOL followed its new policy and issued a notice of claim declaring Arch liable as the insurer of Apogee's liability. J.A. 319. The ALJ embraced DOL's new policy and relied on the regulations governing responsible operators, 20 C.F.R. §§ 725.494 and 725.495, to hold Arch responsible *as an insurer*. *See* J.A. 138 (describing Arch as a "self-insurer" five times). Neither DOL nor the ALJ identified any source of law—a statutory or regulatory provision or contract—that bound Arch to continue paying claims against a subsidiary that it sold and that later owners covered with their own self-insurance as required by DOL.

Arch appealed to the Benefits Review Board, which affirmed the ALJ's reliance on sections 725.494 and 725.495. J.A. 235. A panel of this Court then affirmed, relying on two regulations not relied on by the agency, ALJ or Board—20 C.F.R. §§ 726.4 and 726.110(a)(1)—as authority for DOL treating Arch's former self-insurance of Apogee as extending indefinitely. It did so notwithstanding that Arch sold Apogee, informed DOL of the transfer, and obtained DOL's approval for its ongoing self-insurance without Apogee included. *See Howard*, 112 F.4th at 354.

DOL had *never* argued that those provisions authorized its actions. In fact, the ALJ affirmatively *disclaimed* Part 726 as forming any basis of liability. J.A. 141. She instead concluded that Part 726 governed how a company obtains self-insurance authorization. *Id.* And the Board agreed. J.A. 248-49. Neither provision cited by the panel was ever part of DOL's contemporaneous rationale for either its policy change— *i.e.,* the change announced in Bulletin 16-01—or the ALJ's or Board's decisions.

In the Seventh Circuit, Arch's challenge to being treated as Apogee's perpetual self-insurer raised the same issue raised here. That court noted that "[t]here must be some source of law (or perhaps combination of sources) that the Department can point to that affirmatively requires Arch to satisfy benefits owed to Mrs. Grimes." *Grimes*, slip op. at 14. It then concluded that "the ALJ and the Board have failed to justify their conclusions that Arch can be compelled to satisfy the black lung liability of Apogee." *Id.* at 21. It went on to address this panel's decision, explaining that "*Chenery* precludes us from affirming the Board on the Sixth Circuit's theory" because no one ever relied on 20 C.F.R. §§ 726.4(b) and 726.110(a)(1) to justify imposing liability on Arch. *Id.* at 19 (citing, *Chenery*, 318 U.S. at 87–88). The court also observed that "it is hard to see how either provision" the panel cited "could support a finding of liability." *Id.* Because it split from this Court, it conducted an *en banc* poll, and no judge voted to reconsider. *Id.* at 20.

Arch timely filed this Petition for Rehearing *En Banc*.

## REASONS TO GRANT THE PETITION

### I. The Panel's Result Conflicts with *Grimes*

The panel's decision conflicts with the Seventh Circuit's authoritative statement in *Grimes*, and that court declined to reconsider its decision *en banc*.

A case "presents a question of exceptional importance if it involves an issue on which the panel decision conflicts with the authoritative decisions of other United States Courts of Appeals that have addressed the issue." Fed. R. App. P. 35(b)(1)(B). The panel's decision conflicts with the Seventh Circuit's authoritative statement in *Grimes*. "By nearly every measure," this case, which involves "an inter-circuit divide followed by lack of conformity to a Supreme Court decision…deserves en banc review." *Int'l Union v. Kelsey-Hayes Co.*, 872 F.3d 388, 390 (6th Cir. 2017) (Sutton, J., concurring).

Under the BLBA, the same question can occur in different circuits and implicate hundreds of future cases because large-scale bankruptcies are relatively common. Patriot's bankruptcy alone created over 500 cases in three circuits where DOL has named Arch as liable as an insurer. Arch is not the only company affected by DOL's changed policy. It has affected fifty self-insured companies and an untold number of prospective claims. https://www.dol.gov/sites/dolgov/files/owcp/dcmwc/blba/indexes/BL16.01OCR.pdf. The current cases are the leading edge of that wave, and reaching a correct and uniform decision is paramount.

Congress enacted the BLBA to create a nationwide system for paying benefits to miners disabled by pneumoconiosis. This Court cautioned against adopting

different rules from one circuit to another because it "destroy[s] the desired uniformity of application of the Black Lung Benefits Act." *Glen Coal Co. v. Seals*, 147 F.3d 502, 513 (6th Cir. 1998). An integral part of that system is the Trust Fund, which collects a Black Lung Excise Tax ("BLET") on every ton of coal mined in the United States. 26 U.S.C. § 4121. *See generally* Cong. Research Serv., The Black Lung Program (Feb. 7, 2023), *available at* https://crsreports.congress.gov/product/pdf/R/R45261. Neither the tax nor the available benefits vary from circuit to circuit. A disparity among the circuits regarding something as fundamental as the difference between commercial and self-insurance triggers is untenable for a federal statute that aims to provide benefits on the same terms across the nation. The outcome in future cases may depend only on the accident of the state in which a miner's last work occurred. That is anathema to a nationwide benefit program.

The most straightforward species of circuit split involves the express recognition by one court that it is breaking with another. That is precisely what has occurred here. The Seventh Circuit devoted five pages to explaining its disagreement with the panel decision. *Grimes*, slip op. at 16–20. Specifically, it explained why the panel's reliance on 20 C.F.R. § 726.110(a)(1) and § 726.4 is wrong. *Grimes*, slip op. at 19 ("[I]t is hard to say how either provision could support a finding of liability."). It further stated: "By its very terms, § 726.110(a)(1) is not an independent source of liability—a self-insurer's promise to pay benefits kicks in only if a provision elsewhere in the Act makes it liable on a claim." *Id.* at 19-20. Section 726.4 is even less helpful. That is a general regulation that merely gives DOL "flexibility in determining which

entities can be designated as the responsible operator." *Id.* It provides no independent basis for liability of a self-insurer. *Id.* That Arch might have been so designated, as an operator, is "beside the point, because that is not the decision that was actually made by the agency." *Id.* at 20; *see also* J.A. 139 (the ALJ noted: "the district director properly named Apogee, not Arch, as a potentially liable operator and as the responsible operator in this claim"); J.A. 247 (the Board stated: "[t]he ALJ found Apogee qualifies as a potentially liable operator"). The District Director, ALJ, and Board held Arch liable as an insurer, only. *See, e.g.*, J.A. 138 (repeating, five times, "Apogee, as self-insured by Arch").

Nor does the panel's finding comport with the regulations' text. The regulations do not expressly contemplate parent-subsidiary self-insurance arrangements, a fact that DOL conceded. *Grimes*, slip op. at 9. That "legal gap" cannot favor the agency and provide a basis for holding Arch liable. *See id.* at 17. Thus, the panel's decision holding Arch liable lacks any "basis in positive law" and is "without legal foundation." *Id.* at 13.

Further, the panel's approach also disregards the structure of the regulations, which set forth two distinct regulatory schemes with liability triggers that accord with industry standards. *Compare* Part 726, Subpart B (Self-Insurers, §§ 726.101-726.115) *with* Subpart C (Insurance Contracts, §§ 726.201-726.213); *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) ("the structure of the regulatory scheme" reveals its meaning). The regulations require commercial insurance policies to be occurrence-based. 20 C.F.R. § 726.203(a). At the same time, the self-insurance regulations do not

reference that trigger—or any trigger for that matter. But the entire system for financial assurances to cover claims that might be made during a period of self-insurance is consistent only with a claim-based trigger. *Id.* § 726.104(a); *Grimes*, slip op. at 6; *see also* Black's Law Dictionary 602 (7th ed. 1999) (the canon "*expressio unius est exclusio alterius*" holds that "to express or include one thing implies the exclusion of another, or of the alternative."); *see generally*, *Harvard College*, 77 F.4th at 39; *see also id.* 37 n.1 (explaining "the critical distinction . . . between occurrence-based and claims-made policies.").

The panel's approach also violates principles of corporate form. In observing that "principles of 'corporate separateness' found elsewhere in the law do not change the statutory obligations at play here," the panel thrust a subsidiary's liabilities upon its one-time parent. *Apogee Coal Co. v. Dir., OWCP [Howard]*, 112 F.4th 343, 354 (6th Cir. 2024). According to the Seventh Circuit, however, that "conflation of Arch and Apogee" violates "the time-honored principle 'that a parent corporation…is not liable for the acts of its subsidiaries.'" *Grimes*, slip op. at 12, 17 (quoting *Bestfoods*, 524 U.S. at 61). It also obviates the agency's appreciation that corporate assets are fluid, and its attendant duty to adjust a self-insuring company's security reserves downward "relative to its current affairs." 20 C.F.R. § 726.109.

These shortcomings persuaded the *Grimes* Court to hold the Trust Fund—not Arch—responsible for benefits because "the rule of law" demands a "concrete basis in positive law or principle of equity" that this panel failed to identify. *Grimes,* slip op

at 17.  These antipodal outcomes are intolerable for a federal statute with nationwide application.  The Court should rehear this case *en banc*.

## II.     The Panel's Decision Violates *Chenery.*

In relying on rationales disclaimed expressly by the Board and the ALJ, the panel violated the *Chenery* doctrine, which "applies with full force in black lung appeals."  *Grimes,* slip. op. at 15 (citing *Island Creek Coal Co. v. Henline*, 456 F.3d 421, 426 (4th Cir. 2006)).

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) prohibits a court from affirming an agency's findings on grounds other than those articulated by the agency.  It holds: "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."  *Id*. at 87-88.  Put another way, the reviewing court may only consider rationales the agency itself "clearly invoked."  *SEC v. Chenery Corp.*, 332 U.S. 194, 198 (1947) ("*Chenery II*").  And it may not affirm where there is "substantial doubt whether the administrative agency would have made the same findings..." *Braniff Airways, Inc. v. CAB*, 379 F.2d 453, 466 (D.C. Cir. 1967).

The agency here ***expressly eschewed*** the rationale the panel adopted.   The Director never asserted that the Part 726 regulations provide a legal basis for Arch's liability.  Indeed, "neither decisionmaker intimated, let alone held, that Arch's liability as a third-party self-insurer sprung from those regulations."  *Grimes*, slip op. at 19.  The ALJ below disavowed the panel's cited regulations explicitly:

> The self-insurance regulations simply do not govern the imposition of liability.  Section 726 of the regulations govern only *how* an operator must secure its existing liability; it does not *create* liability.

J.A. 141 (emphasis in original). So did the Board, which found the ALJ "correctly found the regulations at 20 C.F.R. §§ 726.101-726.115 govern 'only how an operator must secure its existing liability' and do not 'create liability.'" J.A. 248-49.

The problems inherent in a direct, intra-record conflict like this offend not only Supreme Court precedent, but sound policy. *Chenery* limits the courts' power to intrude into matters of "administrative judgment," thus ensuring agency accountability. *See Chenery*, 318 U.S. at 88. This is why a reviewing court may not affirm agency action "on a basis containing any element of discretion…that is not the basis the agency used, since that would remove the discretionary judgment from the agency to the court." *ICC v. Locomotive Eng'rs.*, 482 U.S. 270, 283 (1987); *accord INS v. Ventura,* 537 U.S. 12, 16 (2002) (holding *Chenery* prohibited a court from assessing asylum eligibility—a determination that Congress "exclusively entrusted to an administrative agency"); *American Energy LLC v. Dir., OWCP*, 106 F.4th 319, 335-36 (4th Cir. 2024) (when reviewing black lung adjudications, "we look exclusively to the grounds relied upon by the Board" under *Chenery*); *Henline*, 456 F.3d at 426-27 (applying *Chenery* strictly to remand Board's and ALJ's "invalid" statute of limitations findings); *Gulf & W. Indus. v. Ling*, 176 F.3d 226, 230 (4th Cir. 1999) (when applying *Chenery*, a court must look to the Board's decision to "ascertain the bases underlying the DOL's exercise of its power.").

Recognizing the "quasi-judicial" function the Board plays in the BLBA's procedural scheme, this Court—but not others—has applied *Chenery* to the Board's review of ALJ decisions flexibly, upholding Board decisions on alternative rationales

in disputes centering on a miner's entitlement. *Compare Crockett Colleries v. Barrett*, 478 F.3d 350, 358 (6th Cir. 2007) (affirming ALJ's award of benefits on substantial evidence grounds rather than the procedural grounds articulated by the Board); *id*. at 358 (positing that a reviewing court may affirm the Board's rulings "on alternative legal grounds") (Rogers, J., concurring) and *Arch of Kent., Inc. v. Dir., OWCP [Hatfield]*, 556 F.3d 472, 480 (6th Cir. 2009) (citing the *Barrett* concurrence to affirm an ALJ's finding that a miner's meritorious claim was timely filed for reasons overlooked by the Board) *with Grimes*, slip op. at 15 ("we also cannot overstate the importance of…the Supreme Court's 1943 decision in *SEC v. Chenery*") and *Henline*, 456 F.3d at 426-27 (applying *Chenery* strictly to remand Board's and ALJ's "invalid" statute of limitations findings).[2]

This case, though, does not concern a question of entitlement like in *Barrett* and *Hatfield*. Rather, it involves a matter of agency policy. Naming responsible parties is a policy determination entrusted to the agency, exclusively. *See* 20 C.F.R. §§ 725.407, 725.408.[3] And the panel's proffered rationale for holding Arch liable was one the agency never articulated and one that the Board and ALJ disclaimed explicitly.

---

[2]    If the Court disagrees with this approach for distinguishing *Barrett* and *Hatfield* from *Grimes* and *Henline*, this results in yet another split over the application of *Chenery* to black lung claims and provides yet another reason for *en banc* review.

[3]    This distinguishes the panel decision from cases the *Barrett* concurrence cited when it observed "other circuits have [ ] affirmed the BRB on alternate grounds." *See* 478 F.3d at 358-59 (Rogers, J., concurring).  *See Lauderdale v. Dir., OWCP*, 940 F.2d 618, 621 (11th Cir. 1991) (onset date of benefits owed by employer); *Todd Shipyards v. Dir., OWCP*, 848 F.2d 125, 129 (9th Cir. 1988) (amount of benefits owed by employer); *United Brands v. Melson*, 594 F.2d 1068, 1072 (5th Cir. 1979) (same).

Instead, the ALJ and Board followed DOL's arguments that 20 C.F.R. §§ 725.494, and 725.495 informed DOL's choice to name Arch. *See Grimes*, slip op. at 8 ("In designating Apogee as a potentially liable operator, the district director, as it turns out, was simply following administrative protocol"). For its part, the panel did not even mention those provisions. *But see Chenery*, 318 U.S. at 88 ("a judicial judgment cannot be made to do service for an administrative judgment"). And for good reason—those regulations provide no basis for holding Arch liable for its defunct, one-time former subsidiary. *See Grimes*, slip op. at 17-18; *see also id*. at 17 ("liability may not be imposed on a corporation simply because it strikes an agency…as sensible as a matter of policy.").

Because the panel's findings to the contrary are "without legal foundation," *see id*. at 13, and because those findings reflect a "decision that was [not] actually made by the agency," *Grimes*, slip op. at 20, the Court should grant Arch's Petition and reverse the ALJ's decision to name Arch, just as the *Grimes* Court did.

## CONCLUSION

For these reasons, the Court should reconsider the panel's decision *en banc*.

Respectfully submitted,
/s/ Michael A. Pusateri
Michael A. Pusateri
Dominic E. Draye
W. William Prochot
Michael A. Pusateri
pusaterim@gtlaw.com
drayed@gtlaw.com
prochotw@gtlaw.com
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
(202) 331-3100

# CERTIFICATE OF COMPLIANCE

**Word count**

      As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains 3893 words (exclusive of the cover, table of contents and table of authorities). I relied on my word processor to obtain the count, using Microsoft Word 2016.

**TypeFace**

      In addition, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Microsoft Word 2016 in Century Schoolbook, 12 pt. font.

/s/Michael A. Pusateri
Michael A. Pusateri

**Attachment A:**

*Apogee Coal v. Director, OWCP [Howard],*112 4th 343 (6th Cir. 2024)

KeyCite Yellow Flag - Negative Treatment

Distinguished by Apogee Coal Company v. Office of Workers' Compensation Programs, 7th Cir., August 19, 2024

112 F.4th 343
United States Court of Appeals, Sixth Circuit.

APOGEE COAL COMPANY,
LLC; Arch Coal, Inc., Petitioners,

v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, U.S. DEPARTMENT
OF LABOR; David M. Howard, Respondents.

No. 23-3332
|
Decided and Filed: August 5, 2024

**Synopsis**

**Background:** Coal mine operator and operator's owner that was operator's self insurer on employee-miner's last day of work with operator petitioned for review of decision of the Benefits Review Board affirming ALJ's finding that owner was the liable insurer for miner's claim for benefits for legal pneumoconiosis under the Black Lung Benefits Act (BLBA), and owner moved to supplement the administrative record on appeal.

**Holdings:** The Court of Appeals, Stranch, Circuit Judge, held that:

[1] neither equity nor Federal Rules of Appellate Procedure favored owner's motion to supplement the administrative record;

[2] ALJ's application of BLBA's liability evidence rules was neither arbitrary nor capricious;

[3] there was no need to pierce the veil of operator to reach owner's liability;

[4] bulletin issued by Department of Labor (DOL) did not require notice-and-comment rulemaking;

[5] DOL did not impermissibly depart from past practice in issuing bulletin;

[6] documents attached to proposed decision and order (PDO) of District Director of the Office of Workers' Compensation Programs (OWCP) naming owner as the relevant self-insurer on employee-miner's claim provided owner with adequate notice of claim; and

[7] owner received adequate notice and an opportunity to defend against its inclusion in employee-miner's claim.

Petition denied, and motion denied.

**Procedural Posture(s):** Review of Administrative Decision; Motion to Supplement the Record.

West Headnotes (25)

**[1]** **Labor and Employment** 🔑 Constitutional and Statutory Provisions

**Workers' Compensation** 🔑 Construction and Operation of Statutes in General

As an administrative act providing employment injury benefits, the Black Lung Benefits Act (BLBA) incorporates the Longshore and Harbor Workers' Compensation Act, which, in turn, incorporates the Administrative Procedure Act (APA). 5 U.S.C.A. § 556; Federal Mine Safety and Health Act of 1977 §§ 401, 422, 30 U.S.C.A. §§ 901(a), 932(a).

**[2]** **Labor and Employment** 🔑 Pneumoconiosis; Black Lung Benefits

Operating within the Administrative Procedure Act (APA) and Longshore and Harbor Workers' Compensation Act frameworks, the Black Lung Benefits Act (BLBA) ensures that coal mine operators are liable to the maximum extent feasible for awarded claims by implementing a specific, sequential process for determining a liable operator and adjudicating the merits of a claim. 5 U.S.C.A. § 556; Federal Mine Safety and Health Act of 1977 §§ 401, 422, 30 U.S.C.A. §§ 901(a), 932(a).

**[3]** **Administrative Law and Procedure** 🔑 Grounds, factors, and considerations

Court of Appeals may supplement the administrative record in circumstances such as when an agency has deliberately or negligently excluded certain documents from the record or when a court needs certain background information to determine whether the agency has considered all relevant factors. Fed. R. App. P. 16(b).

**[4]** **Administrative Law and Procedure** 🔑 In general; necessity

While the Court of Appeals may supplement the administrative record in certain circumstances, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court. Fed. R. App. P. 16(b).

**[5]** **Labor and Employment** 🔑 Judicial review

Self-insured owner of coal mine operator failed to submit any evidence by its discovery deadline, despite having ample notice of much of the evidence, such that neither equity nor Federal Rules of Appellate Procedure favored owner's motion to supplement the administrative record on petition for judicial review of decision of Benefits Review Board affirming ALJ's finding that owner was liable insurer for employee-miner's claim for benefits for legal pneumoconiosis under the Black Lung Benefits Act (BLBA); owner did not allege that supplementation corrected a mistake or omission below, and did not provide any justification for delay, complexity of case was best addressed by timely provision of evidence, public records did not present circumstances warranting admission, and instead should have been easier to timely introduce them, and effort to enter materials excluded by ALJ effectively sought end-run around ordinary discovery procedures. Federal Mine Safety and Health Act of 1977 §§ 401, 412, 30 U.S.C.A. §§ 901(a), 922; Fed. R. App. P. 16(b).

**[6]** **Labor and Employment** 🔑 Judicial review

On petitions for review from the Benefits Review Board, Court of Appeals reviews the Board's legal conclusions de novo.

**[7]** **Labor and Employment** 🔑 Concurrent or Conflicting Regulations

Black Lung Benefits Act (BLBA) regulations' evidentiary procedures do not offend the Administrative Procedure Act (APA). 5 U.S.C.A. § 556(b); Federal Mine Safety and Health Act of 1977 § 422, 30 U.S.C.A. § 932(a); Longshore and Harbor Workers' Compensation Act § 19, 33 U.S.C.A. § 919(d); 20 C.F.R. § 725.1(j).

**[8]** **Labor and Employment** 🔑 Concurrent or Conflicting Regulations

The Black Lung Benefits Act's (BLBA) liability evidence rules, which specifically relate to the process of putting forth evidence to contest liability before the District Director of the Office of Workers' Compensation Programs (OWCP), or, in the presence of extraordinary circumstances, to the ALJ, are consistent with the provisions of the BLBA and the Administrative Procedure Act (APA). 5 U.S.C.A. § 556; Federal Mine Safety and Health Act of 1977 § 401, 30 U.S.C.A. § 901(a); 20 C.F.R. §§ 725.407, 725.408(b), 725.410, 725.414, 725.456, 725.457.

**[9]** **Administrative Law and Procedure** 🔑 Review for arbitrary, capricious, unreasonable, or illegal actions in general

Under the Administrative Procedure Act (APA), an agency's actions are arbitrary and capricious when the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. 5 U.S.C.A. § 551 et seq.

**[10]    Administrative Law and
Procedure** 🔑 Review for arbitrary,
capricious, unreasonable, or illegal actions in
general

Under the Administrative Procedure Act's (APA) arbitrary and capricious standard of review, an agency must articulate a rational connection between the facts found and the choice made. 5 U.S.C.A. § 551 et seq.

**[11]    Labor and Employment** 🔑 Evidence

ALJ rationally held coal mine operator's self-insured owner to statutory 90-day or extraordinary circumstance standard for submitting new evidence regarding liability for employee-miner's claims for benefits for legal pneumoconiosis under the Black Lung Benefits Act (BLBA), and thus ALJ's application of BLBA's liability evidence rules was neither arbitrary nor capricious under the Administrative Procedure Act (APA); owner did not submit any evidence before final deadline, owner sought discovery in support of its position that liability had been improperly reassigned three years after deadline to submit evidence, and regulations still bound owner in the instant case regardless of impediments to seeking discovery or presenting evidence to contest liability due to owner's ongoing separate case seeking declaratory judgment as to its liability. 5 U.S.C.A. § 551 et seq.; Federal Mine Safety and Health Act of 1977 §§ 401, 412, 30 U.S.C.A. §§ 901(a), 922; 20 C.F.R. §§ 725.408, 725.456(b) (1), 725.457(c)(1).

**[12]    Federal Courts** 🔑 Questions of Law in
General

**Federal Courts** 🔑 Statutes, regulations, and
ordinances, questions concerning in general

Court of Appeals reviews questions of law, including the interpretation of a statute, de novo.

**[13]    Statutes** 🔑 Plain language; plain, ordinary,
common, or literal meaning

If clear, the plain meaning of the statutory language controls.

**[14]    Administrative Law and
Procedure** 🔑 Construction

When interpreting regulatory language, courts take the same approach as that used for interpreting statutes.

**[15]    Corporations and Business
Organizations** 🔑 Labor and employment
liabilities and violations

**Labor and Employment** 🔑 Pneumoconiosis;
Black Lung Benefits

Coal mine operator's owner was identified as the self-insurer on employee-miner's black lung benefits claim for legal pneumoconiosis under the Black Lung Benefits Act (BLBA), and owner had self-insured operator during miner's employment, and thus there was no need to pierce the veil of operator to reach owner's BLBA liability to perform its insurance promise. Federal Mine Safety and Health Act of 1977 §§ 401, 412, 30 U.S.C.A. §§ 901(a), 922.

More cases on this issue

**[16]    Labor and Employment** 🔑 Pneumoconiosis;
Black Lung Benefits

Transfers of business interests and self-insurance are expressly contemplated by the Black Lung Benefits Act (BLBA) and its implementing regulations, so principles of corporate separateness found elsewhere in the law do not change the BLBA's statutory obligations. Federal Mine Safety and Health Act of 1977 §§ 401, 412, 30 U.S.C.A. §§ 901(a), 922; 20 C.F.R. § 726.110(a)(1).

**[17]**    **Labor and Employment**  🗝 Pneumoconiosis;
Black Lung Benefits

An insurer's identity as a self-insurer, rather than
as a corporate insurer, does not alter the statutory
requirements for paying claims owed by a coal
mine operator under the Black Lung Benefits Act
(BLBA). Federal Mine Safety and Health Act of
1977 §§ 401, 412, 30 U.S.C.A. §§ 901(a), 922.

**[18]**    **Administrative Law and**
**Procedure**  🗝 Notice and comment in general

Under the Administrative Procedure Act (APA),
whenever agencies promulgate a rule that intends
to create new law, rights, or duties, they must
engage in a process known as notice-and-
comment rulemaking. 5 U.S.C.A. § 553.

**[19]**    **Administrative Law and**
**Procedure**  🗝 Notice and comment in general

Court of Appeals looks to the content of the
agency's action, not the name it ascribes to
an action, to determine whether it engaged in
legislative rulemaking that required notice and
comment under the Administrative Procedure
Act (APA). 5 U.S.C.A. § 553.

**[20]**    **Administrative Law and**
**Procedure**  🗝 Legislative rules; substantive
rules

**Administrative Law and**
**Procedure**  🗝 Notice and comment in general

A hallmark of a substantive rule, requiring
notice and comment under the Administrative
Procedure Act (APA), is that the action affects
individual rights and obligations. 5 U.S.C.A. §
553.

**[21]**    **Labor and Employment**  🗝 Notice

**Labor and Employment**  🗝 Comment

Bulletin issued by Department of Labor (DOL),
guiding District Director of the Office of
Workers' Compensation Programs (OWCP) to

provide notice of employee-miner's claim for
benefits for legal pneumoconiosis under the
Black Lung Benefits Act (BLBA) to predecessor
owner of coal mine operator where potentially
appropriate, did not impermissibly create new
rights or liabilities, and therefore bulletin did
not require notice-and-comment rulemaking
under the Administrative Procedure Act (APA);
predecessor owner's status relative to potential
claims did not change because it was at all
times a potentially liable party under BLBA's
regulations, and predecessor owner had ability to
contest its identification as the liable party given
that the determination of liability remained to be
made in the discretion of the District Director and
the ALJ. 5 U.S.C.A. § 553; Federal Mine Safety
and Health Act of 1977 §§ 401, 412, 30 U.S.C.A.
§§ 901(a), 922; 20 C.F.R. § 726.4(b).

**[22]**    **Constitutional Law**  🗝 Pensions and benefits,
regulation of

**Labor and Employment**  🗝 Pneumoconiosis;
Black Lung Benefits

There was no evidence that Department of Labor
(DOL) had historically treated self-insurers and
commercial insurers differently with respect to
Black Lung Benefits Act (BLBA) claims, and
thus DOL did not impermissibly depart from
past practice in violation of the Administrative
Procedure Act (APA) and due process principles
by issuing bulletin instructing that coal mine
operator's owner should be notified as the
liable insurer for successor operator's claims
pending before District Director of the Office
of Workers' Compensation Programs (OWCP),
relating to employee-miner's claim for benefits
for legal pneumoconiosis under the Black Lung
Benefits Act (BLBA), regardless of owner's later
transfers. U.S. Const. Amend. 5; 5 U.S.C.A. §
553; Federal Mine Safety and Health Act of 1977
§§ 401, 412, 30 U.S.C.A. §§ 901(a), 922.

**[23]**    **Constitutional Law**  🗝 Pensions and benefits,
regulation of

**Labor and Employment**  🗝 Proceedings in
general

Documents attached to proposed decision and order (PDO) of District Director of the Office of Workers' Compensation Programs (OWCP) that named coal mine operator's owner as the relevant self-insurer on employee-miner's claim for benefits for legal pneumoconiosis under the Black Lung Benefits Act (BLBA) provided owner with adequate notice of claim consistent with due process, even though PDO incorrectly once included name of successor operator as operator's self-insurer; PDO was also certified and sent to owner, rather than successor. U.S. Const. Amend. 5; Federal Mine Safety and Health Act of 1977 §§ 401, 412, 30 U.S.C.A. §§ 901(a), 922; 20 C.F.R. § 725.418.

---

**[24]**    **Constitutional Law** 👈 Notice and Hearing

The basic elements of procedural due process are notice and opportunity to be heard. U.S. Const. Amend. 5.

---

**[25]**    **Constitutional Law** 👈 Pensions and benefits, regulation of

**Labor and Employment** 👈 Proceedings in general

Coal mine operator's owner received adequate notice and an opportunity to defend against its inclusion in employee-miner's claim for benefits for legal pneumoconiosis under the Black Lung Benefits Act (BLBA), as would support finding that owner's due process rights were not violated; owner had received notice of claim, had subsequently participated in claim by filing form contesting its liability, and owner understood that DOL intended to name owner as the liable party, which explained owner's filing of separate declaratory judgment case seeking declaration as to owner's liability. U.S. Const. Amend. 5; Federal Mine Safety and Health Act of 1977 §§ 401, 412, 30 U.S.C.A. §§ 901(a), 922; 20 C.F.R. § 725.418.

**\*347** On Petition for Review from the Benefits Review Board. No. 20-0229 BLA.

**Attorneys and Law Firms**

ON BRIEF: Mark E. Solomons, Dominic E. Draye, Michael A. Pusateri, GREENBERG TRAURIG, LLP, Washington, D.C., for Petitioners. Sarah M. Hurley, Sean G. Bajkowski, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Federal Respondent. Brad A. Austion, WOLFE WILLIAMS & REYNOLDS, Norton, Virginia, for Respondent David M. Howard.

Before: GIBBONS, McKEAGUE, and STRANCH, Circuit Judges.

---

**OPINION**

JANE B. STRANCH, Circuit Judge.

This petition concerns Arch Resources and Apogee Coal Company's challenge of Black Lung Benefits Act (BLBA) liability for a claim submitted by David Howard. Howard mined from 1978 to 1997, and his last employer was Apogee Coal (at that time, owned and self-insured by Arch). The parties, referred to collectively as "Arch," do not contest Howard's entitlement to benefits for legal pneumoconiosis, but do dispute being identified as the liable insurer on Howard's claim. Petitioners ask this court to review the Benefits Review Board's decision affirming the Administrative Law Judge's finding that Arch was the liable insurer for Howard's benefits claim under the BLBA. Arch likewise asks this court to grant its motion to supplement the administrative record on appeal. For the reasons stated below, we **DENY** the petition for review and Arch's motion.

---

**I. BACKGROUND**

**A. The Black Lung Benefits Act**

**[1]** The Black Lung Benefits Act provides benefits to miners suffering from pneumoconiosis, a lung disease caused by prolonged exposure to coal dust. *See* 30 U.S.C. §§ 901(a), 922. As an administrative act providing employment injury benefits, it incorporates the Longshore and Harbor **\*348** Workers' Compensation Act (the "Longshore Act"), *see* 30 U.S.C. § 932(a), which, in turn, incorporates the Administrative Procedure Act (APA). *Dir., OWCP v. Greenwich Collieries*, 512 U.S. 267, 271, 114 S.Ct. 2251, 129

L.Ed.2d 221 (1994). BLBA hearings are to be conducted in accordance with the requirements of both the Longshore Act and the APA, which vest Administrative Law Judges with the power to hold hearings, make credibility judgments, and award benefits. *See* 33 U.S.C. §§ 919(d), 927.

**[2]** Operating within the APA and Longshore Act frameworks, the BLBA "ensure[s] that coal mine operators are liable 'to the maximum extent feasible' for awarded claims" by implementing a specific, sequential process for determining a liable operator and adjudicating the merits of a claim. *Ark. Coals, Inc. v. Lawson*, 739 F.3d 309, 313 (6th Cir. 2014) (quoting *Dir., OWCP v. Oglebay Norton Co.*, 877 F.2d 1300, 1304 (6th Cir. 1989)). The process is triggered when a miner files a claim. That claim goes to a district director, who "is responsible for identifying those operators that are potentially liable and for issuing an initial order designating the responsible operator." *Id.* The district director must then "investigate whether any operator may be held liable for the payment of benefits" and notify any potentially liable parties through a Notice of Claim. 20 C.F.R. §§ 725.407, .495. Under the BLBA, a miner's last employer is presumed "capable of assuming its liability" for BLBA claims if it either obtained commercial insurance or was self-insured "during the period in which the miner was last employed by the operator, provided that the operator" either still qualifies as a self-insurer or has provided a security deposit "sufficient to secure the payment of benefits in the event the claim is awarded." *Id.* § 725.494. A district director may presume an operator's ability to pay so long as that operator was the claimant's last mining employer. *See id.* § 725.495(d). If the operator contests liability, as Arch does, then it bears the burden of proving that it is not liable. *See id.* §§ 725.103, .408(a). The operator has 90 days from the date it receives the Notice of Claim to submit any documentary evidence that may show it was not properly identified. *Id.* § 725.408(b).

A district director then issues a Schedule for Submission of Additional Evidence (SSAE) including "the district director's designation of a responsible operator liable for the payment of benefits." *Id.* § 725.410(a)(3). The SSAE gives the parties, including the "designated responsible operator," another "60 days within which to submit additional evidence." *Id.* at § 725.410(b). The SSAE provides the last opportunity for an operator to submit evidence contesting its liability, absent extraordinary circumstances. *See id.* §§ 725.456(b)(1), .457(c)(1). This is because following the SSAE period, a district director issues a Proposed Decision and Order (PDO) for the claim. *Id.* § 725.418. The PDO serves as the final

designation of a liable operator, *see id.* § 725.418(d), and if an Administrative Law Judge (ALJ) later finds that the operator was improperly identified, a different operator may not be specified and any benefits will be awarded from the federally administered Black Lung Disability Trust Fund. *See* Final Rule, 65 Fed. Reg. 79920, 79990 ¶ (b) (Dec. 20, 2000). Once a PDO is issued, an ALJ takes over the claim—at which point no further evidence contesting liability may be submitted unless the operator demonstrates extraordinary circumstances warranting admission. 20 C.F.R. §§ 725.456(b)(1), .457(c)(1). [1]

**\*349** The ALJ ultimately determines the award of benefits on a BLBA claim. The BLBA provides these benefits from one of two sources: 1) the Black Lung Disability Trust Fund, a federally administered trust fund financed by taxes on coal, or 2) the private insurance of mine operators. *See id*. §§ 725.490, .494(e). Operator insurance comes in two forms: self-insurance, (i.e., operators covering their own costs under a process regulated by DOL), or commercial insurance (i.e., insurance purchased through traditional insurance carriers). *Id.* § 726.1. An operator may appeal to the Benefits Review Board to contest the award of benefits; upon affirmance, an operator may then petition this court for review. *Id.* §§ 725.481-.482.

### B. Proceedings Below

After 17 years of mining, David Howard retired from his last employer, Apogee Coal Company. On his last day of work —February 27, 1997—Apogee was self-insured through its owner, Arch Resources, formerly known as Arch Coal. Then, in 2005, Arch sold Apogee and its federal black lung liabilities to Magnum Coal Company. These interests were transferred again when Patriot Coal Company purchased Magnum and its liabilities in 2008. So, when Howard filed for benefits in 2014, the District Director investigating Howard's claim identified Apogee, self-insured through Patriot, as the potentially liable operator and issued a Notice of Claim naming it as such. The Department of Labor (DOL) then named Patriot as the presumptive insurer of Howard's claim on the SSAE issued on August 25, 2015.

On October 9, 2015, Patriot was dissolved in bankruptcy. U.S. Dep't of Labor, BLBA Bulletin No. 16-01, 1 (2015). The following month, the DOL issued Bulletin 16-01 (the "Bulletin"), instructing that Arch should be notified as the liable insurer for Patriot's "claims pending before the District

Director" that originally fell under Arch's previous self-insurance—regardless of its later transfers. *Id.* at 3-4.

Howard's claim fell under the Bulletin's guidance because Arch was Apogee's self-insurer on Howard's last day of work with Apogee. So, on December 8, 2015, the District Director issued a second Notice of Claim, this time naming Arch as the liable insurer. Later, on March 17, 2016, the District Director issued an SSAE similarly naming Arch as Apogee's insurer. Arch responded by submitting a CM-2970(a) form to the District Director contesting its designation as a liable party in Howard's claim. Arch, however, failed to submit or request evidence and failed to name any liability witnesses. Arch's deadline to submit evidence passed on May 16, 2016. With no evidence contradicting Arch's assignment of liability, the District Director issued a PDO ordering Howard's benefits to be paid from Arch's self-insurance. [2] The matter was assigned to an ALJ, and Arch filed motions to hold Howard's case in abeyance pending collateral litigation and to extend the discovery period. Both motions were denied.

**\*350** While Arch was contesting its liability for Howard's claim in this case, it filed a suit in the U.S. District Court for the District of Columbia on April 8, 2016 (the "D.C. case"), seeking injunctive and declaratory relief from the Bulletin. The district court dismissed that suit for lack of jurisdiction on March 16, 2017, and Arch appealed. *See Arch Coal, Inc. v. Hugler,* 242 F. Supp. 3d 13 (D.D.C. 2017); *Arch Coal, Inc. v. Acosta,* 888 F.3d 493 (D.C. Cir. 2018). On April 27, 2018, the D.C. Circuit affirmed the dismissal of Arch's case, explaining that Arch was "required to exhaust its administrative remedies and secure a final order from the [Benefits Review] Board" regarding its challenge to the Bulletin before seeking review in the court of appeals. *Acosta,* 888 F.3d at 501, 503. It also noted that during those administrative proceedings, Arch would be "entitled to reasonable discovery before the Department to the full extent allowed by the BLBA and its implementing regulations." *Id.* at 502.

On April 29, 2019, over a year after the ALJ's denials of Arch's discovery motions in Howard's case and the D.C. Circuit's resolution of the D.C. case, Arch requested subpoenas from the ALJ in Howard's case and served the DOL with written discovery requests. Arch alleged that this discovery would prove "the Bulletin's retroactive and arbitrary departure from established self-insurance principles." The ALJ denied Arch's subpoena requests.

On June 19, 2019, Arch moved to transfer liability to the Black Lung Disability Trust Fund, and the ALJ denied the motion, then named Arch as the insurer on Howard's awarded benefits on February 25, 2020. Arch appealed to the Board, and the Board affirmed. Arch timely petitioned this court for review.

On petition to this court, the parties submitted a joint appendix containing the record on appeal. Arch separately moved to supplement the appellate record with evidence not considered below, including public records, non-public documents, and documents from claims unrelated to Howard's. We consider Arch's petition for review and its motion to supplement below.

## II. ANALYSIS

Arch contends that it is not liable for Howard's claim arising from his employment with Apogee. The ALJ and the Board rejected this argument and explained that Arch failed to timely submit evidence to the District Director after noting that it contested liability. On petition to this court, Arch moves to supplement the appellate record, challenges the evidentiary procedures applied below, and disputes three elements of the Board's decision on the merits. Because evidence supporting Arch's arguments is critical to the remainder of the appeal, we first consider its request to supplement the record and its evidentiary challenges. After determining the scope of the evidence properly before this court, we address Arch's arguments on the merits.

### A. Motion to Supplement the Administrative Record on Appeal

Arch failed to submit evidence to the District Director and the ALJ denied its request to submit evidence late because Arch did not meet its burden to show extraordinary circumstances. *See* 20 C.F.R. §§ 725.414(c)-(d), .457. Now, Arch requests that we allow it to "expand" the record before our court. [3]

**\*351** [3] [4] Federal Rule of Appellate Procedure 16(b) provides that "parties may at any time, by stipulation, supply any omission from the record or correct a misstatement, or the court may so direct. If necessary, the court may direct that a supplemental record be prepared and filed." We may supplement the administrative record in circumstances such as "when an agency has deliberately or negligently excluded certain documents from the record, or when a court needs certain 'background' information to determine whether the

agency has considered all relevant factors." *Latin Ams. for Social & Econ. Dev. v. Adm'r of the Fed. Highway Admin.*, 756 F.3d 447, 465 (6th Cir. 2014) (citation omitted). But "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

**[5]** Arch does not allege that the supplementation corrects a mistake or omission below. *See* Fed. R. App. P. 16(b). And Arch's motion does not provide any justification for its delay; it merely argues that this case is complex with far-reaching effects, and that many of the sources it seeks to introduce are either public records or evidence explicitly excluded by the ALJ. Arch's first point is unavailing, as many cases before this court are complex and have far-reaching effects, consequences best addressed by timely provision of evidence. Arch's second point is similarly unpersuasive, as public records do not present circumstances warranting admission —indeed, publicly available materials and materials held by Arch should have been easier to introduce timely. Arch's effort to enter materials excluded by the ALJ, moreover, effectively seeks an end-run around ordinary discovery procedures. In sum, Arch failed to submit any evidence by its discovery deadline, despite having ample notice of much of the evidence it now seeks to introduce. Neither equity nor the Federal Rules of Appellate Procedure favor Arch's motion. We deny the motion.

### B. Liability Evidence Rules

Arch argues that the regulatory liability evidence rules relied upon below violate both the provisions of the BLBA and the APA as incorporated by the Longshore Act. It contends in the alternative that DOL's interpretation of the rules as applied to Arch was arbitrary and capricious. We address each argument in turn.

### 1. The Propriety of the Liability Evidence Rules

**[6]** Arch first argues that the liability evidence rules employed below impermissibly empower district directors to perform an evidentiary gatekeeping role that properly belongs to ALJs under the APA. "On petitions for review from the Benefits Review Board, we review the Board's legal conclusions de novo." *Karst Robbins Coal Co. v. Dir., OWCP*, 969 F.3d 316, 323 (6th Cir. 2020).

Arch's argument rests on the relationship between the BLBA, the APA, and the Longshore Act. The Supreme Court has explained that the BLBA "incorporates the APA (by incorporating parts of the [Longshore Act]), but it does so except as otherwise provided by regulations of the Secretary." *Greenwich Collieries*, 512 U.S. at 271, 114 S.Ct. 2251 (cleaned up).

**[7]** Arch claims that the BLBA regulations' evidentiary procedures violate a provision of the Longshore Act that requires **\*352** hearings administered under the Act to "be conducted in accordance with the" APA. 33 U.S.C § 919(d). The APA sets out procedural rules that govern a broad range of administrative proceedings. *See* 5 U.S.C. § 556. Its rules apply to certain hearings carried out under the Act, but those rules do "not supersede the conduct of specified classes of proceedings, in whole or in part, by or before boards or other employees specially provided for or designated under statute." *Id.* § 556(b). The BLBA regulations then incorporate the APA's procedures "except as is otherwise provided by the Act or" DOL regulations because certain "procedures prescribed by the" Longshore Act and the APA "must be altered to fit the circumstances ordinarily confronted in the adjudication of a black lung claim." 20 C.F.R. § 725.1(j); *see* 30 U.S.C. § 932(a). Thus, the BLBA-authorized regulations expressly authorize departing from the procedures otherwise required by the Longshore Act and APA to address the unique circumstances surrounding black lung claims. And the APA specifically contemplates such departures. *See* 5 U.S.C. § 556(b). In short, the APA and the BLBA are consistent—the BLBA regulations' evidentiary procedures do not offend the APA.

It is also not clear that the BLBA-authorized liability evidence rules conflict with the APA's analogous rules. Arch takes issue with the requirement that evidence or notice of future evidence be given to a district director, not an ALJ, on the basis that the APA and Longshore Act require an ALJ to consider evidence and award benefits. *See* 20 C.F.R. § 725.415. But the BLBA regulations do not divest the ALJ of power to take evidence. *See id.* § 725.351. Instead, the ALJ may take evidence under appropriate circumstances. *See id*; *see also id.* § 725.414(c). And the ALJ is responsible for taking certain kinds of evidence (e.g., witness testimony) that the parties noticed to the district director. *Id.* § 725.351. Ultimately, it is the ALJ who weighs evidence of each case and determines an award. *Id.*

**[8]** Congress intended for this to be the case. The BLBA-authorized regulations consistently reference the requirement that evidence offered to contest liability must be brought before a district director. *See, e.g.*, 20 C.F.R. §§ 725.410, .414, .456, .457. The language of the liability evidence rules is clear: parties contesting their identification for liability have 90 days to supply or notice any evidence supporting their position. *See* 20 C.F.R. §§ 725.407, .408(b). The liability evidence rules are consistent with the provisions of the BLBA and the APA.

### 2. Interpretation of the Liability Evidence Rules

Arch also takes issue with the ALJ's reliance on the BLBA regulations in denying it discovery three years after the deadline to submit evidence. Arch argues that the rules do not apply to its particular circumstance because Arch sought discovery to challenge the DOL's alleged departure from past practice with self-insurers, rather than to defend against Howard's claim.[4] Arch alleges that the ALJ's denial **\*353** of its motion to issue subpoenas on two DOL employees was arbitrary and capricious. The DOL counters that Arch sought these subpoenas, and pursued its challenge to the Bulletin, as a mechanism for disputing liability in Howard's case, and so its discovery requests fell squarely within the liability evidence rules.

**[9]** **[10]** An agency's actions are arbitrary and capricious when:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The agency must articulate a "rational connection between the facts found and the choice made." *Id.* (quoting *Burlington*

*Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

"Under the Department of Labor's regulations, no operator may submit evidence regarding the operator's capability of assuming liability for the payment of benefits unless it does so within ninety days of receiving notice that it is a 'potentially liable operator.' " *Appleton & Ratliff Coal Corp. v. Ratliff*, 664 Fed. App'x 470, 475 (6th Cir. 2016) (quoting 20 C.F.R. § 725.408). A party may submit new evidence to contest liability after the 90-day period has elapsed only in "extraordinary circumstances." *See* 20 C.F.R. §§ 725.456(b)(1), .457(c)(1).

**[11]** After receiving the Notice of Claim on December 8, 2015 and the subsequent SSAE on March 17, 2016, Arch contested its liability identification in April 2016, but it did not submit any evidence before the final deadline of May 16, 2016. It was not until April 29, 2019, that Arch sought discovery in support of its position that the Bulletin improperly reassigned liability from Patriot to Arch. Regarding extraordinary circumstances warranting subpoenas to be served on DOL employees, Arch argued that it could not have timely presented evidence to the District Director because the D.C. case challenging the Bulletin was ongoing and because "experience had taught it that [the] DOL would not, in fact, afford it discovery to develop its claims." But the ALJ held that neither was an impediment to seeking discovery or presenting evidence to contest liability because the regulations still bound Arch in this case.

Accordingly, the ALJ denied Arch's request. Because Arch's dispute was over its "capability of assuming liability," the ALJ rationally held Arch to the statutory 90-day or extraordinary circumstance standard. The ALJ's application of the BLBA's liability evidence rules was neither arbitrary nor capricious.

### C. Bulletin 16-01

Trying a different tack, Arch contends that through Bulletin 16-01, the DOL changed "a Fifty-Year-Old Policy Retroactively and in violation of Corporate and Insurance Law Principles and the Regulations." Specifically, Arch argues that treating self-insurance the same as commercial insurance for liability purposes, especially in light of Arch's subsequent sale, 1) ignores corporate separateness; 2) creates a new "rule" for self-insurance that is required to pass through notice and comment; and 3) departs from past practice in

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   9

violation of the APA and due process principles. We address each argument below.

**\*354**  1. <u>Self-Insurance, Commercial Insurance, and "Corporate Separateness"</u>

 **[12]**   **[13]**   **[14]**  Arch first argues that it was improperly found liable for Howard's claim because holding it accountable after its sale of Apogee violates principles of corporate separateness and the distinctions between self-insuring operators and those using commercial insurance. We review questions of law, including the interpretation of the BLBA, de novo. *See Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 243 (6th Cir. 2004). "If clear, the plain meaning of the statutory language controls." *Id.* at 246. We take the same approach when interpreting regulatory language. *See Saginaw Chippewa Indian Tribe of Mich. v. Blue Cross Blue Shield of Mich.*, 32 F.4th 548, 557 (6th Cir. 2022).

A self-insurer is obligated "[t]o pay when due, as required by the Act, all benefits payable on account of total disability or death of any of its employee-miners." 20 C.F.R. § 726.110(a)(1). Self-insurers, like commercial insurers, are bound by the terms of the BLBA. *Id.* § 726.1. For the purposes of BLBA liability, the pool of potentially liable parties is broad: "any transferee or transferor of a corporation or other business entity," and any "business entity which has had or will have a substantial and reasonably direct interest in the operation of a coal mine," may be liable under the BLBA. *Id.* § 726.4(b). "The failure of any such business entity to self-insure or obtain a policy or contract of insurance shall in no way relieve" it from "its obligation to pay" BLBA benefits. *Id.*

 **[15]**   **[16]**   **[17]**  Arch invokes the theory of successor liability, claiming that its sale of Apogee's liabilities completely severed the two businesses and insulated it from future Apogee-originated claims.[5] It thus contends that holding Arch liable for Howard's claims, predicated on his service as an Apogee employee, is unlawful. But this ignores the plain language of the regulations above. Transfers of business interests and self-insurance are expressly contemplated by the statute and its implementing regulations, so principles of "corporate separateness" found elsewhere in the law do not change the statutory obligations at play here.[6] Arch's identity as a self-insurer, rather than a corporate insurer, does not alter the statutory requirements for paying claims owed by an operator.

After its identification, it was up to Arch to show that it was not the liable party. *See* 20 C.F.R. §§ 725.103, .410(b). As noted above, Arch failed to take any action in this claim to prove as much within the procedural requirements of the BLBA and accompanying regulations. This argument therefore fails.

2. <u>Applicability of Notice-and-Comment</u>

 **[18]**  "Under the APA, whenever agencies promulgate 'a rule that "intends to create new law, rights or duties" ' ... they must engage in a process known as notice-and-comment rulemaking." **\*355** *Oakbrook Land Holdings, LLC v. Comm'r of Internal Revenue*, 28 F.4th 700, 710 (6th Cir. 2022) (quoting *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018)), *cert. denied*, ––– U.S. ––––, 143 S. Ct. 626, 214 L.Ed.2d 370 (2023). Arch claims that Bulletin 16-01 constitutes a rule under the APA and, as such, DOL violated the APA by failing to provide for notice and comment.

 **[19]**   **[20]**  We look to the "content of the agency's action," not the name it ascribes to an action, to determine whether it engaged in legislative rulemaking that required notice and comment. *Arizona v. Biden*, 31 F.4th 469, 482 (6th Cir. 2022). A "hallmark[ ] of a substantive rule" is that the action "affect[s] individual rights and obligations." *Id.* (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)).

In *Mann Construction, Inc. v. United States*, 27 F.4th 1138, 1143-44 (6th Cir. 2022), we held that a notice promulgated by the Internal Revenue Service (IRS) had "the 'force and effect of law' " and was therefore "subject to the notice-and-comment process" because it created a new duty for taxpayers that did not arise from a statute. The notice at issue in *Mann* made taxpayers subject to penalties for failing to report transactions to the IRS that they did not previously need to report, effectively changing the law. *Id.* at 1143-44. By contrast, in *Arizona*, we held that notice and comment was not required for an administrative policy that directed immigration officers to prioritize detention and removal of certain noncitizens based on specific criteria. 31 F.4th at 473, 482. Although the effect of the guidance was to single out certain parties for potential expulsion, *Arizona* held that it did not "affect individual rights and obligations." *Id.* at 482 (brackets omitted) (quoting *Chrysler Corp.*, 441 U.S. at 302, 99 S.Ct. 1705).

**[21]**  Here, the Bulletin states that its purpose is to "provide guidance for district office staff in adjudicating claims in which the miner's last coal-mine employment of at least one year was with one of the ... companies that have been affected by [Patriot's] bankruptcy." U.S. Dep't of Labor, BLBA Bulletin No. 16-01, 1 (2015). Relevant to this claim, it states that for "cases pending before district directors, in which ... the PDO is not yet final," district directors are to find out "whether the claim is covered by Arch Coal's self-insurance," and if so, to "send a notice of claim" to Arch through its appropriate state claims address. *Id.* at 3-4.

In reviewing this Bulletin, and in addition to our precedent on notice and comment requirements, we have the benefit of a sister circuit's decision on a comparable case challenging Bulletin 16-01 brought by Arch Coal in the D.C. Circuit. *Acosta* recognized that "[i]t is well understood that the notice-and-comment provisions of section 553 of the APA do not apply to agency bulletins, policy statements, directives, guidances, opinion letters, press releases, advisories, warnings, or manuals that do not have the force of law." *888 F.3d at 501. Acosta* then held that unlike a rule, Bulletin 16-01 "does not 'alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency.' " *Id.* (quoting *James V. Hurson Assocs. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000)).

As the D.C. Circuit explained, Bulletin 16-01 simply guided district directors to provide claim notices to Arch where potentially appropriate. Because the determination of liability remained to be made in the discretion of the district director and ALJ, Arch had the ability to contest its identification. And Arch's status relative to potential claims did not change, because it was **\*356** at all times a potentially liable party under the BLBA's regulations. *See* 20 C.F.R. § 726.4(b). As was the case in *Arizona*, the Bulletin did not create new rights nor liabilities. *See* 31 F.4th at 482. Accordingly, the Bulletin did not require notice and comment rulemaking.

### 3. The DOL's Usual Practice with Self-Insuring Claims

**[22]**  Arch also contends that the Bulletin represents a departure from fifty years of DOL policy. Yet the DOL correctly points out that Arch failed to supply any evidence showing that the DOL has historically treated self-insurers and commercial insurers differently with respect to BLBA

claims. In the absence of record evidence to support this contention, we affirm the Board.

### D. Due Process and Notice

**[23]**  Arch's final argument is that it should be dismissed from this suit because it did not receive adequate notice that it was named as Apogee's carrier. The core of Arch's argument is that the PDO issued by the District Director named only Patriot, not Arch, as the carrier. Examination of the record, however, shows that the PDO incorrectly included Patriot's name once as Apogee's self-insurer, but documents attached to the PDO otherwise named Arch as the relevant self-insurer on Howard's claim. The PDO was also certified and sent to Arch—not Patriot.

**[24]**  "The basic elements of procedural due process are notice and opportunity to be heard." *Arch of Ky., Inc. v. Dir., OWCP*, 556 F.3d 472, 478 (6th Cir. 2009). A carrier's due process rights in the BLBA context are protected in part by 20 C.F.R. § 725.418, which states that "no operator may be finally designated as the responsible operator unless it has received notification of its potential liability pursuant to § 725.407, and the opportunity to submit additional evidence pursuant to § 725.410." The adequacy of the notice provision in § 725.418 therefore turns on the information provided by the Notice of Claim and SSAE.

Arch invokes this court's decision in *Warner Coal Co. v. Director, OWCP*, 804 F.2d 346 (6th Cir. 1986), to argue that "named parties, including insurers, must receive notice in the PDO as a matter of due process." But nowhere in that case was a PDO mentioned, nor the regulation requiring that it name a carrier. Instead, *Warner Coal* considered the broader issue of "whether ... the Secretary of Labor must give written notice of the black lung claim to the insurance carrier for the claimant's employer prior to the administrative adjudication of a claim affecting the carrier's liability." 804 F.2d at 346. It held that due process in the BLBA carrier liability context required "that the carrier be given adequate notice and an opportunity to defend," and so, "carriers must receive notice in [BLBA] claim proceedings." *Id.* at 347.

**[25]**  Prior to the award of benefits, Arch received notice of the proceedings and an opportunity to defend through both the Notice of Claim and the SSAE's identification of Arch as the liable carrier. Arch in fact received notice and subsequently participated in the claim by filing a CM-2970(a) form contesting its liability. And Arch has made it abundantly clear that after receiving the Notice of Claim in this and other

cases following the issuance of Bulletin 16-01, it understood that DOL intended to name it as the liable party in claims such as Howard's. This knowledge, moreover, is the reason Arch offers to explain its filing of the D.C. case and its refusal to submit evidence per the issued schedule in this case. Thus, Arch had "adequate **\*357** notice and an opportunity to defend" against its inclusion in Howard's claim. *Id.*

Accordingly, Arch has not shown that its due process rights have been violated.

### III. CONCLUSION

Because Arch has provided no extraordinary circumstances justifying its motion to expand the record, and because it has failed to make any meritorious argument on the merits of the Board's decision below, both its motion and petition before this court are **DENIED**.

**All Citations**

112 F.4th 343

### Footnotes

1    We refer to the BLBA regulations that specifically relate to the process of putting forth evidence to contest liability before the district director (or, in the presence of extraordinary circumstances, to the ALJ) as "liability evidence rules." *See* 20 C.F.R. §§ 725.408; 725.410(a)-(b); 725.414(b)-(d); 725.456; 725.457.

2    The PDO lists Arch in its designation of certification but at a single place in the PDO cites Patriot as the self-insuring carrier. While we agree with the ALJ that this was apparently an error (as the mention of Patriot references the original notice of claim rather than the operable notice of claim), the error is irrelevant to our review due to the PDO's nonbinding effect.

3    Arch moved under "Federal Rule[s] of Appellate Procedure 10 [and] 28" to supplement the record on appeal. It also cited "Circuit Rules 16, 32"—but Circuit Rule 16 does not exist in the Sixth Circuit, and Rule 32 merely governs the form of briefs. *See* 6 Cir. R. 16, 32. Under the law of our Circuit, we construe Arch's motion as a Federal Rule of Appellate Procedure 16(b) motion to supplement the administrative record.

4    Arch appears to suggest that the rules should not apply to it because it challenged liability as an insurer, rather than an operator or employer. Nothing in the regulations, statutes, or caselaw supports this argument. In fact, the Board has long held that "liability evidence rules apply to carriers." *Olenick v. Olenick Bros. Coal Co.*, BRB No. 11-0833 BLA, 2012 WL 5267588 at *3 (Ben. Rev. Bd. Sept. 19, 2012) (citation omitted); *see also J.H.B. v. Peres Processing, Inc.*, BRB No. 08-0625 BLA, 2009 WL 2104861, at *4-5 (Ben. Rev. Bd. June 30, 2009) (per curiam) (applying liability evidence rules to a carrier contesting its liability); 20 C.F.R. §§ 725.407, .414(b)-(d).

5    Arch likewise argues that holding it accountable for Apogee's liabilities constitutes impermissible "veil piercing." But, as noted by the ALJ and Board, Arch was identified as the self-insurer on the claim, and it is true that Arch self-insured Apogee during Howard's employment. So, veil piercing is irrelevant to Arch's duty to perform its insurance promise, as there is no need to pierce the "veil" of Apogee to reach Arch's liability.

6    Arch argued below, as it does to this court, that commercial insurance uses an "occurrence trigger," while self-insurance uses a "claim trigger," for the purposes of determining a liable carrier. Its attempt to distinguish the two lacks support in the rules or the regulations.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Attachment B:**

*Apogee Coal Co. v. OWCP [Grimes]*, No. 23-2521 (7th Cir. Aug. 19, 2024)

In the

# United States Court of Appeals

## For the Seventh Circuit

———————————————

No. 23-2521

APOGEE COAL COMPANY, *et al.*,

*Petitioners*,

*v.*

OFFICE OF WORKERS' COMPENSATION PROGRAMS,

*Respondent*.

———————————————

Petition for Review of an Order of the
Benefits Review Board.
No. 22-0262 BLA

———————————————

ARGUED MAY 13, 2024 — DECIDED AUGUST 19, 2024

———————————————

Before SCUDDER, ST. EVE, and PRYOR, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Harold Grimes developed black
lung disease after 34 years of working in coal mines. He died
of lung cancer in 2018. It is undisputed that Grimes's spouse,
Susan, is eligible for survivor's benefits under the Black Lung
Benefits Act. This appeal requires us to decide who must pay
those benefits. A Department of Labor administrative law
judge assigned financial responsibility to Apogee Coal Com-
pany—Grimes's last employer—and the Benefits Review

Board affirmed. Central to both decisions was the conclusion that Arch Resources Inc.—Apogee's former parent corporation—bore responsibility for paying the benefits on Apogee's behalf. Arch disagrees and insists that Mrs. Grimes's benefits must instead come from the Black Lung Disability Trust Fund. On the record before us, we agree with Arch. Neither the ALJ nor the Board has identified any provision (or combination of provisions) in the Act or its implementing regulations that justify holding Arch liable for the benefits obligations of Apogee. So we grant Arch's petition for review, vacate the Board's decision, and remand with instructions that Mrs. Grimes's benefits be assigned to the Trust Fund.

## I

## A

The Black Lung Benefits Act provides disability benefits to miners "totally disabled" due to black lung disease. See *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 108 (1988); see also 30 U.S.C. §§ 901(a), 922(a), 932(c). It does so largely at the expense of the mining industry itself. Whenever possible, the statute assigns financial responsibility for a miner's benefits to one of the coal mine operators in whose service the miner developed black lung disease. See *Old Ben Coal Co. v. Luker*, 826 F.2d 688, 693 (7th Cir. 1987); see also 30 U.S.C. § 932(c); 20 C.F.R. § 725.495(a)(1). When no such entity is capable of paying, the cost of benefits falls to the Black Lung Disability Trust Fund, see 26 U.S.C. § 9501(d)(1)(B), which is jointly administered by the Secretary of the Treasury, the Secretary of Labor, and the Secretary of Health and Human Services, see *id.* § 9501(a)(2), and funded by an excise tax on coal, see *id.* §§ 9501(b)(1), 4121(a)(1).

The Department of Labor adjudicates benefits claims under the Act. See 30 U.S.C. § 932a; see also *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 717 (1990) (describing administrative scheme). The Department's Division of Coal Mine Workers' Compensation performs this work in field offices across the nation. 30 U.S.C. § 903(a); see also DCMWC Offices and Leadership, https://www.dol.gov/agencies/owcp/dcmwc/districtoffices, archived at [perma.cc/8EVQ-CETS].

The processing of black lung claims occurs in three stages. The district director for the field office that received the claim undertakes the initial review, including by examining the applicant's employment history, see 20 C.F.R. § 725.404(a), and notifying those coal mine operators, if any, that are potentially responsible for paying benefits under the statute. See *id.* § 725.407(a)–(b); see also *Rockwood Cas. Ins. Co. v. Director, Off. of Workers' Compensation Programs*, 917 F.3d 1198, 1205–06 (10th Cir. 2019) (discussing notification process). Absent the requisite notice, liability for benefits obligations cannot be imposed on a coal mine operator. See 20 C.F.R. § 725.360(a)(3). In addition to fulfilling these threshold functions, district directors have substantial authority to gather evidence, see *id.* § 725.404, develop the medical record, see *id.* § 725.414, and hear argument from interested parties, see *id.* §§ 725.408(a)(2), 725.412(a)(1), 725.416(a).

The work of the district director culminates in the issuance of a decisional document called a preliminary decision and order (or PDO for short) that "resolve[s] [the] claim on the basis of the evidence submitted to or obtained by the district director." *Id.* § 725.418(a). In any case in which the district director awards benefits, it must designate the coal mine operator, if any, that the Act and its implementing regulations make

liable for the miner's benefits. See *id.* § 725.418(d). Absent such a designation, the district director must assign the claim and attendant payment obligation to the Trust Fund. See 26 U.S.C. § 9501(d)(1)(B).

The Act and its regulations establish a two-step procedure for determining which employer, if any, is liable for awarded benefits. A district director first identifies each of the miner's previous employers that qualify as a so-called potentially liable operator under five criteria enumerated in 20 C.F.R. § 725.494(a)–(e). Only the fifth of these criteria is contested in this appeal—that "[t]he operator [be] capable of assuming [] liability for the payment of continuing benefits …." *Id.* § 725.494(e). After identifying the pool of potentially liable operators, the district director must then select a single responsible operator according to the formula prescribed by a neighboring regulation, § 725.495. As a general rule, that regulation makes liable "the potentially liable operator … that most recently employed the miner." *Id.* § 725.495(a)(1).

Parties dissatisfied with a district director's PDO may seek referral to an ALJ for a formal hearing to resolve any contested issue. See *id.* §§ 725.450, 725.451. In most respects, the district director's findings do not bind the ALJ. The ALJ may not, however, revisit the district director's decision to designate a particular employer as the financially liable operator under the Act's liability rules. See *Rockwood Cas. Ins. Co.*, 917 F.3d at 1215. If the ALJ determines that the district director designated the wrong entity, "a new responsible operator may not be named." *Id.* The benefits are instead paid out of the Trust Fund. See Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 65 Fed. Reg. 79990 (Dec. 20, 2000) ("In the event the responsible

operator designated by the district director is adjudicated not liable for a claim, the Black Lung Disability Trust Fund will pay any benefit award.").

A party that disagrees with an ALJ's decision may challenge it before the Benefits Review Board. See 33 U.S.C. § 921(b); 20 C.F.R. § 802.205(a). The Board's authority is strictly appellate—it may not "engage in a *de novo* proceeding or unrestricted review of a case brought before it." 20 C.F.R. § 802.301(a). Board decisions may be appealed to the court of appeals "for the circuit in which the [claimant's] injury occurred." 33 U.S.C. § 921(c).

B

To ensure that potentially liable operators have the financial ability to pay benefits, Congress has mandated that all operators either acquire a commercial insurance policy covering their black lung liability or receive the Department of Labor's approval to self-insure. See 30 U.S.C. § 933(a); 20 C.F.R. § 726.1; see also *Lovilia Coal Co. v. Williams*, 143 F.3d 317, 319–20 (7th Cir. 1998) (explaining that operators that fail to do one or the other "may be punished by civil penalty").

The self-insurance option permits an operator to satisfy its financial obligations under the Act by demonstrating to the Department's satisfaction that it has sufficient resources to forgo the procurement of commercial insurance coverage.

An operator seeking to self-insure must, at a minimum, satisfy several threshold requirements enumerated in 20 C.F.R. § 726.101(b), including that its "average current assets over the preceding 3 years" be sufficient to cover "black lung benefits … which such operator may expect to be required to pay during the ensuing year," *id.* § 726.101(b)(3), and that it

"obtain security" in a form and amount approved by the Department, *id.* § 726.101(b)(4). Even then, the Department of Labor has discretion to deny an application for self-insurance. See *id.* § 726.101(a).

Upon approving an application for self-insurance, the Department sets the required amount of security at a level sufficient "to guarantee the payment of benefits and the discharge of all other obligations which may be required of such applicant under the Act." *Id.* § 726.104(a). That security can take many forms, including (1) "an indemnity bond with sureties satisfactory to the [Department]," (2) "a deposit of negotiable securities with a Federal Reserve Bank," (3) "a letter of credit issued by a financial institution satisfactory to the [Department]," and (4) a trust fund established "pursuant to section 501(c)(21) of the Internal Revenue Code." *Id.* § 726.104(b)(1)–(4).

The approval of a self-insurance application reflects no more than a determination by the Department that an operator has sufficient assets to cover expected black lung liabilities at the time of approval. This explains why self-insurers must receive renewed authorization at periodic intervals, as financial health is not static. See *id.* § 726.110(a). All along the Department wields substantial authority to examine an operator's books and records, see *id.* § 726.112(b), to adjust the required level of security to reflect the evolving financial health of the operator, see *id.* § 726.109, and to withdraw self-insurance authorization entirely if circumstances come to warrant, see *id.* § 726.115.

## II

With this statutory background in place, we turn to the dispute before us.

### A

Harold Grimes worked as a coal miner from 1965 to 1999 in both underground and surface mines. That work brought Grimes into regular contact with coal and rock dust as well as other gases and fumes. In retirement he developed emphysema and in 2016 was diagnosed with lung cancer. Believing that these conditions stemmed at least in part from his work in the mines, Grimes filed a claim for black lung benefits with the Department of Labor.

That filing set into motion the regulatory scheme we just described, beginning with the assigned district director examining Mr. Grimes's employment history to determine if any of his former employers satisfied § 725.494's requirements for potential liability. It found and notified just one—Apogee Coal Company. This was an interesting choice. Grimes, it is true, had worked for Apogee from 1972 until his retirement from the coal industry in 1999. But Apogee went bankrupt in 2015, alongside its parent company at the time, Patriot Coal Corporation. What is more, Apogee did not appear to resume operations following that bankruptcy.

In light of that history, the question before us comes into focus: how could § 725.494's fifth requirement be satisfied—that Apogee be "capable of assuming … liability for the payment of continuing benefits"—if the company was defunct. *Id.* § 725.494(e). This is where Apogee's parent company at the time of Grimes's retirement—Arch Resources Inc.—enters the mix.

In designating Apogee as a potentially liable operator, the district director, as it turns out, was simply following administrative protocol. Apogee was one of 50 Patriot Coal subsidiaries to go under in 2015. That wave of bankruptcies placed tremendous financial pressure on the Black Lung Disability Trust Fund. See U.S. Gov't Accountability Off., GAO-20-438T, Black Lung Benefits Program: Oversight Is Needed to Address Trust Fund Solvency Strained By Bankruptcies, p. 2 (2020) (estimating that Patriot Coal's bankruptcy resulted in the transfer of $230 million of benefits responsibility from mining companies to the Trust Fund). In response to this development, the Department of Labor issued an internal bulletin instructing its claims processing staff to notify bankrupt subsidiaries of potential liability in situations where the Department believed solvent third parties could be required to pay benefits on the subsidiaries' behalf. See Div. of Coal Mine Workers' Comp., Off. of Workers' Comp. Programs, Dep't of Labor, BLBA Bull. No. 16-01 (2015).

This was most obviously the case for miners who worked for one of Patriot's bankrupt subsidiaries at a time when the subsidiary was covered by a commercial black lung insurance policy. That is because 20 C.F.R. § 726.203(a) requires all such policies to include an endorsement making the insurer liable for any black lung claim that accrues against its insured during the policy period, regardless of when the benefits claim is ultimately filed. See *Director, Off. of Workers' Compensation Programs v. Trace Fork Coal Co.*, 67 F.3d 503, 505 n.4 (4th Cir. 1995). What this means is that commercial insurers remain contractually obligated to pay black lung benefits on their insured's behalf, even when the insured has ceased operating. By extension it also means that bankrupt operators remain "capable of assuming liability for the payment" of insured claims under

§ 725.494(e), so long as the insurance company itself is solvent.

Here, however, Apogee was not covered by a commercial insurance policy during Mr. Grimes's employment. It instead obtained self-insurance authorization through its then-parent corporation, Arch Resources. On these factual points, everyone agrees.

So far as we can tell, the Act's regulations do not expressly contemplate such a parent-subsidiary self-insurance arrangement, which the parties refer to as a self-insurance umbrella. Nevertheless, it is apparently a common practice. From what we have been able to gather, this approach allows a subsidiary like Apogee to self-insure on the strength of its parent's financial health. If a subsidiary covered by the parent's financial umbrella is unable to pay a black lung claim, the Department can call on the parent to do so. In this way, parent corporations effectively guarantee their subsidiaries' black lung obligations.

The record before us does not reveal whether the terms of this parent-subsidiary self-insurance arrangement are memorialized in a written contract akin to black lung insurance policies. Although self-insurers are required, as a "condition precedent" to receiving self-insurance authorization, to "execute and file with the [Department] an agreement and undertaking" committing to pay black lung claims "as required by the Act," no such agreement is in the record. *Id.* § 726.110(a), (a)(1). Neither party did much in their briefs to explain with much clarity how these parent-subsidiary arrangements work and get recorded at a nuts-and-bolts level.

What we do know, though, is that Bulletin 16-01 instructs claims processing staff to treat parent-subsidiary self-insurance arrangements similarly to commercial insurance policies. At a practical level this translates into a bankrupt Patriot Coal subsidiary (like Apogee) being named as a potentially liable operator so long as the claimant (like Harold Grimes) worked for the entity at a time when it was covered by a solvent parent corporation's self-insurance umbrella. In that circumstance, the Department appeared to believe that a parent corporation (akin to a commercial insurer) could be made under the Act to pay all claims that accrued against the subsidiary during the period of self-insurance, regardless of when the claim for benefits was filed. If this is correct, then in this circumstance, too, a bankrupt subsidiary would be "capable of assuming [] liability for the payment" of benefits through a solvent third party. *Id.* § 725.494(e).

Consistent with these instructions from Bulletin 16-01, the district director identified Apogee as a potentially liable operator on Mr. Grimes's claim and notified Arch of its potential for liability as Apogee's "Insurance Carrier."

Mr. Grimes's death came before the district director could issue its preliminary decision and order. This resulted in the substitution of Mrs. Grimes as a party, and the case proceeded. From the beginning, Arch objected to the district director's decision to notify Apogee as a potentially liable operator, seeing the notice as an indirect assertion of liability against it. Believing that no legal authority supported the Department's theory of liability, Arch insisted that the benefits obligation must fall to the Trust Fund.

The district director was not persuaded and in April 2019 issued a preliminary decision and order finding Mrs. Grimes

eligible for black lung survivor's benefits and designating Apogee as the responsible operator under 20 C.F.R. § 725.495. Although the district director's decision did not explicitly address Arch's objections to liability, implicit in its designation of Apogee was the conclusion that the core logic underpinning Bulletin 16-01 was correct—that although Apogee had gone bankrupt, Arch remained solvent and could be compelled to pay any black lung claims that accrued against Apogee while it was covered by Arch's self-insurance umbrella.

B

At Arch's request, the district director referred Mrs. Grimes's claim to a Department of Labor ALJ for further adjudication. After extensive proceedings, the ALJ came to agree with the district director's central conclusions—both that Mrs. Grimes was eligible for benefits (as Mr. Grimes's surviving spouse) and that, despite its bankruptcy, Apogee could be designated as the responsible operator because Arch bore legal responsibility for Mrs. Grimes's benefits under the Act and its implementing regulations.

The reasoning the ALJ gave for the latter of these two conclusions is difficult to parse. Where the ALJ began is easy enough to follow—with the recognition that Apogee could be designated as the responsible operator for Mrs. Grimes's benefits only if it satisfied the regulatory criteria enumerated by 20 C.F.R. § 725.494. In conducting that inquiry, however, the ALJ at times seemed to treat Arch as though it too were designated by the district director as a responsible operator. For example, the ALJ faulted Arch for failing to "prove that it is financially unable to pay benefits" under 20 C.F.R. § 725.495(b), a provision that by its terms applies only to the designated responsible operator. And in closing, the ALJ

remarked that "Apogee/Arch meets the regulatory criteria of responsible operator."

Arch seized upon this apparent conflation of Arch and Apogee in a motion for reconsideration. Pointing out that the district director had made it a party to Mrs. Grimes's black lung claim only in its capacity as a potentially liable self-insurer, Arch insisted that the ALJ had erred by treating it as a designated responsible operator under the Act's regulations.

The ALJ disagreed. In a supplemental opinion, the ALJ clarified that he was well aware that the district director "named Apogee, not Arch, as a potentially liable operator" and from there stood by his prior ruling that the district director had authority to do so under 20 C.F.R. § 725.494. Because everyone agreed that Apogee met § 725.494's first four requirements, the ALJ explained that "the only way for [Arch] to escape liability was to establish that Apogee [did] not possess sufficient assets to pay benefits." Arch failed to make that necessary showing, with the ALJ reasoning this way: Although Apogee was "no longer in … operation," Arch could be made to pay "under the regulations" because "it provided Apogee's self-insurance while the Miner was employed by Apogee." And there was no dispute that Arch had the financial ability to do so.

## C

The Benefits Review Board affirmed. Rather than address the ALJ's reasoning, the Board rejected Arch's challenge to liability in a single paragraph that incorporated by reference its reasoning in three prior cases: *Bailey v. E. Assoc. Coal Co.*, BRB No. 20-0094 (Oct. 25, 2022) (en banc), *Graham v. E. Assoc. Coal*

*Co.*, 25 BLR 1-298 (2022), and *Howard v. Apogee Coal Co.*, 25 BLR 1-301 (2022).

Arch then sought our review.

## III

Arch lodges several objections to the administrative proceedings below. We address just one—its contention that the Department's theory of continuing liability for self-insuring parent corporations is without legal foundation.

## A

But before we reach the merits, we owe a word on the standard of review. Although black lung appeals come to us from decisions of the Benefits Review Board, we have often observed that our principal focus is on the reasoning of the ALJ. See, *e.g.*, *Collins v. Old Ben Coal Co.*, 861 F.2d 481, 486 (7th Cir. 1988); *Zeigler Coal Co. v. Director, Off. of Workers' Compensation Programs*, 326 F.3d 894, 897 (7th Cir. 2003) (collecting cases). In most cases, this makes good sense. Because the Board's authority is strictly appellate, see 20 C.F.R. § 802.301, it must affirm an ALJ's decision that is "rational, supported by substantial evidence, and in accordance with applicable law." See *Consol. Coal Co. v. Director, Off. of Workers' Compensation Programs*, 911 F.3d 824, 838 (7th Cir. 2018). Most often our role is to ensure that the Board adheres to that mandate— that it affirms decisions of the ALJ that satisfy that standard and reverses those that do not. See *Crowe ex rel. Crowe v. Zeigler Coal Co.*, 646 F.3d 435, 440–41 (7th Cir. 2011). So our focus necessarily concentrates in the main on the ALJ's reasoning, not the Board's.

This case comes to us with a slight wrinkle, however. Rather than review the ALJ's analysis on its own terms, the

Board invoked, without elaboration, three of its own prece-
dents that it believed foreclosed Arch's position. We see no
problem in the Board's doing so. Whatever limitations 20
C.F.R. § 802.301 might place on the authority of the Board to
affirm an ALJ ruling on alternative grounds—a question we
do not consider or decide—we have no doubt that the Board
can apply its own decisions to the cases that come before it,
even when those decisions went overlooked by the ALJ.

But when we roll up our own sleeves and look to the de-
cisions relied on by the Board, we immediately see that they
do not overlap completely with the reasoning given by the
ALJ below. We therefore find ourselves confronted with *two*
distinct rationales for the agency action under review. In these
circumstances, we cannot limit our focus to the ALJ's reason-
ing alone. We instead must affirm so long as *either* rationale is
sound. So we proceed by examining with equal rigor the
analysis of both the ALJ and Board.

B

For all this case's regulatory complexity, the question pre-
sented distills to a single point of law: did either the ALJ or
the Board identify a valid legal basis for holding Arch liable
for the black lung liability owed by Apogee to Harold
Grimes's surviving spouse?

That basis could be statutory, regulatory, contractual, or
even equitable. But a basis there must be. There must be some
source of law (or perhaps combination of sources) that the De-
partment can point to that affirmatively requires Arch to sat-
isfy benefits owed to Mrs. Grimes. Without such a legal basis,
we see no alternative other than to reach the twofold conclu-
sion that the district director improperly designated Apogee

the responsible operator *and* that the Trust Fund must bear the cost of Mrs. Grimes's benefits. The latter conclusion follows because, remember, Apogee, by everyone's account, has no other conceivable source of assets that it could call on to cover its benefits obligation to Mrs. Grimes. To put the point in regulatory terms, if Arch is not legally obligated to pay on Apogee's behalf, Apogee is not "capable of assuming [] liability" for Mrs. Grimes's benefits under 20 C.F.R. § 725.494(e) and could not be designated as the responsible operator under § 725.495(a)(1).

We also cannot overstate the importance of a principle that limits our review. That principle comes from the Supreme Court's 1943 decision in *SEC v. Chenery* and instructs that agency action must be judged on the reasoning given by the agency at the time of its decision. See 318 U.S. 80, 87–88. Indeed, both parties were quick at oral argument to agree with this precise observation and, even more specifically, that the *Chenery* doctrine applies with full force in black lung appeals. See *Island Creek Coal Co. v. Henline*, 456 F.3d 421, 426 (4th Cir. 2006); *Pate v. Director, Off. of Workers' Compensation Programs*, 834 F.2d 675, 676 (7th Cir. 1987); but see *Arch of Kent., Inc. v. Director, Off. of Workers' Compensation Programs*, 556 F.3d 472, 477 (6th Cir. 2009) (concluding that *Chenery* does not apply to review of black lung benefits determinations).

In no way is our observation academic. The *Chenery* doctrine has the very practical effect of directing our focus singularly on whether the rationales given by the ALJ and the Board for holding Arch liable were legally sound.

Right off the bat, then, we can eliminate some possibilities. As Arch correctly observes, neither the ALJ nor the Board purported to hold Arch liable under common law principles

of equity. See, *e.g.*, *Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 753 (7th Cir. 1989) (applying veil-piercing principles to determine whether parent could be held liable for labor law violations of subsidiary). Nor did the ALJ or the Board ground Arch's liability in an oral or written contract or in one or more than one provision of the Black Lung Benefits Act itself. Instead, both decisionmakers relied exclusively on the Act's implementing regulations.

But the ALJ and Board invoked the Act's regulations in only the most general and conclusory manner. We have thoroughly reviewed the decision of the ALJ and not one of the regulations it discussed or cited can be fairly read (in isolation or combination) to support the premise at the core of its liability determination: that self-insuring parent corporations—akin to commercial insurers—are legally obligated to pay all black lung benefits that accrue against their subsidiaries during the period of self-insurance, regardless of when the claim is filed.

The Board's reliance on its own precedent fell short for much the same reason. Of the three cases it identified and relied upon—*Bailey*, *Graham*, and *Howard*—only *Howard* squarely confronted the legal question before the ALJ here. The *Howard* case also involved Arch and Apogee. There, as here, the Department of Labor sought to use Arch's self-insurance umbrella as a means of shifting liability away from the Trust Fund. And there, too, Arch was adamant that the regulations did not support this result. It emphasized that the Department had achieved a similar result in the commercial insurance context only through the promulgation of 20 C.F.R. § 726.203(a), and stressed that "no similar provision" exists for self-insurance.

The Board in *Howard* was unpersuaded by Arch's insistence that its liability had to find some basis in positive law. To be sure, the Board did seem to agree with Arch that neither the Act nor its implementing regulations explicitly made a self-insuring parent liable for claims that accrued against a former subsidiary like Apogee. But from there the Board saw that legal gap as supporting the Department of Labor, not the other way around. Arch, it reasoned, had failed to point to any "regulatory authority to support [its] argument that self-insurance liability is triggered by the date the claim is filed rather than the last day of the miner's coal mine employment." Regulatory silence, in other words, supported liability, not assignment of the claim to the Trust Fund.

The Director attempts to defend the essence of *Howard*'s reasoning on appeal. Conceding that there is no "explicit regulation" supporting the Department's proposed rule, the Director contends that such a regulation is unnecessary because the liability of parent corporations like Arch is inherent in the very fiber of self-insurance. We find this assertion unpersuasive, for the position anchors itself more in policy reasoning than an identifiable source of law. Liability may not be imposed on a corporation simply because it strikes an agency or a court as sensible as a matter of policy. The rule of law requires that the rights, duties, and obligations of persons and corporations alike spring, if at all, from some concrete basis in positive law or principle of equity. Unless and until the Department identifies such a basis for the theory of liability it embraced in this case, we are unwilling to read into regulatory silence an intention to depart from the time-honored principle "that a parent corporation … is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks omitted); see also *Olympia*

*Equipment Leasing Co. v. W. Union Tel. Co.*, 786 F.2d 794, 798 (7th Cir. 1986).

The Director presses several other contentions to save the ALJ's and Board's decisions. Foremost, the Director criticizes as "irrational" a rule that would treat the primary liability of operators like Apogee—which endures as long as they remain "capable of assuming [] liability for the payment of continuing benefits" under 20 C.F.R. § 725.494(e)—differently from that of a self-insuring parent corporation. He claims, moreover, to find support for the Department's position in a D.C. Circuit decision interpreting indemnity bonds posted as security for self-insurance. See *United States v. Ins. Co. of N. Am.*, 83 F.3d 1507 (D.C. Cir. 1996). Finally, he warns of the potentially serious policy consequences that might ensue if Arch's position prevails. Whatever their merit, not one of these arguments was mentioned (directly or even obliquely) by the ALJ or the Board below. *Chenery* precludes us from considering them for the first time on appeal.

We have read the ALJ's and Board's decisions many times over, and in the end remain unable to identify a statutory or regulatory provision—identified by the ALJ or Board—that supports holding Arch liable for the benefits obligation owed by Apogee to Harold Grimes's surviving spouse. *Chenery* requires that we approach our review this exact way, and in the final analysis we see no way around concluding that the decisions of the ALJ and Board lack legal support. We therefore have no choice but to vacate the decision of the Benefits Review Board.

In reaching this conclusion, we find ourselves at odds with the Sixth Circuit's recent decision in *Apogee Coal Company, LLC v. Director, Off. of Workers' Compensation Programs*, No. 23-

3332, — F.4th —, (Aug. 5, 2024), which affirmed the Board's bottom-line conclusion in *Howard* that Arch could be held liable as a self-insuring parent for black lung benefits owed by Apogee, its former subsidiary. It did so based on two regulations: 20 C.F.R. §§ 726.110(a)(1) and 726.4(b). The first mandates that all self-insurers "execute and file … an agreement and undertaking" in which they agree to pay black lung benefits "when due, as required by the Act." *Id.* § 726.110(a)(1). The second emphasizes "that the Secretary [of Labor] has wide latitude for determining which operator shall be liable for the payment of Part C benefits" and states that any "business entity which has had or will have a substantial and reasonably direct interest in the operation of a coal mine may be determined liable for the payment of pneumoconiosis benefits" under the Act.

After careful consideration, we see nothing in the Sixth Circuit's analysis that warrants a different outcome in this case. Although §§ 726.110(a)(1) and 726.4(b) found passing mention in the decisions of the ALJ and the Board below, neither decisionmaker intimated, let alone held, that Arch's liability as a third-party self-insurer sprung from those regulations. *Chenery* thus precludes us from affirming the Board on the Sixth Circuit's theory.

Even if we could overlook *Chenery*, it is hard to see how either provision could support a finding of liability on the facts before us. Section 726.110(a)(1) mandates only that self-insurers agree to pay black lung benefits "*as required by the Act*." (emphasis added). By its very terms, § 726.110(a)(1) is not an independent source of liability—a self-insurer's promise to pay benefits kicks in only if a provision elsewhere in the Act makes it liable on a claim. As for § 726.4(b), that

regulation appears to do no more than give the Secretary of Labor flexibility in determining which entities can be designated as the responsible operator. But remember that the district director designated Apogee—not Arch—as the responsible operator for Mrs. Grimes's benefits. That the district director *might* have been able to designate Arch as the responsible operator in this case (a question we take no position on) is beside the point, because that is not the decision that was actually made by the agency.

Because this opinion could be seen as creating a conflict with the Sixth Circuit, the panel circulated it before release to all judges in active service under Circuit Rule 40(e). No judge voted to hear the appeal en banc.

All that remains is to determine the scope of remand. Whatever authority we might possess to remand for a fresh attempt by the agency to justify its liability determination, we decline to do so in the circumstances of this case. The Director has not requested a remand, and the Act's implementing regulations disfavor turning the liability question into a game of administrative ping pong. It is precisely to prevent such delay in the adjudication of benefits that the Department decided to require the Trust Fund to pay benefits in cases where the district director designated the wrong responsible operator. 65 Fed. Reg. 79990 (Dec. 20, 2000) (noting that "[t]his limitation … prevents a claimant from having to relitigate his entitlement to benefits"). So although we return the case to the Department, we do so for the limited and exclusive purpose of allowing the Department to take those measures necessary to assign Mrs. Grimes's benefits to the Black Lung Disability Trust Fund.

**IV**

We close by emphasizing the limited scope of today's holding. That the Department of Labor has yet to articulate a basis for liability in cases like this one does not mean that no such basis exists. For today, all we decide is that the ALJ and the Board have failed to justify their conclusions that Arch can be compelled to satisfy the black lung liability of Apogee. The *Chenery* doctrine, to say nothing of the party presentation principle, affirmatively prohibits us from scouring the Act and regulations for bases for liability that have to date gone unidentified by the Department. In future black lung cases, the Director can press additional arguments for the rule it advocates. And with the benefit of those proceedings, courts will come closer to a final answer about what the regulations do and do not authorize. In the specific case of Mrs. Grimes, however, the Trust Fund, not Arch, must pay.

The petition for review is GRANTED and the case REMANDED to the Board with instructions that Mrs. Grimes's benefits be assigned to the Black Lung Disability Trust Fund.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Petition for Rehearing En Banc was electronically served upon counsel of record via the Court's CM/ECF system.

/s/Michael A. Pusateri
Michael A. Pusateri